IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| SOPHIA BALOW, AVA BOUTROUS, JULIA COFFMAN, KYLIE GOIT, EMMA INCH, SHERIDAN PHALEN, MADELINE REILLY, OLIVIA STARZOMSKI, SARAH ZOFCHAK, TAYLOR ARNOLD, and ELISE TURKE, Individually and on behalf of all those similarly situated,<br><br>     Plaintiffs,<br><br>v.<br><br>MICHIGAN STATE UNIVERSITY, MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES, SAMUEL L. STANLEY JR. and BILL BEEKMAN,<br><br>     Defendants. | CIVIL ACTION NO.  1:21-cv-00044<br><br><br><br><br><br>MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION<br><br>EXPEDITED CONSIDERATION REQUESTED |

NEWKIRK ZWAGERMAN, PLC
Jill Zwagerman, AT0000324
Lori Bullock AT0012240
Danya Keller AT0012300
Attorney for Plaintiffs
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
Fax: (515) 883-2004
jzwagerman@newkirklaw.com
dkeller@newkirklaw.com
lbullock@newkirklaw.com

1

BOGAS & KONCIUS, PC
BRIAN E. KONCIUS (P69278)
Local Counsel for Plaintiffs
31700 Telegraph Road, Suite 160
Bingham Farms, MI 48025
Telephone: (248) 502-5001
bkoncius@kbogaslaw.com

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THE MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**TABLE OF AUTHORITES**......................................................................3

**STATEMENT OF THE CASE**.............................................................5

**INTRODUCTION**................................................................................6

**RELEVANT FACTS**...........................................................................8

**BACKGROUND OF TITLE IX**.......................................................21

**ARGUMENT**.....................................................................................27

  I.   Plaintiffs are likely to succeed on the merits of their Title IX claim because they have been denied equal athletic opportunities and MSU has a history of noncompliance. ...................................................................29

  II.   Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction. .........................................................................................43

  III.   The scales of equity tip heavily in favor of entering a preliminary injunction to maintain the status quo. ...................................................47

  IV.   The entry of an injunction is in the public interest because civil rights protected by Congress outweigh minor budgetary concerns...............48

**CONCLUSION**...................................................................................49

# TABLE OF AUTHORITES

**Cases**

*Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438 (6th Cir. 2003) ..............................................................................43

*Barrett v. West Chester Univ. of Penn.*, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003) ......................................................................... 46, 48

*Bd. of Educ. of the Highland Local Sch. Dist.* v. Dept. of Educ., 208 F. Supp. 3d 850 (S.D. Ohio 2016)...................................................43

*Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277 (D. Conn. 2009) ............ passim

*Biediger v. Quinnipiac University*, 691 F. 3d 85 (2nd Cir. 2010)............. 31, 34, 42

*Biediger v. Quinnipiac University*, 728 F. Supp. 2d 62 (D. Conn. 2010) ..............31

*Caulfield v. Bd. of Educ.*, 583 F.2d 605 (2d Cir. 1978)...........................................29

*Choike v. Slippery Rock Univ.*, 2006 WL 2060576 (W.D. Pa. July 21, 2006)........46

*Cohen v. Brown Univ.*, 101 F.3d 155 (1st Cir. 1996) ................................. 27, 38, 47

*Cohen v. Brown Univ.*, 809 F. Supp. 978 (D.R.I. 1992)................................... 25, 48

*Cohen v. Brown University*, 991 F.2d 888 (1st Cir. 1993) .............................. passim

*Distrib. Co. v. Reno*, 154 F.3d 281 (6th Cir. 1998) .................................................43

*Elrod v. Burns*, 427 U.S. 347 (1976) ......................................................................43

*Equity in Athletics v. Dept. of Educ.*, 504 F. Supp. 88 (W.D. Va. 2007) ...........40

*Favia v. Indiana Univ. of Penn.*, 812 F. Supp. 578 (1993)........................ 45, 46, 48

*Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100 (6th Cir. 1982).29

*Frontiero v. Richardson*, 411 U.S. 677 (1973) .......................................................41

*Haffer v. Temple Univ. of the Com. Sys. of Higher Educ.*, 678 F. Supp. 517 (E.D. Pa. 1987) ..........................................................................41

*Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265 (6th Cir. 1994) ............. 25, 41

*Leary v. Daeschner*, 228 F.3d 729 (6th Cir. 2000).................................................28

*Mayerova v. E. Michigan Univ.*, 346 F. Supp. 3d 983 (E.D. Mich. 2018)...... passim

*Neal v. Bd. of Trustees*, 198 F.3d 763 (9th Cir. 1999)............................................26

*Ohlensehlen v. Univ. of Iowa*, No. 3:20-cv-00080, 2020 WL 7651974 (S.D. Iowa Dec. 24, 2020)................................................................. 32, 34, 37, 38

*Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834 (D. Minn. 2019) ............. 27, 34

*Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824 (10th Cir. 1993).... 25, 39, 42, 43

*Roberts v. Colo. State Univ.*, 814 F. Supp. 1507 (D. Colo. 1993).................... 25, 41

*Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F. Supp. 198 (S.D. Tex. 1982)...................................................................44

**Statutes**

20 U.S.C. § 1092(g) ................................................................................................33

20 U.S.C. § 1681(a) ..........................................................................................6, 21

3

20 U.S.C. § 1687 ..................................................................................22

**Other Authorities**

44 Fed. Reg. 71,418 ...........................................................................24

44 Fed. Reg. at 71,415 (1979)...........................................................33

44 Federal Register 71,413 (1979).....................................................23

Office of Civil Rights, U.S. DOE, *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 15, 1996)...................................... 25, 26, 38

Office of Civil Rights, U.S. DOE, *Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, OCR, U.S. DOE, to Colleagues* (Apr. 20, 2010) ............................27

**Rules**

Fed. R. Civ. P. 65 ...............................................................................28

**Regulations**

34 C.F.R. § 106.41(c)..........................................................................23

34 C.F.R. § 668.47(b) .........................................................................33

35 C.F.R. § 106.41(a)......................................................................6, 22

# STATEMENT OF THE CASE

Title IX prevents discrimination on the basis of gender in any education program including college sports. On October 22, 2020, Michigan State University announced the elimination of varsity women's swimming and diving after the current academic year. Shortly after the announcement, Plaintiffs reached out notifying MSU that the university was out of compliance with Title IX and requested that their sport be reinstated immediately. MSU, once again decided to double down on its decision to discriminate against women, despite its recent history of legal battles for gender discrimination and mistreatment of its female athletes.

The Plaintiffs, current members of the women's swimming and diving team, seek a preliminary injunction to prevent MSU from eliminating their sport while the school is already in violation of Title IX. MSU has a history of failed compliance with Title IX's athletic participation opportunity requirements because they do not offer athletic opportunities for female athletes that are substantially proportional to their female undergraduate population, do not have a history of expanding athletic opportunities for women, and do not accommodate the interest and ability of the female athletes at their institution.

Plaintiffs will suffer irreparable harm if MSU is permitted to move forward with its plan, which violates Plaintiffs' civil rights and Congress' clear desire to level the playing field for women in athletics. Plaintiffs satisfy all four elements required

to obtain a preliminary injunction and require the intervention of the Court to hold MSU accountable for its clear violation of the law. MSU has had 42 years to bring its athletic program into compliance with Title IX and Plaintiffs only seek to put an end to its noncompliance.

Plaintiffs rely on the authorities cited in the Table of Authorities in support of their claims. *See* p. 3–4.

## INTRODUCTION

Under Title IX, universities must provide equal opportunities for men and women to participate in athletics. The law states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity," including intercollegiate athletics. 20 U.S.C. § 1681(a); 35 C.F.R. § 106.41(a). Because Michigan State University and the other named defendants (collectively "MSU" or "Defendants") blatantly violated this mandate by eliminating the varsity women's swimming and diving team, the law requires the immediate entry of a preliminary injunction preventing the elimination of the team at the end of the 2020–2021 academic year, until the Plaintiffs can present additional evidence that will also support a permanent injunction.

In October 2020—despite already being out of compliance with Title IX— MSU eliminated athletic opportunities for female athletes by eliminating the

women's swimming and diving team. This decision, one of many in MSU's troubled history of gender discrimination, will deprive Plaintiffs, their team members, and new recruits the opportunity to train and prepare to compete in the 2021–2022 season and beyond. By eliminating varsity women's swimming and diving, MSU violated Title IX. The Plaintiffs, who are current members of the women's swimming and diving team, bring this action to prevent MSU from further implementing its illegal, discriminatory plans.

Elimination of the women's swimming and diving team denies the Plaintiffs and putative class members an equal opportunity to participate in intercollegiate varsity sports at MSU. Many will now be deprived entirely of the opportunity to participate in intercollegiate athletic competition. This is only exacerbated by the difficulties presented by the COVID-19 pandemic, which makes transferring schools practically impossible due to the inability to visit campuses, participate in in-person recruiting, or obtain scholarships from a new school.

The harm to the Plaintiffs is compounding daily, leaving immediate reinstatement by preliminary injunction the appropriate remedy under the law. Remuneration is hardly sufficient for harms of this nature, which are necessarily difficult to quantify. A college athlete's window of time to compete is limited to four years, and the loss of even a single year's opportunity to compete will result in irreparable, life-long harm to the Plaintiffs. Time is of the essence and demands the

immediate entry of a preliminary and permanent injunction, restoring the status quo, and preventing the elimination of women's varsity swimming and diving.

## **RELEVANT FACTS**

Michigan State University sponsors a broad varsity intercollegiate athletic program. Currently, MSU sponsors varsity teams for both men and women—men's baseball, basketball, cross country, football, ice hockey, golf, soccer, swimming and diving, tennis, track and field, and wrestling; and women's basketball, cross country, golf, gymnastics, rowing, softball, soccer, swimming and diving, tennis, track and field, and volleyball. In choosing which sports to offer each sex and regulating the number of roster spots on each team, MSU chooses how many varsity athletic participation opportunities it provides to men versus how many it provides to women. Historically, MSU has offered its male students proportionally more opportunities to participate in varsity intercollegiate athletics than it has offered its female students (as compared to the proportion of undergraduate male and female students). The same is true of MSU's unequal allocation of athletic financial assistance and scholarships and athletic treatment and benefits.

MSU is a member of the National Collegiate Athletic Association ("NCAA") and participates in Division I, the highest level of intercollegiate competition. As such, MSU offers athletic scholarships to members of its varsity teams, including the women's swimming and diving team. MSU recruits high school students to

participate on MSU's varsity athletic teams. Indeed, MSU recruited many of the current team members to participate on and represent the university through its women's varsity swimming and diving team. Plaintiffs thus reasonably relied on MSU's representations and expected to participate in their varsity sport during each of their four years at the MSU. Plaintiffs would have not enrolled at MSU but for the opportunity to participate on the women's swimming and diving team.

This proposed class action is brought on behalf of present and future members of the women's varsity swimming and diving teams and all other women athletes who are being denied or will be denied gender equity in MSU athletics. As such, the Plaintiffs represent a class of similarly situated individuals.

### *Sophia Balow*

Plaintiff Sophia Balow is a sophomore majoring in Business at MSU's highly competitive business school and a member of the women's swimming and diving team. *See* Balow Decl., Ex. 2. Sophia grew up in Plymouth, Michigan and she started swimming with she was seven years old. She swam competitively in high school and decided she wanted to make the commitment to become a college athlete. Sophia turned down admission to prestigious East Coast colleges to have the opportunity to swim at MSU.

Sophia is one of the top distance swimmers at MSU, but as a sophomore she has not yet reached her potential in swimming. Unfortunately, now she may never

know how well she could have done because the program has been cut. After learning that MSU will be eliminating swimming and diving at the end of the current academic year, Sophia and her teammates are faced with the decision to give up the sport they have spent years of their lives training for or transferring to a new college. However, transferring is not a viable option for Sophia without giving up her spot in MSU's business school.

Further, transferring to a new institution carries with it a number of risks. Transferring can result in the athlete losing course credits and having to complete an additional semester or two at their own cost and expense at a new university. Under the rules of the NCAA, a student athlete in a Division I program, such as MSU, can only transfer once without running the risk of losing eligibility and prolonging their education unnecessarily.[1] These risks, which are generally applicable to all of the Plaintiffs, are hereafter referred to as the "Transfer Risks."

### Ava Boutrous

Plaintiff Ava Boutrous is a junior at MSU and a member of the varsity swimming and diving team. *See* Boutrous Decl., Ex. 3. Ava is majoring in chemistry at MSU, and she intends to pursue a post-graduate degree in either medicine or pharmacy. Ava comes from a swimming family. Ava's father was a Division I swimmer, and as a child she knew she wanted to follow in her father's footsteps. In

---

[1] http://www.ncaa.org/student-athletes/current/transfer-terms

order to meet this goal, Ava chose to sacrifice many of the normal experiences that high school kids have so that she could focus on swimming and become a Division I swimmer. Ava chose MSU for her collegiate swimming career because of the team chemistry and coaching. There was a connection amongst the team and coaches that she did not see at any of the other schools that she visited.

If allowed to stand, MSU's elimination of the varsity swimming and diving team will be the end of Ava's college swimming career. Ava is too far along in her academics to transfer to another institution without suffering Transfer Risks, including that it is highly unlikely she would be able to graduate in four years. This would cause unnecessary delay and expense in her education. In addition to the irreparable harm to Ava's college athletic career, MSU's decision to eliminate swimming and diving will cause Ava to lose the special connection she had with her father. Swimming was always something that father and daughter could talk about when too often a father and daughter are not able to find common ground.

### Julia Coffman

Plaintiff Julia Coffman is a freshman at MSU and a member of the school's varsity swimming and diving team. *See* Coffman Decl., Ex. 4. Julia started swimming when she was four or five years old. She has always known that she wanted to swim competitively in college. Julia was recruited at other schools around the country and was offered scholarships to attend some of those institutions.

However, she turned them down to attend MSU. Part of the reason she chose MSU was because of the location. She liked that she would not have to get on a plane to go home to see her family, which would have been the case at other schools she was considering. However, a bigger part of the reason she chose MSU was because she knew approximately ten swimmers who were already on the swim team or would be joining the team with her. Knowing these individuals provided her with a foundation of a great team that she was familiar with. More importantly, it provided her with a support network to help with the transition from high school to college. She anticipated these same connections, and new ones she would develop on the team, would play a significant role in establishing her professional network after she graduated from college.

Julia is considering her transfer options, but she is hesitant because she will not be able to attend a school that has the same support network and is so close to home. Julia is not ready to give up swimming yet and is hopeful that her team will be reinstated.

### Kylie Goit

Plaintiff Kylie Goit is a freshman at MSU and a member of the swimming and diving team. *See* Goit Decl., Ex. 5. Swimming is an important part of Kylie's life and her family. Kylie's older sister is a junior at MSU and a member of the MSU swimming and diving team. Having the opportunity to swim with her older sister is

part of the reason Kylie chose to come to MSU. Before MSU, Kylie's sister swam for another college, and Kylie watched her struggle with how hard it was to fit in. When Kylie saw the team at MSU, she knew it would be a very good fit for her. Kylie had full ride offers in Florida and New York to attend college for free on scholarship, but instead chose to attend MSU and take only a 10% scholarship.

If Kylie knew that MSU was going to cut the program, she never would have attended MSU and would have chosen one of the other colleges that were recruiting her. Transferring now is extremely challenging because her swim times are over a year old as she has not been able to compete this season because of COVID-19. Additionally, transferring is extremely complicated because there is no guarantee that any other school will have a scholarship or even a spot available for her on the team. She also watched her older sister join a program that was not a good fit for her. She only has one opportunity to transfer and maintain full eligibility. She loves the atmosphere, environment, coaches, and teammates at MSU. Finding all of those things in the next school, including scholarship money, is next to impossible.

In addition to losing her ability to compete at a top level in a sport, Kylie already started losing some of the benefits of being a student athlete. Kylie has struggled with the isolation of the pandemic as well as being told that her team was being cut. She sought help from the athletic department, for mental health services. She was told that they only had so many spots available and that they were going to

"save" the appointments, giving Kylie the impression that student athletes whose sport is not being eliminated are more important to the college.

### Emma Inch

Plaintiff Emma Inch is a sophomore at MSU majoring in marketing and a member of the varsity swimming and diving team. *See* Inch Decl., Ex. 6. Emma has been swimming since she was six years old with her twin sister. Emma swam competitively in high school, while her twin sister focused on running. Incredibly, both Emma and her twin were recruited by MSU to play their respective sports. Additionally, Emma is proud to swim at MSU because her uncle was the captain of MSU's men's swimming and diving team. Emma had a very successful freshman year at MSU. She made the finals as a freshman in the Big Ten conference meet and scored points for the team. Emma was part of an upward trend in the program and helped contribute to the team scoring more points in the conference meet than they had in many years.

Outside of the pool Emma is actively involved in several committees and has many leadership roles because she is on the swim team. She is the swim and dive team's representative on the Diversity and Leadership Committee and a team representative for the Student-Athlete Advisory Committee ("SAAC"). Emma had intended and hoped to become the President of SAAC, but now she will be unable to because she will no longer be a student athlete. These committees provide

amazing opportunities for student athletes to network and meet community members who can offer them career advice and provide them with job opportunities they would not otherwise have. Emma will be irreparably harmed by having these opportunities taken away from her along with her team. Emma is not ready to give up swimming and will likely be forced to transfer if the program is not saved. Emma does not want to transfer as she will leave behind her twin sister, her legacy at MSU, and her hard work to become a leader in and out of the pool.

### *Sheridan Phalen*

Plaintiff Sheridan Phalen is a freshman at MSU, is majoring in nutrition and biology and is a member of the varsity swimming and diving team. *See* Phalen Decl., Ex. 7. Sheridan started swimming competitively at the age of five. Sheridan is a very shy person, but being part of the swim team has helped her make some friends. This is especially important because she was able to make those friends, despite attending school during the global pandemic when very few, if any, of her classes are in person. Without swimming, Sheridan will lose the opportunity she has to make the necessary connections to help her professionally or emotionally. She will be irreparably harmed without swimming because she struggles meeting people and forming relationships.

Sheridan is not able to transfer without suffering the Transfer Risks discussed above. However, Sheridan knows that some of her teammates and friends will be

transferring. Sheridan's ability to meet people and form relationships has been limited by the global pandemic and will become absent entirely if MSU is permitted to follow through with its decision to violate Title IX and eliminate varsity swimming and diving.

### *Madeline Reilly*

Plaintiff Madeline Reilly is a junior at MSU majoring in kinesiology and a member of the varsity swimming team. *See* Reilly Decl., Ex. 8. Madeline plans to attend medical school after her graduation from MSU. Madeline has been swimming since the time she could walk, and both of her parents swam in college. At the age of 12, Madeline began focusing primarily on swimming and putting all of her efforts into being able to compete at the Division I level in college. Swimming also helped her to develop confidence and taught her how to set and obtain goals.

In addition to losing her ability to compete at a top level in the sport she has dedicated her life to, Madeline also had other opportunities as a student athlete at MSU. As a student athlete on the swimming and diving team, Madeline got to volunteer with pediatrics patients at Sparrow Hospital. Volunteering with sick children is what inspired her to want to go to medical school. She was planning on leading this program next year, but since she will not be a student athlete, this is likely not going to occur. Madeline is also involved in SAAC. She will lose this role and her leadership roles as a committee member.

Transferring is not an option for Madeline because, as a junior, she will suffer more severely from Transfer Risks. Madeline's credits will not necessarily transfer to another institution. Therefore, rather than graduating in four years and moving on to medical school, she would be required to go to another school, that may or may not have a spot available for her on a team, pay additional money to a new university and delay her graduation and the start of her medical career.

### Olivia Starzomski

Plaintiff Olivia Starzomski is a freshman at MSU majoring in criminal justice and is a member of the varsity swimming and diving team. *See* Starzomski Decl., Ex. 9. Oliva has been swimming competitively since she was five years old. In high school, she and her mother moved to Toronto, away from her father and brother, so she could train at the Ontario Swim Academy. She sacrificed her family to train at the best facilities that Canada had to offer.

Olivia was recruited from Canada to join the MSU swim and dive team. She is a two-time Canadian National Champion in the 200 Breaststroke and four-time Provincial Champion in the 200 Breaststroke. She set the Provincial record for the 100 Breaststroke and was an Olympic Trial Qualifier. Oliva had many opportunities to swim in college and was recruited heavily. She knew she wanted to come to the United States to swim and looked at many schools within the Big 10 where she was offered substantial scholarships. MSU also recruited her and offered her a 90%

scholarship. After vising the campus, she fell in love with MSU and knew she wanted to complete her college career at MSU.

Olivia's goals do not stop with four years of college athletics. She intends to swim beyond college and continue excelling in her sport to ultimately attend the Canadian Olympic Trials to make the Canadian National Team. However, MSU's decision to cut swimming and diving is depriving her of the ability to meet this goal. She cannot get better and make the Olympic team if she does not have the competition.

Olivia is understandably concerned about transferring. Not only is the process stressful, but she only gets one chance to transfer. If this new school is not a good fit for her, she has no other options and will be stuck there unless she sacrifices eligibility. She will also be irreparably harmed because she will not get the same level of scholarship if she is forced to transfer, as evidenced by another school already telling Olivia that they do not have scholarship money available for the 2021–2022 school year. This will likely be repeated by other schools and Olivia will be irreparably harmed MSU's illegal decision.

### *Sarah Zofchak*

Plaintiff Sarah Zofchak is a junior and is a member of the varsity swimming and diving team. *See* Zofchak Decl., Ex. 11. Sarah is a lifelong MSU fan and she was elated at the opportunity to swim for MSU, as her older brother swam on the

men's swimming and diving team. Sarah started swimming competitively when she was six or seven years old. She always believed she would be a college swimmer and was not going to accept anything less. In addition to being a student and an athlete, Sarah is a member of the Spartan Buddies and volunteers at Sparrow Hospital. These types of organizations, as well as having a network of teammates and all the alumni that came before her on the swimming and diving team have been absolutely imperative to Sarah's success, both in and out of the pool.

If MSU is permitted to eliminate swimming and diving, Sarah and her teammates will lose access to an incredible alumni network. Each year, MSU hosts an alumni meet with the current members of the swimming and diving teams and it is one of the longest running of such events in the country. Without a team, Sarah will lose those networking opportunities, as well as forming those emotional connections with new athletes that come after her who are going through the same things that she did as a college swimmer. If the team is cut, she will not have the opportunity to share the wisdom of what she learned with those who would have otherwise joined the swimming and diving team after her.

### *Taylor Arnold*

Plaintiff Taylor Arnold is a senior at MSU majoring in Special Education, minoring in Teaching English to Speakers of Other Languages, and a member of the varsity swimming and diving team. *See* Arnold Decl., Ex. 1. Taylor grew up in a

MSU family and she was raised as a fan of the Spartan culture. Taylor's older sister also attended MSU, which helped solidify Taylor's decision to attend MSU after visiting campus and learning about the team.

Being a member of the swimming and diving team has given Taylor opportunities that are impossible to replace. She has a "swimming family" that she could rely upon for help on everything from personal issues to selecting her classes. She knows that women coming after her will not have the same opportunities that she did in being a student athlete. This is especially true in the areas of perseverance and adversity. Being a member of the swimming and diving team taught her that even when you do not get the best results, you keep trying and working hard. Through this process, she developed stronger friendships.

Further, in the future, being an alumna of MSU swimming and diving will not have the same weight or recognition to future employers when the swimming and diving team no longer exists. It also does not have the same prestige for being in the Big 10 and a Power 5 conference when the school no longer wishes to support the sport. The loss of the team is irreparable and hurts Taylor's future job prospects. Taylor and her teammates are now left with no community when returning to campus, no alumni meets, and they are losing meaningful connections with other MSU alumni.

*Elise Turke*

Plaintiff Elise Turke is a senior at MSU majoring in neuroscience and minoring in Spanish, and she is a member of the varsity swimming and diving team. *See* Turke Decl., Ex. 10. While she is a senior on the team, she is irreparably harmed by the cutting of the swimming and diving team. Being part of the team is a big part of her identity as a student athlete. In her application and essays to medical school, Elise focused her responses on what she had learned being a student athlete at MSU, because being a student athlete allowed her to develop myriad skills such as setting and achieving goals, time management, networking, and perseverance. There are countless women out there who will never have this same chance to experience what it is like to be a Division I swimmer or diver at MSU, and they will be forever harmed.

## BACKGROUND OF TITLE IX

Enacted in 1972, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Civil Rights Restoration Act of 1987 made plain the Congressional intent that "program or activity" applies to any program or activity so long as any part of the public institution receives federal financial assistance. 20 U.S.C. § 1687. Thus, a university which receives any federal

financial assistance and offers varsity athletics to its students is subject to Title IX, even if none of the funding for either its men's or women's athletic programs comes from federal sources.

In 1975, the United States Department of Education ("DOE") (formerly the Department of Health, Education and Welfare) adopted regulations interpreting Title IX. These regulations are codified at 34 C.F.R. Part 106 (the "Regulations"). The Regulations are enforced by the Office for Civil Rights ("OCR") within the DOE and are afforded "substantial deference" by the courts.[2] *Cohen v. Brown University*, 991 F.2d 888, 896–97 (1st Cir. 1993) (*Cohen II*).

Interscholastic athletics are expressly included within the "program or activity" requirements of Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and no recipient shall provide any such athletics separately on such basis.

35 C.F.R. § 106.41(a).

The Regulations set forth ten non-exhaustive factors for assessing whether an institution is providing equal athletic opportunities to men and women:

---

[2] The Department of Health, Education and Welfare originally adopted the Regulations, which were in turn adopted by the DOE. 45 C.F.R. Part 86.

1. Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
2. The provision of equipment and supplies;
3. Scheduling of games and practice time;
4. Travel and per diem allowance;
5. Opportunity to receive coaching and academic tutoring;
6. Assignment and compensation of coaches and tutors;
7. Provision of locker rooms, practice and competitive facilities;
8. Provision of medical and training services;
9. Provision of housing and dining facilities and services; and
10. Publicity.

34 C.F.R. § 106.41(c). The Court may also consider a school's "failure to provide necessary funds for teams for one sex." *Id*.

In 1979, the OCR issued a policy interpretation of Title IX and the Regulations. This policy interpretation is found at 44 Federal Register 71,413 (1979) (the "Policy Interpretation"). The Policy Interpretation provides that, to comply with Title IX and 34 C.F.R. § 106.41(c), schools must provide equal athletic opportunities in three general areas: (1) equal athletic participation opportunities; (2) equal athletic financial assistance, and (3) equal treatment and benefits. *See* 34 C.F.R. § 106.41(c)(1).

The narrow issue in Plaintiffs' motion for an immediate preliminary injunction is only MSU's failure to provide equal athletic participation opportunities however, all broader aspects of Title IX compliance are included in this action. *See*

Compl. ¶¶ 132–135; 142–146 (demonstrating unequal athletic opportunities with the data reported by MSU to the DOE); *id.* ¶¶ 156–186 (alleging three counts under Title IX).

According to the Policy Interpretation, compliance in equal athletic participation opportunities is determined by the following three-part test:

> (1) whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments;
>
> (2) where the members of one sex have been and are under-represented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; *or*
>
> (3) where the members of one sex are under-represented among intercollegiate athletes and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*See* Policy Interpretation, Section VII.C.5.a., 44 Fed. Reg. 71,418 (emphasis added).

This three-part test was further clarified after notice and comment in the OCR's 1996 Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (the "1996 OCR Clarification"). Office of Civil Rights, U.S. DOE, *Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test* (Jan. 15, 1996).

Under the first prong, a court considers whether a school has provided each male and each female student with a mathematically proportional opportunity to participate in athletics. Schools were expected to reach full compliance with participation by 1978. 1996 OCR Clarification at 7. Nevertheless, even where a school has failed to achieve actual equity in the decades since the enactment of Title IX, the second and third prongs of the test provide "escape routes for the university" to demonstrate compliance with Title IX. *Cohen v. Brown Univ.*, 809 F. Supp. 978, 991 (D.R.I. 1992), *aff'd*, 991 F.2d 888 (1st Cir. 1993) (*Cohen I*). That is to say, when Defendants fail under the first prong, the burden shifts to them to demonstrate compliance under prong two or three. *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 275 (6th Cir. 1994); *Cohen II*, 991 F.2d at 901–02; *Roberts v. Colo. State Bd. of Agric.*, 998 F.2d 824, 828 (10th Cir. 1993) (*Roberts II*) *aff'g in part, rev'g in part sub nom. Roberts v. Colo. State Univ.*, 814 F. Supp. 1507, 1518 (D. Colo. 1993) (*Roberts I*);

The second prong thus examines a school's "past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion" that is responsive to the developing interest and abilities of female athletes. 1996 OCR Clarification at 5. To satisfy this prong, the University must show a history of "good faith remedial efforts" to account for Congress's expectation that women's interests in athletic participation would expand as discrimination and

stereotypes decreased. *Id.* at 7. However, understandably courts have found that when a university eliminates fully rostered teams, that same university cannot meet its burden to show a history of expansion. *See Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 294 (D. Conn. 2009) ("There is no question that, if Quinnipiac fails to meet prong one of Title IX compliance, it will be out of compliance with Title IX. That is because, by eliminating a women's team while there is sufficient interest to field one, the University will have failed to demonstrate that it is committed to expanding opportunities for the underrepresented gender—women—or that it has fully and effectively accommodated the interests and abilities of that underrepresented gender.").

The third prong gives a school another opportunity to comply where it has failed to achieve proportionality. Under this prong, a university must demonstrate it has fully and effectively accommodated the athletic interests and abilities of its female students. In passing Title IX, Congress intended to encourage women to participate in sports and "to remedy the discrimination that results from stereotyped notions of women's interests and abilities." *Neal v. Bd. of Trustees*, 198 F.3d 763, 768 (9th Cir. 1999). As the First Circuit has emphasized, "interest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience." *Cohen v. Brown Univ.*, 101 F.3d 155, 178–79 (1st Cir. 1996) (*Cohen III*). Thus, schools must show a history of encouraging females to participate in varsity athletics

by fully and effectively accommodating their developing and expanding interests and abilities. Again, a school necessarily fails to effectively accommodate female's interests and abilities when it eliminates existing and thriving women's sports. *See Portz v. St. Cloud State Univ.*, 401 F. Supp. 3d 834, 858 (D. Minn. 2019) ("Where an institution has recently eliminated a viable team for the underrepresented sex from its intercollegiate athletics program, the Court will find that sufficient interest, ability, and available competition to sustain an intercollegiate team in that sport. This creates a presumption that the institution is not in compliance with Prong Three that the institution can rebut through strong evidence that interest, ability, or competition no longer exists." (citing Office of Civil Rights, U.S. DOE, *Letter from Russlynn Ali, Assistant Sec'y for Civil Rights, OCR, U.S. DOE, to Colleagues*, at 5 (Apr. 20, 2010) ("2010 OCR Letter")).

If MSU meets its burden under the second or third prong, the burden shifts back to Plaintiffs to demonstrate "a shortfall in the full and effective accommodation of interested female athletes by showing, initially, both numerical disparity and unmet interest." *Cohen II*, 991 F.2d at 903–04.

## ARGUMENT

The Court has broad discretion to enter a preliminary injunction order. The Court should do so here because Plaintiffs readily satisfy the requirements for entry of a preliminary injunction. *See* Fed. R. Civ. P. 65.

The court analyzes four factors when considering a motion for preliminary injunction: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.

*Mayerova v. E. Michigan Univ.*, 346 F. Supp. 3d 983, 991 (E.D. Mich. 2018). The four factors for a preliminary injunction "are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

While the Sixth Circuit has held that the proof required for the plaintiff to obtain a preliminary injunction is much more stringent than the proof required to survive a summary judgment motion, a party is not required to prove his case in full at a preliminary injunction hearing and the findings of fact and conclusions of law made by a court granting the preliminary injunction are not binding at trial on the merits.

*Id.* (citations and internal quotation marks omitted). Here, Plaintiffs seek a prohibitory injunction to stop MSU from going forward with its illegal decision to eliminate the swimming and diving team in the upcoming year. *See Biediger*, 616 F. Supp. 2d at 291. The Court has the discretion to grant a preliminary injunction once there are "sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Friendship Materials, Inc. v. Michigan Brick,*

*Inc.*, 679 F.2d 100, 103–04 (6th Cir. 1982); *see also Caulfield v. Bd. of Educ.*, 583 F.2d 605 (2d Cir. 1978).

Pursuant to Fed. R. Civ. P. 65(a)(1), the movant is required to give notice to the respondent of movant's intention to seek an injunction. Here, Plaintiffs have provided more than sufficient opportunity to Defendants to cure their illegal decision to eliminate the women's varsity swimming and diving team. (*See* Ex. 16).

I.      **Plaintiffs are likely to succeed on the merits of their Title IX claim because they have been denied equal athletic opportunities and MSU has a history of noncompliance.**

The Court assesses Plaintiffs' Title IX claim they have been denied equal opportunities to compete in varsity sports under the three-prong analysis set forth above. Plaintiffs must first demonstrate that there exists a disparity between the gender composition of the defendant institution's student body and its athletic program, thereby demonstrating that one gender is underrepresented in athletics. *Cohen II*, 991 F.2d at 895. If Plaintiffs make that showing, then MSU must satisfy either the second prong or the third prong. If MSU can make either of those showings—which it cannot—then the Plaintiffs must then show "some further evidence of discrimination, such as unmet need amongst the members of the disadvantaged gender." *Id.*

Plaintiffs readily satisfy the first prong. Determining substantial proportionality under Title IX first requires determining the gender breakdown of

the undergraduate full-time student population. The most recent verified data submitted to the Department of Education pursuant to the Equity in Athletics Disclosure Act ("EADA data") and the enrollment numbers publicly available through MSU's registrar's office, show MSU's recent enrollment numbers are:

| Year | Male Undergrads | Percentage of Male Undergrads | Female Undergrads | Percentage of Female Undergrads | Total Undergrads |
|---|---|---|---|---|---|
| 2018-19 | 17360 | 48.8% | 18231 | 51.2% | 35591 |
| 2019-20 | 17530 | 49.1% | 18192 | 50.9% | 35722 |
| 2020-21 *Fall enrollment numbers from Ex. 12 | 18745 | 48.7% | 19,746 | 51.3% | 38,491 |

(*See* Ex. 13, Lopiano Report at 20). After determining the gender proportions of the undergraduate population, the analysis then requires MSU's genuine participation opportunities for women to match the percentage of undergraduate full-time female students. *See Biediger v. Quinnipiac University*, 728 F. Supp. 2d 62, 64–66, 94 (D. Conn. 2010) (discussing genuine participation opportunities); *Biediger v. Quinnipiac University*, 691 F. 3d 85, 95, 99 (2nd Cir. 2010) (same).

By its very own numbers, MSU fails to meet the "substantial proportionality" threshold. The most recent data available under EADA at the time of this filing from the 2018–2019 academic year shows that MSU disproportionately underrepresents

women in athletic opportunities by denying 25 women meaningful participation opportunities—and that is prior to the elimination of the team at issue here. (Ex.13, Lopiano, at 20). These 25 women represent the number of female student athletes that the school needs to *add* in order for the school to reach substantial proportionality to its undergraduate full-time student's gender breakdown and the disparities appear to be getting worse over the last three years.

MSU's participation gap of 1.3%, or 25 women, is more than sufficient to "sustain a viable athletic a team" and, as such, violates Title IX. *See Biediger*, 728 F. Supp. 2d at 111–12 (finding the university out of compliance with Title IX based upon a gap of 3.62% or 38 women); *Cohen II*, 991 F.2d 905–06 (recognizing that even where a university "professes that it has done no more than slash women's and men's athletics by approximately the same degree . . . [that] claim overlooks the shortcomings that plagued its program before it took blade in hand."). Because the EADA data is not available for 2019 to the present, the most reliable information regarding athletic participation is the publicly available rosters published by MSU for each of their varsity sports. This information demonstrates that the participation

gap for 2019–2020[3] is 2% or 35 women, 10 more than 2018. For 2020–2021,[4] MSU

has expanded the gap to disfavor female athletes with a 2.65% gap or 42 women.

(*See* Ex. 13, Lopiano at 33). These numbers alone are sufficient to require that MSU

add female sports, not cut them.

Furthermore, MSU's participation gap is much larger than it appears from the

school's EADA data. The most recent certified participation data from the DOE is

from 2018–2019, which portrays MSU's athletic participation in the most

advantageous light for MSU. *See Ohlensehlen v. Univ. of Iowa*, No. 3:20-cv-00080,

2020 WL 7651974, at *6 (S.D. Iowa Dec. 24, 2020) ("First is the matter of fact that,

by their nature, EADA reports always overstate women's participation in

intercollegiate athletics."). Under Title IX, athletic participation is measured by

counting "athletes," defined as university students:

> (a) Who are receiving the institutionally-sponsored
> support normally provided to athletes competing at the
> institution involved, e.g., coaching, equipment, medical
> and training room services, on a regular basis during a
> sport's season; and

---

[3] In 2019–2020, MSU's rosters indicate there were 434 male student athletes and
415 female student athletes or 51.1% of the student athletes were male and 48.9%
of the student athletes were female. (Ex. 13, Lopiano at 35).

[4] In 2020–2021, MSU's rosters indicate there are 400 male athletes and 379 female
athletes or 51.4% of the student athletes are male and 48.6% of the student athletes
are female. (MSU has not published the roster for the men's tennis team and as such,
400 male athletes assumes 10 athletes on the men's tennis team, which is equivalent
to the number of men on the 2019–2020 tennis team).

(b) Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

(c) Who are listed on the eligibility or squad lists maintained for each sport, or

(d) Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

44 Fed. Reg. at 71,415. However, for EADA schools report, "[t]he total number of participants, by team, as of the day of the first scheduled contest for the team." 20 U.S.C. § 1092(g)(1)(B)(i). "Participants" counted under EADA include:

(i) . . . students who, as of the day of a varsity team's first scheduled contest—

(A) Are listed by the institution on the varsity team's roster;

(B) Receive athletically related student aid; or

(C) Practice with the varsity team and receive coaching from one or more varsity coaches.

(ii) Any student who satisfies one or more of the criteria in paragraphs (b)(3)(i)(A) through (C) of this section is a participant, including a student on a team the institution designates or defines as junior varsity, freshman, or novice, or a student withheld from competition to preserve eligibility (i.e., a redshirt), or for academic, medical, or other reasons.

34 C.F.R. § 668.47(b)(3). "In other words, EADA reports permit the counting of male practice players on "female" teams and do not account for those athletes who stop participating or never fully participate on the team after the first scheduled

competition." *Ohlensehlen*, 2020 WL 7651974, at *6. Given the allowances permitted by EADA reporting, the publicly available web rosters are a more reliable count of athletic participation because they reflect the members of the team that compete for MSU. MSU's web rosters for 2018–2019 demonstrate the participation gap was 37 women as compared to the participation gap of 25 women under the EADA for the same year. (Ex. 13, Lopiano at 20, 35).

In addition to the overstated participation count using EADA data, MSU also overinflates its women's teams for rowing, cross country, and indoor and outdoor track and field. MSU overinflates, or "pads", these teams by including women that do not receive genuine participation opportunities. "In order to count for Title IX purposes, a participation opportunity must be genuine and 'real, not illusory.'" *Portz*, 196 F. Supp. 3d at 976 (quoting *Biediger*, 691 F.3d at 92). Further, the court must consider the context of the sport when analyzing a genuine participation opportunity. *Biediger*, 691 F.3d at 93. For example, in college varsity cross country there is no limit to the number of cross country runners that can run in a meet. (*See* Ex. 13, Lopiano at 26). MSU is permitted to enter two teams of seven runners and then as many additional "unattached" runners as want to compete. *Id.* Therefore, any female cross country runner on MSU's Division I varsity cross country team who wanted to race would have that opportunity, even if they were not on one of the MSU "team" entries. *Id.* Despite that fact, MSU has a significant number of women who they

purport are on their women's cross country team who never run a single race. In 2017, MSU's roster had 44 women on the cross country team but 18 (or 40.1%) of the women on the team never ran a single race.[5] *Id.* While it may be the case that a few of those women were injured and could not compete, it stretches credulity to believe that 40% of the team would be injured and unable to compete. *Id.* at 26–27. Additionally, this pattern repeats throughout the years.

| WOMEN | Web Roster | Participated in 2 or more events | Participated in 1 event | Participated in 0 events |
|---|---|---|---|---|
| 2012 Cross Country | 42 | 14 | 7 | 21 |
| 2013 Cross Country | 35 | 22 | 3 | 10 |
| 2014 Cross Country | 41 | 16 | 3 | 22 |
| 2015 Cross Country | 42 | 21 | 4 | 17 |
| 2016 Cross Country | 42 | 23 | 5 | 14 |
| 2017 Cross Country | 44 | 23 | 3 | 18 |
| 2018 Cross Country | 44 | 25 | 3 | 16 |
| 2019 Cross Country | 41 | 28 | 1 | 12 |

*Id.* at Table 5, p. 26.

A similar patter can also be seen in indoor and outdoor track and field at MSU. Again, in college track and field a meet will hold a sufficient number of heats of each race to accommodate all entries from the colleges at that meet. Therefore, again, any woman on MSU's Division I varsity indoor and outdoor track and field teams who wanted to race would have that opportunity. *Id.* at 29. Despite this fact, MSU's

---

[5] Colleges report all competition results for cross country and track and field to the Track & Field Results Reporting System (TFRRS), which can be found at https://www.tfrrs.org/. TFRRS is the official source for all NCAA cross country, indoor track and field, and outdoor track and field event results.

rosters for the track and field teams continue to have a significant number of women who have never run a single race or competed in a single field event.

| WOMEN'S INDOOR | Web Roster | Participated in 2 or more events | Participated in 1 event | Participated in 0 events |
|---|---|---|---|---|
| 2009-10 Indoor | 73 | 28 | 3 | 42 |
| 20010-11 Indoor | 71 | 36 | 6 | 29 |
| 2011-12 Indoor | 76 | 40 | 5 | 31 |
| 2012-13 Indoor | 65 | 35 | 5 | 25 |
| 2013-14 Indoor | 69 | 34 | 4 | 31 |
| 2014-15 Indoor | 80 | 34 | 2 | 44 |
| 2015-16 Indoor | 87 | 32 | 5 | 50 |
| 2016-17 Indoor | 69 | 37 | 6 | 26 |
| 2017-18 Indoor | 75 | 35 | 7 | 33 |
| 2018-19 Indoor | 66 | 38 | 4 | 24 |
| 2019-20 Indoor | 67 | 33 | 5 | 29 |
| WOMEN'S OUTDOOR | Web Roster | Participated in 2 or more events | Participated in 1 event | Participated in 0 events |
| 2010 Outdoor | 73 | 36 | 9 | 28 |
| 2011 Outdoor | 71 | 43 | 1 | 27 |
| 2012 Outdoor | 76 | 48 | 1 | 27 |
| 2013 Outdoor | 65 | 39 | 1 | 25 |
| 2014 Outdoor | 69 | 41 | 3 | 25 |
| 2015 Outdoor | 80 | 35 | 3 | 42 |
| 2016 Outdoor | 87 | 36 | 4 | 47 |
| 2017 Outdoor | 69 | 38 | 10 | 21 |
| 2018 Outdoor | 75 | 42 | 7 | 26 |
| 2019 Outdoor | 66 | 43 | 1 | 22 |

*Id.* at Table 6, p. 29.

Moreover, the rosters for the women's cross country and indoor and outdoor track and field teams are larger than that of the average team size for Division I colleges across the country and consistently larger than the MSU'S men's teams for these sports even though men's and women's teams compete in the same number of total meets. This overinflating of the cross country and indoor track and outdoor track and field amounts to between 16 and 38 participation opportunities that MSU

is denying to female athletes and, in turn, increases the participation gap. *See id.* at 30–36.

Additionally, MSU is also inflating its women's rowing team. (Ex.13, Lopiano at 23–25). First, when one looks at the EADA data for rowing as compared to MSU's rosters for women's rowing, the difference is significant. *Id.*

| Women's Rowing | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EADA Roster | 89 | 97 | 85 | 87 | 83 | 86 | 88 | 91 | 88 | 86 | 90 | 85 | 88 | 89 | N/A | N/A |
| MSU Web Raster | 33 | 31 | 37 | 30 | 40 | 33 | 35 | 27 | 53 | 55 | 61 | 57 | 61 | 83 | 67 | 88 |

*Id.* at Table 4, p. 23. This is likely due to the amount of attrition women's rowing faces at MSU—rowing is a sport that recruits women who have never played the sport before. *See, e.g.*, *Ohlensehlen*, 2020 WL 7651974, at *7 (discussing the common attrition in intercollegiate rowing). There is no equivalent male team at MSU where men are recruited en masse to play on the team for a sport that they have never played. *See id.* at 8 ("[T]he quality of competition afforded to male and female athletes is an important factor in evaluating whether a university satisfies these requirements of Title IX."). Additionally, the women's rowing roster and EADA data also include novice rowers—those who have never rowed before—who compete in separate races only with other novices, not in varsity races and not in championship races. (Ex. 13, Lopiano at 24–25, 40–42). Novice rowers receive an

experience that is more equivalent to a junior varsity experience and as such should not count as participants under Title IX. *See e.g. Ohlensehlen*, 2020 WL 7651974, at *8; *Cohen IV*, 101 F.3d at 187. These novice rowers represent 22% to 30% of MSU's EADA data for women's rowing and 27% to 49% of MSU's online rosters for women's rowing. This represents a significant number of women, approximately 20 to 30, who are not receiving a genuine Division I varsity experience and do not count as participation opportunities for women, in turn increasing the participation gap even further.

MSU does not comply with prong one for participation under Title IX because the participation gap for women is more than sufficient to field a viable team. MSU overcounts athletes on cross country, indoor and outdoor track and field, and rowing, which distorts their participation numbers. This is in addition to being out of compliance by 42 women. MSU should be adding women's sports, not cutting them.

Having established that MSU cannot meet prong one, the burden shifts to MSU to demonstrate compliance under either prong two or prong three. These escape routes harbored in Title IX provide MSU no reprieve. The second prong of the analysis would allow MSU to overcome the facial inequality of its athletic programs if it could show a history of expansion for women's athletics. 1996 OCR Clarification at 5. It cannot make this showing because it has not added any women's sports in years, and now it is cutting women's sports. *Mayerova*, 346 F. Supp. 3d at

995 ("Part two of the test is not just concerned with an increase in the number of women's opportunities, however. The test also directs the court to consider whether the expansion in women's opportunities is 'demonstrably responsive to the developing interests and abilities of the underrepresented sex.'").

Indeed, any such notion is obviated by the facts underlying this very lawsuit. That is, the Plaintiffs and proposed class of aggrieved female athletes currently suffer from MSU's retraction of women's athletic programs. *See Roberts II*, 998 F.2d at 828 (affirming entry of injunction reinstating women's softball team in the absence of substantial proportionality or a history of expanding women's athletic opportunities); *see also Cohen II*, 991 F.2d at 899–900 (explaining that the university's decision to discontinue women's gymnastics and tennis resulted in an unmet athletic need among female students and since the university did not show a continuing practice of expanding athletic opportunities for its female students, it could not overcome the athletes' prima facie case). MSU cannot show any evidence of a sustained effort to expand opportunities for women. *See Mayerova*, 346 F. Supp. 3d at 995.

The third prong likewise does MSU no favors. MSU could still comply with Title IX despite its facial inequities for women if it could show full and effective accommodation of women's athletic interests and abilities. It cannot. Again, the facts of the present suit demonstrate that there exists an unmet athletic interest among the

female athletes of MSU. *Id*. at 996 ("Indeed, Plaintiffs, as members of eliminated teams, represent interests and abilities that are not effectively accommodated by the present program. Accordingly, part three of the Three-Part Test does not provide safe harbor for Defendants."). Furthermore, MSU's athletic cuts were not made to achieve Title IX compliance, and any efforts to establish a pattern of expanding athletic opportunities or accommodating their athletic interests has been completely negated by eliminating the women's swimming and diving team. *See id.* ("EMU's action in eliminating teams was not taken with the intent of moving the university into full compliance with the Title IX proportionality test (part one), but admittedly for financial reasons). *Cf. Equity in Athletics v. Dept. of Educ.*, 504 F. Supp. 2d 88, 91 (W.D. Va. 2007) (upholding reduction in men's and women's teams taken to bring university into compliance with Title IX proportionality test).

Even if MSU could satisfy the second or third prong and the burden shifted back to the Plaintiffs, there is "some further evidence of discrimination, such as unmet need" and pretext. *Cohen II*, 991 F.2d at 895. First, the Plaintiffs are being deprived of the opportunity to continue to pursue their demonstrated abilities in varsity women's swimming and diving. Not only would their needs go unmet, but the very athletic opportunities that brought them to MSU have been ripped away from them amid their collegiate careers. *See, e.g.*, *id*.

Further, MSU's pretextual explanation is that it eliminated the women's swimming and diving team for budgetary reasons is false and fails as a matter of law. While Plaintiffs understand that MSU has purportedly made the decision to eliminate sports because of a budgetary shortfall due to the COVID-19 pandemic, this budgetary shortfall is no different from any other financial crisis that universities face. If the courts allowed universities to provide unequal opportunities to women and violate Title IX every time a university faced difficult budgetary issues, it would obliterate the law. As various courts have held, there is no economic defense to Title IX violations. *See Horner*, 43 F.3d at 275 ("Thus, a recipient may not simply plead limited resources to excuse the fact that there are fewer opportunities for girls than for boys."); *Roberts I*, 814 F. Supp. at 1518 ("[Defendant's Witness] testified at trial that the primary reason the women's softball team was eliminated was to reduce a budget shortfall in CSU's athletic department. However, a financial crisis cannot justify gender discrimination."); *Haffer v. Temple Univ. of the Com. Sys. of Higher Educ.*, 678 F. Supp. 517, 530 (E.D. Pa. 1987) ("Moreover, it is clear that financial concerns alone cannot justify gender discrimination." (citing *Frontiero v. Richardson*, 411 U.S. 677 (1973) (holding that budgetary savings is not a defense to gender-based regulations that otherwise violate equal protection)).

Additionally, MSU's assertion that it does not have the funds to continue women's swimming and diving is doubtful considering MSU unveiled facilities

upgrades that will cost millions of dollars. Specifically, MSU will be spending millions of dollars upgrading an indoor football facility that was just recently built in 2008.[6]

Having established both that MSU does not provide athletic opportunities to male and female students in proportion to their representation in the undergraduate student body, and that there is an unmet athletic interest among female students, the Plaintiffs meet the requirement of a preliminary injunction that they are likely to succeed on the merits *See Roberts II*, 998 F.2d at 828 (affirming entry of injunction reinstating women's softball team); *Cohen II*, 991 F.2d 888 (affirming entry of preliminary injunction reinstating women's gymnastics and tennis teams); *Biediger*, 691 F.3d at 108 (affirming entry of permanent injunction after the entry of a preliminary injunction preventing elimination of the women's volleyball team). Of course, MSU will have the opportunity to try and demonstrate that its conduct is in compliance with Title IX, despite evidencing a participation gap large enough to field a women's varsity team in its efforts to oppose the entry of a preliminary or permanent injunction. As explained above, MSU is unlikely to make such a meritorious showing, and the Plaintiffs are likely to succeed on the merits, which supports the immediate entry of a preliminary injunction to restore the status quo.

---

[6] Defendants released these plans publicly on YouTube at https://m.youtube.com/watch?feature=youtu.be&v=ebgOtK7u3xg, but have since taken down this site.

## II.    Plaintiffs will suffer irreparable harm in the absence of a preliminary injunction.

Absent judicial intervention, the Plaintiffs will continue to suffer irreparable harm in several concrete respects: the ongoing violations of their civil rights to be free from discrimination based on sex, the elimination of competitive athletic opportunities, and the loss of leadership roles in and out of sports. Immediate entry of a preliminary injunction is appropriate where—as described above—the Plaintiffs make out a prima facie claim of sex discrimination under Title IX. *Biediger* 616 F. Supp. 2d 277; *Cohen II*, 991 F.2d 888; *Roberts II*, 998 F.2d 824.

Additionally, here the Plaintiffs are seeking to enforce important civil rights codified in Title IX that prohibit discrimination in intercollegiate athletics based on sex. Irreparable harm is often presumed in cases involving the enforcement of civil rights. *See*, *e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (finding the loss of freedom of speech "unquestionably constitutes irreparable injury."); *Am. Civil Liberties Union of Ky. v. McCreary Cnty., Ky.*, 354 F.3d 438, 445 (6th Cir. 2003); *Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998); *Bd. of Educ. of the Highland Local Sch. Dist. v. Dept. of Educ.*, 208 F. Supp. 3d 850, 877–78 (S.D. Ohio 2016) (finding irreparable injury for school's violation of Title IX and the U.S. Constitution); *Vietnamese Fishermen's Ass'n v. Knights of the Ku Klux Klan*, 543 F.

Supp. 198, 218 (S.D. Tex. 1982) ("Victims of discrimination suffer irreparable injury, regardless of pecuniary damage.").

Plaintiffs' Declarations establish that Plaintiffs have been and will continue to be irreparably harmed by MSU's decision to eliminate the varsity women's swimming and diving programs. The student athletes are losing the ability to compete in the sport they have dedicated thousands of hours of their lives to in order to compete at this level. Coaches are unable to plan the competition schedule for the next season and recruit for next year. And the athletes are being deprived of other leadership roles within and outside their respective sports teams. Without a preliminary injunction, Plaintiffs will lose every opportunity they had to compete at the upper echelons of their sport—something that, for most athletes, is the stuff of dreams. For many, this will mark the premature end of their college athletic careers altogether.

Specifically, Ava, Madeline, and Sarah (current juniors) will be denied the opportunity to complete their tenure as senior members of the team without an injunction. These women and other members of the team will be denied the opportunity to compete in college varsity swimming and diving ever again given the Transfer Risks.[7] Of equal importance, these women will lose their chance to serve

---

[7] To even have the chance to play Division I ever again, they would have to undertake the burdens and costs associated with Transfer Risks.

in leadership roles, such as on the Student-Athlete Advisory Committee for the 2021–2022 academic year. Similarly, the other named Plaintiffs and their teammates will be denied the opportunity to ever compete in varsity women's swimming and diving at MSU. These women have competed in swimming and diving at MSU since their freshman years in college but will be denied the opportunity to complete their anticipated tenure as members of the MSU team. Not only will these women lose sporting opportunities, they will also lose professional and personal development from no longer competing at the highest levels and against the best.

The opportunity to participate in intercollegiate sports is a short window, limited to four years. Denial of even one year's participation will permanently disenfranchise all the named Plaintiffs and similarly situated athletes from a significant aspect of their expected collegiate experience. The fact that these female athletes are denied these opportunities to participate in athletics while male athletes at MSU are proportionally overrepresented in violation of Title IX cements Plaintiffs' claim that they will suffer irreparable injury.

"In general, courts have found that the elimination of a women's team creates irreparable harm when the plaintiffs have demonstrated a strong likelihood of success on the merits of their Title IX claim." *Mayerova*, 346 F. Supp. 3d at 997 (citing *Biediger*, 616 F. Supp. at 277; *Cohen I*, 809 F. Supp. 978; *Favia v. Indiana Univ. of Penn.*, 812 F. Supp. 578 (1993); *Choike v. Slippery Rock Univ.*, 2006 WL

2060576 (W.D. Pa. July 21, 2006); *Barrett v. West Chester Univ. of Penn.*, 2003 WL 22803477 (E.D. Pa. Nov. 12, 2003).

As noted most recently by the district court, the holding in *Favia* recognized that

> [The university] has denied plaintiffs the benefits to women athletes who compete interscholastically: they develop skill, self-confidence, learn team cohesion and a sense of accomplishment, increase their physical and mental well-being, and develop a lifelong healthy attitude. The opportunity to compete in undergraduate interscholastic athletics vanishes quickly, but the benefits do not. We believe the harm emanating from lost opportunities for the plaintiffs are likely to be irreparable.

*Mayerova*, 346 F. Supp. 3d at 997 (quoting *Favia*, 812 F. Supp. at 583). *See also Biediger*, 616 F. Supp. 2d at 291 ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Barrett*, 2003 WL 22803477 at *14 ("Plaintiffs have a finite period of time in which to compete."). "Aside from recognizing the lost opportunity to participate in intercollegiate athletics, courts have found that delaying the reinstatement of a team until the conclusion of litigation creates additional harms such as the loss of training time and competitive edge and the inability to attract quality players and coaches." *Mayerova*, 346 F. Supp. 3d at 997.

### III. The scales of equity tip heavily in favor of entering a preliminary injunction to maintain the status quo.

The third prong of the preliminary injunction test requires a balancing of the equities. Here, any budgetary inequity that MSU may conjure pales in comparison to the discrimination and losses suffered by the Plaintiffs. "Had Congress intended to entrench rather than change the status quo—with its historical emphasis on men's participation opportunities to the detriment of women's opportunities—it need not have gone to all the trouble of enacting Title IX." *Cohen III*, 101 F.3d at 178–79.

The Plaintiffs merely seek to maintain the status quo and retain a critical women's varsity sports team, which hardly imposes an inequitable burden on MSU, a university with an athletics budget of approximately $128 million, of which the varsity swimming and diving team represents less than $2 million. The harm to the Plaintiffs, on the other hand, is substantial. MSU recruited and invited the Plaintiffs to come to its campus and represent the university in the upper strata of competition in their sport. MSU proffers a pretextual reason to eliminate the Plaintiffs' team—budgetary restrictions. However, when presented with a plan from students and parents to make contributions to keep the women's swimming and diving team afloat, MSU declined to consider it. Then MSU announced facilities upgrades that will cost the university hundreds of millions of dollars. Even if MSU's concerns really are budgetary, surely it can make budgetary cuts without discriminating against women. Moreover, Plaintiffs merely seek an order maintaining the status

quo, which would stop MSU from pulling the rug out from under the Plaintiffs by eliminating the swimming and diving team in the upcoming year. *See Biediger*, 616 F. Supp. 2d at 291.

In sum, the competing equities weigh in favor of granting the preliminary injunction. The costs to MSU would be tolerable and not cause undue hardship. Whatever the minor financial burden to MSU, it is overbalanced by the continuing harm to the Plaintiffs and the trampling of their civil rights if the Court took no action.

## IV. The entry of an injunction is in the public interest because civil rights protected by Congress outweigh minor budgetary concerns.

The final prong of the preliminary injunction standard is whether the public interest would be served by the issuance of the injunction. As many courts have recognized, the public interest is best served by vindicating the legal interests and civil rights that Congress has determined to be of great importance. *See Mayerova*, 346 F. Supp. 3d at 999 ("[T]the court finds that the public interest is best served by upholding the goals of Title IX."); *Barrett*, 2003 WL 22803477 at \*15 ("Promoting compliance with Title IX serves the public interest."); *Cohen I*, 809 F. Supp. at 1001 ("[T]he public interest will be served by vindicating a legal interest that Congress has determined to be an important one."); *Favia*, 812 F. Supp. at 585 ("The public has a strong interest in prevention of any violation of constitutional rights."). While the public may have an interest in a public university having financial autonomy,

that interest does not extend to violating the law while making budgetary decisions. *Cohen II*, 991 F.2d at 905. ("Title IX does not purport to override financial necessity. Yet, the pruning of athletic budgets cannot take place solely in comptrollers' offices, isolated from the legislative and regulatory imperatives that Title IX imposes.").

Public interest would not be served by leaving the women's team on the sidelines until the suit is finally resolved. The entry of injunctive relief would not have a detrimental effect on the public interest. The inverse is true. If the Court determines that MSU was in full compliance with Title IX after a full development of the record in this matter, the public interest will be best served by valuing civil rights over budgetary concerns in the first instance.

## CONCLUSION

The Plaintiffs have demonstrated that they are presently suffering an irreparable harm by the Defendants' decision to terminate its varsity women's swimming and diving program. Because of this, every day these talented female athletes are suffering a loss of the opportunity to develop their full potential as student athletes. Moreover, the balance of hardships tips decidedly in favor of the Plaintiffs because they are suffering from discrimination on account of sex.

The Plaintiffs, therefore, respectfully request that this Court promptly issue an injunction preventing Defendants from continuing to discriminate against female students on the basis of sex by cutting the women's swimming and diving team.

Plaintiffs also seek an injunctive order of longer duration requiring Defendants provide female students of MSU with an equal opportunity to participate in varsity intercollegiate athletics by sponsoring additional women's varsity athletic opportunities based upon the interests and abilities of Defendants' present, prospective, and future female students.

Respectfully submitted,

NEWKIRK ZWAGERMAN, PLC

*/s/     Lori A. Bullock*
Jill Zwagerman, AT0000324
Lori Bullock AT0012240
Danya Keller AT0012300
NEWKIRK ZWAGERMAN
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: 515-883-2000
Fax: 515-883-2004
Email: jzwagerman@newkirklaw.com
Email: lbullock@newkirklaw.com
Email: dkeller@newkirklaw.com

BOGAS & KONCIUS, PC
BRIAN E. KONCIUS (P69278)
Local Counsel for Plaintiffs
31700 Telegraph Road, Suite 160
Bingham Farms, MI 48025
Telephone: (248) 502-5001
bkoncius@kbogaslaw.com

ATTORNEYS FOR PLAINTIFFS

## CERTIFICATION

A copy of this Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary Injunction has been emailed to Defendants on this date and shall be served on the named Defendants in accordance with the Plaintiffs' service obligations under Federal Rule of Civil Procedure 4.

January 15, 2021

*s/ Lori A. Bullock*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitations of Local Rule 7.2(b)(i), as this brief contains 10,778 words (as determined by the Microsoft Word 2016 word-processing program used to prepare this brief), excluding those parts of the brief exempted by Local Rule 7.2(b)(i).

January 15, 2021

_s/ Lori A. Bullock_