# Report by
# DONNA LOPIANO, PH.D.

**SOPHIA BALOW, AVA BOUTROUS, JULIA COFFMAN, KYLIE GOIT, EMMA INCH, SHERIDAN PHALEN, MADELINE REILLY, OLIVIA STARZOMSKI, SARAH ZOFCHAK, TAYLOR ARNOLD, and ELISE TURKE, Individually and on behalf of all those similarly situated,**

**v.**

**MICHIGAN STATE UNIVERSITY, et al**

Ex. 13, Pg. 1

## I.  SCOPE OF OPINIONS TO BE RENDERED

I have been asked to prepare a report giving my opinions on (a) whether the manner in which Michigan State University ("MSU") has acted to restructure its athletics program treats male and female athletes equitably, (b) whether MSU intercollegiate athletics program provides equitable participation opportunities, scholarship and recruiting support as required by Title IX of the Education Amendments of 1972, (c) whether an examination of operating budgets for men's and women's sports indicates any gender equity concerns related to the Title IX laundry list of treatment and benefits, (d) whether MSU's plans to count prospective participants for the 2021-22 academic year comport with proper Title IX participant counting methodology and how equity in athletics participation is assessed, and (e) the extent to which, the student-athlete plaintiffs in this case would be likely to suffer irreparable harm as a result of the elimination of the varsity sports in which they participate at MSU.  My opinions are based upon my expertise in sports management and gender equity in sports, my review of a limited number of documents provided to me to date regarding the factual situation in this case, my knowledge of National Collegiate Athletic Association ("NCAA") and other sports governance association rules related to the classification of sports, teams, events, and eligibility to participate in college sports, my knowledge of financial and other challenges faced by students who transfer from one four-year college to another, and my knowledge of how NCAA Division I higher education institutions engage in recruiting students to participate in their intercollegiate athletics programs.

## II.  EXPERT QUALIFICATIONS

I am the president of Sports Management Resources, LLC ("SMR"), a consulting practice that focuses on helping educational institutions and sport organizations solve sports program

Ex. 13, Pg. 2

integrity, equity, growth, and management challenges.  My practice includes an emphasis on the development and implementation of model policies governing the management of sports programs conducted by educational and open amateur sport organizations.

Before founding SMR in 2008, I was the Chief Executive Officer of the Women's Sports Foundation, a national 501(c)(3) not-for-profit education organization located in East Meadow, New York (1992-2007). I previously served as a coach, assistant professor, and athletics director at various NCAA institutions, including 18 years as Director of Women's Athletics at the University of Texas at Austin (1975-1992). I also served as president of the Association of Intercollegiate Athletics for Women, the organization that formerly regulated women's intercollegiate athletics prior to the NCAA, the National Association for Intercollegiate Athletics, and the National Junior College Athletic Association offering programs for women. I have received many national and international awards recognizing my work in gender equity and sports management.

I am considered one of the foremost national experts on gender equity in athletics. I have testified, several times, about gender equity before congressional committees and state and federal administrative commissions. At the Women's Sports Foundation, I oversaw the production of numerous research projects related to gender equity and sports participation of girls and women, including a comprehensive study of the Office of Civil Rights Title IX athletics enforcement efforts. I have also served as a gender equity consultant to state education agencies, school districts, and institutions of higher education and continue to do so as President of SMR.

I am also considered an expert in athletics administration and sports management. I have taught a wide range of graduate and undergraduate courses involving the management of non-school open amateur and Olympic club, professional, interscholastic and intercollegiate sport. I

Ex. 13, Pg. 3

have assisted open amateur sport organizations, colleges and universities in dealing with management challenges and assessing their organizational climates with regard to gender and racial diversity, and have spoken at numerous conferences on these subjects. I am currently an adjunct professor at Southern Connecticut State University, where I teach both undergraduate and graduate courses in sports management. I train future athletic directors and sports administrators. I present workshops for coaches and athletic administrators that educate them about risk management related to Title IX compliance, both with regard to athletics participation and sexual harassment. I train school and college Title IX compliance officers regarding the methodology of performing Title IX athletics assessments. With Dr. Connee Zotos, I have authored the *Athletic Director's Desk Reference,* considered by most to be the most comprehensive policy compilation focused on meeting the needs of high school and college athletic directors. I have also written *Restructuring A College Athletic Program to Protect Olympic Sports During Financial Uncertainty*, and numerous articles on gender equity in sports, sports management, intercollegiate athletics reform, and the benefits of sports participation for women and girls.

My expert qualifications are based upon my education, academic background, previous employment, experience, and other related factors. My background and qualifications, as well as a listing of my publications, to the best of my recollection, are set forth in the attached curriculum vitae as Exhibit A. My www.SportsManagementResources.com web site contains my blogs on athletics issues and other policy-related advice produced by me that are not included in my curriculum vitae.

### III.    OTHER CASES IN WHICH THE EXPERT HAS TESTIFIED

The cases in which I was retained to testify as an expert are included on pp. 6-8 in my curriculum vitae at Exhibit A.

### IV.    COMPENSATION

SMR's consulting fees and terms are attached at Exhibit B. I have agreed to charge at the following specified hourly rates for my preparation and consulting services on this case:

- $250 per hour for report preparation
- $200 per hour for consultation with attorneys related to preparation for expert reports or depositions
- $500 per hour for deposition or court testimony
- $2,500 per day for site visits
- No charge for hours spent traveling
- Actual out-of-pocket expenses.

### V.    DOCUMENTS, DATA, OR INFORMATION CONSIDERED IN THE FORMATION OF EXPERT OPINIONS

My opinions are based upon my expertise in sports management and gender equity in sport and my review of documents provided to me to date.  The documents and sources relied upon in the formulation of my opinions for this report are listed in Exhibit C.  I reserve the right to review

and rely on additional relevant documents that may have been requested but not yet delivered, depositions which have yet to be taken in this case, or other information which comes to my attention following the date of submission of this report and to prepare an additional report(s) that reflects such new information if requested.  Finally, I reserve the right to depend on information that I am able to recollect based on questions asked of me following the submission of this document and during my testimony at deposition or trial.

## VI.   OPINIONS

1. **Rendering opinions, not legal judgments.** I am not an attorney or a judge, or member of a jury charged with the responsibility of determining whether actions taken by MSU or its administrators constitute illegal discrimination.  Rather, my expertise and opinions are advisory and based on my years of experience as an athletic director, an academic, researcher, teacher, and consultant who educates coaches and administrators on what constitutes gender equity and sport management practice.  Many of the vernacular terms we use to teach sports managers and Title IX compliance coordinators, and that I may use are also legal terms (e.g., compliance) but should not be interpreted as rendering a legal opinion.   Thus, any opinions rendered for this report as to whether MSU data or practices meet Title IX standards of gender equitable participation or treatment, are my expert <u>opinions</u> and not intended to usurp the authority of a judge or jury to render a legal judgment related to whether a fact situation complies with Title IX.  It is within this context that I was asked to address the matters for this case.

2. **Title IX is more than a count of participants.**  Title IX's gender equity in athletics mandate includes all of the following elements:

*§ 106.41 Athletics.*

*A recipient which operates or sponsors interscholastic, intercollegiate, club, or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:*

(1) *Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;*
(2) *The provision of equipment and supplies;*
(3) *Scheduling of games and practice times;*
(4) *Travel and per diem allowances;*
(5) *Opportunity to receive coaching and academic tutoring;*
(6) *Assignment and compensation of coaches and tutors;*
(7) *Provision of locker rooms, practice and competitive facilities;*
(8) *Provision of medical and training facilities and services;*
(9) *Provision of housing and dining facilities and services;*
(10) *Publicity*

--- 34 C.F.R. § 106.41(c)

Items (2) through (10) are commonly referred to as the Title IX "laundry list of treatment and benefits." Other general sections of the regulation that apply to athletics include financial aid (106.41), recruiting (106.37) and admissions (106.21). Failure to meet the gender equity requirements of any one of these elements would render the institution not in compliance with Title IX.

To date, and to my knowledge, there has been no discovery in this case. Thus, my assessment of whether MSU provided gender equitable opportunities, benefits, and treatment to its athletes was limited by publicly available information about the athletics program. Specifically, I used the following information resources (listed, among other resources, in Exhibit C of this report):

a. U.S. Department of Education Equity in Athletics Disclosure Act database (https://ope.ed.gov/athletics/#/);

**Ex. 13, Pg. 7**

b.  Michigan State University Athletics web site (https://msuspartans.com/) and the Michigan State (Sport) Archives (search Michigan State (insert sport) archives);

c.  U.S. Track & Field and Cross Country Coaches Association.   TFRRS database. (https://www.tfrrs.org/); and

d.  Quinn, B., MSU Legal Counsel, letter to Jill M. Zwagerman dated December 4, 2020 re:  response to Zwagerman November 16, 2020 correspondence.

Using these information resources, I was able to assess and reasonably opine on whether MSU treated its male and female athletes equitably related to the following Title IX elements:

- participation opportunities
- levels of competition
- selection of sports that meet the interests and abilities of males and females respectively
- athletics financial aid
- recruiting

Prior to rendering these opinions, it is important to understand several important principles that govern Title IX assessments. First, the assessment of athletics gender equity is "institution specific."  "Institution specific" means that comparisons are made with regard to the participation opportunities and to the treatment and benefits afforded to all male and female athletes within each institution rather than compared to what any other institution is doing.   In other words, no comparisons are made to the participation or treatment of males and females at other institutions.

Second, the assessment of athletics gender equity is "total program oriented," which means that proper gender equity analysis is the treatment of all male athletes versus the treatment of all female athletes, rather than comparing one sport to another (e.g., men's basketball compared to women's basketball) except when the institution conducts an athletic program that places sports within different competition levels (e.g., varsity, junior varsity, novice, sub varsity) in which case

the proper gender equity analysis also includes the treatment of *all* male athletes versus the treatment of *all* female athletes but within each competition level.

Third, it is important to understand that a lack of financial resources is not an acceptable defense for failure to treat male and female athletes equally or provide equal participation opportunities.  Think of whether it would be acceptable to say, "I'm sorry, I can't afford to comply with federal tax law and pay my taxes."

Fourth, the fact that a sport may generate significant revenues is not an acceptable reason for treating athletes in that sport better than athletes of the opposite sex.  Title IX does not deal with revenues.  Once revenues are accepted by the institution or generated by a team or athletic event (tuition, student fees, donor gifts, gate receipts, booster club contributions, media rights fees, sponsorships, etc.), the institution controls those revenues and is obligated to treat male and female students equally with regard to how they decide to expend those revenues.

Fifth, it is acceptable for the institution to treat some teams better than other teams, as long as when the institution makes these choices of differing treatment (think of some sports competing on the varsity level while others compete at a sub varsity level), equal proportions of male and female athletes are in the group being more favorably and less favorably treated.  These five general principles underlie all Title IX considerations.

It should also be noted that the affirmative, proactive aspects of Title IX compliance are so important that the federal regulations require that all schools or school districts sign a Certificate of Assurance (see Exhibit D) each time they apply for federal financial assistance, as a condition for receipt of federal funds.  By signing the Certificate each year, schools, both secondary and post-secondary, are representing that they have taken affirmative efforts to comply with Title IX,

they will continue to do so and will take whatever remedial action is necessary to eliminate existing discrimination on the basis of sex or to eliminate the effects of past discrimination.

**3. I opine that from 2003-04 through the end of 2019-20 (17 years), MSU did not provide male and female athletes with athletics participation opportunities proportional to the percent of males and females in its undergraduate student population.** In this section, I (a) explain the Title IX Prong One participation proportionality option and why MSU cannot use Prongs Two or Three, (b) opine that MSU has accepted its obligation to use Prong One as its option to comply with Title IX participation requirement, (c) opine that MSU is basing its Prong One participation calculations on its annual Equity in Athletics Disclosure Act reports which do not follow Title IX's counting instructions and thereby overcount female athletes and undercount the female participation gap, (d) opine that MSU, in addition to relying on the overcounting that is a function of the different EADA counting instructions, has inaccurately counted female participants and/or improperly inflated several women's team rosters, and (d) opine that MSU has failed in the past and is currently failing to provide proportional participation opportunities to its male and female athletes.

**(a)  The Title IX Prong One participation proportionality option and why MSU cannot use Prongs Two or Three.** There are three options to meet the equal participation opportunity standard, typically referred to as Prongs One, Two, and Three:

1. *Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or*

2. *Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion that is demonstrably responsive to the developing interests and abilities of that sex; or*

Ex. 13, Pg. 10

3.  *Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.*

-- *44 Fed. Reg. at 71418 (the "Three-Part-Test")*

The first prong reflects the goal of actual equity in which each male and female student has the same opportunity to participate in intercollegiate athletics, and I discuss it at length below. The second and third prongs reflect alternative means of compliance that explain why actual equity (male/female athletic participation proportional to percent male/female undergraduates) may not be possible at a given institution. MSU could not use the Prong Two option because it did not demonstrate a history and continuing practice of program expansion for the underrepresented sex (females). Institutions were given a three-year period to come into compliance with Title IX, from 1975 to 1978. By 1978, MSU had established eleven women's sports (basketball, cross country, field hockey, golf, gymnastics, softball, swimming and diving, tennis, indoor track, outdoor track and volleyball). Despite the tremendous explosion of women's participation in the 1980s and 1990s, MSU added only two sports in the 42 years following 1978 (soccer in 1986 and rowing in 1998), thereby failing to demonstrate a history and continuing practice of program expansion for the underrepresented sex. Similarly, MSU cannot use Prong Three because it cannot demonstrate that it has fully met the interests and abilities of the underrepresented sex, specifically that there was no other women's sport that could have be added within its competitive region. Further, if a school drops a sport for the underrepresented sex at any point in time and does not replace it in the same year with another sport accommodating an equal or greater number of participants, it is not eligible to utilize Prong Two or Three. On October 22, 2020, MSU lost the ability to rely on Prong Two or Three when it announced it intended to eliminate its women's swimming and diving program effective 2021-22 and did not announce the addition of another women's sport.

**Ex. 13, Pg. 11**

To further explain gender equity under Prong One, an institution achieves actual equity when the percentage of female athletes is substantially proportionate to the percentage of full-time female students enrolled at the institution.  If 50% of an institution's full-time students are female, then 50% of the institution's athletes should be female. In other words, if an institution has 1000 students (500 males and 500 females) but only enough resources to offer 500 athletic participation opportunities, then to achieve actual equity, it must offer 250 of those opportunities to males and 250 of those opportunities to females.  Each male and each female will then have an equal 1 in 2 chance of playing sports.  If the school instead created 300 slots for males and only 200 slots for females, then each male student would have a 3 in 5 chance of playing sports while each female would only have a 2 in 5 chance of playing sports.

An institution's permissible deviation from actual proportionality is also fact specific.  The allowable variance is not a percentage, <u>but is instead the number of participation opportunities or participants represented by that percentage that is less than the size of a team for the underrepresented sex that could be added</u>.  As the Department of Education Office of Civil Rights explained in their 1996 Clarification of the Three-Part Test (at pp. 9-10) in their Institution B case example:

> OCR would also consider opportunities to be substantially proportionate when the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team.  As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.
>
> For instance, Institution A is a university with a total of 600 athletes.  While women make up 52 percent of the university's enrollment, they only represent 47 percent of its athletes. If the university provided women with 52 percent of athletic opportunities, approximately 62 additional women would be able to participate.  Because this is a significant number of unaccommodated women, it is likely that a viable sport could be added.  If so, Institution A has not me part one.

> *As another example, at Institution B women also make up 52 percent of the university's enrollment and represent 47 percent of the Institution B's athletes. Institution B's athletic program consists of only 60 participants. If the University provided women with 52 percent of athletic opportunities, approximately 6 additional women would be able to participate. Since 6 participants are unlikely to support a viable team, Institution B would meet part one.*

*The OCR may consider reference to average team size, but that does not take precedence.* Further, *Biediger v. Quinnipiac*, a case in which I served as an expert, addressed this issue specifically; determining how to address a female participation gap of 38, that although the median size of Quinnipiac's women's teams was 24, the women's volleyball team, which had been eliminated, required only 14 players, and therefore the presence of a viable team was the appropriate standard. In other words, if the school has a large number of athletes, the allowable <u>percent</u> variance will be smaller than a school with a small number of athletes. That is why a school needs to compute what the percentage represents in actual participation opportunities.

While the above language indicates that "OCR may consider the average size of teams offered for the underrepresented sex," the examples indicate that the standard is a "viable team" that could be added. And common practice is to examine the average team size in the school's competitive division (NCAA Division I, in this case) by referring to the NCAA Sports Sponsorship and Participation Report which contains all such information.

With regard to the mathematical computation of the female participation gaps, here is a practical example and step-by-step breakdown of that computation process. For example, a large institution with 5,500 female students (55%) and 4,500 male students (45%) should ideally offer 550 out of its 1,000 athletic participation opportunities (55%) to females and 450 out of its 1,000 opportunities (45%) to men. If the school offered only 520 of its 1000 opportunities (52%) to females and 480 to men (48%), the school could take 30 opportunities away from male athletes and add a team of 30 (like women's soccer or lacrosse) to reach proportionality. But most schools

**Ex. 13, Pg. 13**

wish to remedy the underrepresentation of females without reducing or cutting men's participation. So, the school begins by computing the number of females that would have to be added (the female participation gap) if the current 480 male participants remained constant and comprised 45% of all athletes and the number of females comprised 55% of all athletes.  An easy mathematical way to compute the female participation gap in this fact situation is as follows:

- Divide the number of male athletes (overrepresented sex) by their percent of the undergraduate student body (480 divided by .45) – to get the <u>total number of athletes</u> if male athletes were 45% of all athletes--in this example = 1067 total athletes

- Then subtract the actual number of male athletes (480) and the actual number of female athletes (520) to find the number of new female participation opportunities that must be added for females to be 55% of all athletes – in this example, 1,067 minus the 1,000 current male and female athletes = 67

- Now check your math:
  - Current females are 520 plus new females will be 67 = 587 total female athletes. 587 is 55% of 1067.
  - Current males are 480.  480 is 45% of 1,067.

Now the school considers multiple options to achieve proportionality.  It can choose to add two new women's teams, maybe soccer and lacrosse to solve the 67 female participation gap.  Or, if it wishes to keep all of its men's sports programs which is usually the case, it might choose to slightly reduce some of its larger men's teams like football and track and field or reduce the larger men's teams by 3 or 4 and the smaller men's teams by 1 or 2 (termed "roster management") and add just one women's team.

To summarize, the school knows it doesn't have to achieve exact proportionality – just be close enough to "0", exact proportionality, so the female participation gap is less than the size of any women's team that could be added to reach proportionality without flipping underrepresentation to the opposite sex.

The application of Prong One was reaffirmed in the OCR's 1996 Clarification of the Three-Part test and has been included in the NCAA's gender equity materials for many years.  When the Department of Education's 2002-2003 Commission on Opportunity in Athletics (the "Title IX Commission") recommended a more lenient standard, the OCR rejected it.  Thus, this application is commonly understood by all schools.

The athletic participation opportunities counted by schools are a core element of Title IX compliance.  Prior to the 1990s, schools universally failed to offer equitable participation opportunities for women.  In the early to mid-1990s, two major events happened to force schools to pay attention to their participation numbers.  First, courts began to hear and rule on Title IX cases. In *Franklin v. Gwinnett County Schools*, 503 U.S. 66 (1992), the Supreme Court held that institutions can be sued in court for money damages.  In cases against Brown University and Colorado State University, schools that could not comply with Prongs Two and Three, and were not in compliance with Prong One proportionality were prevented by the courts from eliminating women's teams as a mechanism to reach proportionality.  Second, Congress passed the Equity in Athletics Disclosure Act in 1994 ("EADA").  20 U.S.C. 1092(g).  The EADA required schools to start reporting information such as student enrollment and student athletic participation starting with the 1995-1996 academic year.  The EADA information can be used to reasonably estimate whether an institution meets the substantial proportionality participation requirement of Prong One.  EADA reports are not Title IX compliance reports.  Rather, these reports are conditions of

funding under the Higher Education Act (20 U.S.C. 1092(g)) that were designed to make prospective students aware of an institution of higher education's commitment to providing equitable athletic opportunities.

**(b) MSU acknowledged its obligation to meet Title IX's Prong One participation requirement.** It appears that MSU recognizes its Prong One proportionality obligation as indicated by a December 4, 2020 letter from MSU Legal Counsel Brian Quinn to Jill M. Zwagerman in which Mr. Quinn states at page 1:

> *With regard to the "substantial proportionality" prong of the test, OCR provides that substantial proportionality is met if "the number of opportunities that would be required to achieve proportionality would not be sufficient to sustain a viable team." In determining what number of opportunities would be sufficient to sustain a viable team, OCR considers "the average size of teams offered for the underrepresented sex, a number which would vary by institution." MSU meets this test."*

**(c) I opine that MSU is basing its Prong One participation calculations on its annual Equity in Athletics Disclosure Act reports, which do not follow Title IX's counting instructions thereby overcounting female athletes and undercounting the female participation gap.** Title IX's counting requirements (1996 Clarification at p. 3) define participants as those athletes:

1. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved (e.g., coaching, equipment, medical and training room services) on a regular basis during a sport's season; and

2. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

3. Who are listed on the eligibility or squad lists maintained for each sport; or

4.  Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

Title IX counting is therefore based on three primary sources: (1) official athletics eligibility list (the NCAA Squad List[1] in the case of MSU), which contains financial aid, years of athletic eligibility, enrollment, medical status and any change of status such as withdrawal, quitting a team, etc.; (2) MSU's NCAA Hour Limitation Record[2] which is used to determine whether an athlete has attended team practices and meetings, and (3) the institution's report of all competition results (except that the TFRRS online database is the official source for all NCAA cross country, indoor track and field and outdoor track and field event results); which is used to determine years of eligibility (participation in one competition usually results in the use of one year of NCAA eligibility).  Although I have requested all of these data sources, to date, only the TFRRS online database was available to me.

When primary sources are unavailable, use of multiple secondary sources like the institution's EADA report and athletic department generated team rosters as displayed on the athletic department's official internet site, archives, and other print or electronic publications (e.g., media guides) are acceptable alternatives for rendering a reasonable opinion on whether an institution is providing proportional participation opportunities to males and females because they are generated from primary sources.  When using secondary sources, multiple secondary sources

---

[1]    National Collegiate Athletic Association.  NCAA Division I Squad Lists and Instructions - Form 20-2. Retrieved from:  https://ncaaorg.s3.amazonaws.com/compliance/d1/2020-21D1Comp_Form20-2-SquadLists.pdf

[2]    Note that participation in a competition is not required in order to count as a participant: An athlete who participates in the majority of teams practices and never gets into a game does count. The *NCAA 2020-21 Division I Manual* at pg. 259, describes the record: **17.1.7.3.4 Hour-Limitation Record.** Countable hours must be recorded on a daily basis for each student-athlete regardless of whether the student     athlete is participating in an individual or team sport. Any countable individual or group athletically related activity must count against the time limitation for each student     athlete who participates in the activity but does not count against time limitations for other team members who do not participate in the activity.

should be examined over a sufficient historical time period in order to be sure data from more current years aren't outliers or to detect consistent counting or participation patterns.

Both the EADA reports and the web site rosters are dependable secondary sources because they originate with the NCAA squad list.  An athlete cannot tryout or practice unless eligibility is determined and his/her name is added to the squad list.  Eligible athletes from that list comprise the team roster, which is provided to the coach, athletic trainers, communications staff and others by the compliance officer or other designated staff member.  For this section of my report, I examine all of these secondary sources in detail.

However, EADA Report Participant Counts do not follow Title IX counting instructions. I have been comparing EADA report participation counts to NCAA Squad List Counts and web site team rosters counts for the past thirty years.  EADA reports overcount female participation compared to Title IX participation counts because they use different metrics. Instructions for completing the annual EADA report (2019 Instruction Manual at pg. 31) requires schools to report participants under four metrics that differ from Title IX counting requirements:

1. "Male practice players…should be counted as participants on the women's team."  Title IX only counts females as participants on women's teams.
2. "Participants are students who…receive athletically related student aid." Athletic aid is a standalone metric under Title IX only if the person is otherwise medically unable to participate but otherwise medically unable to participate.
3. "Do not include:  Fifth-year team members who have already received a bachelor's degree."
4. "Do not include:  Individuals who joined the team after the day of the first scheduled contest."

There are no female practice players on men's teams.  Thus, counting male athletes as female athletes results in an overcount of female athletes and has the effect of producing an undercount of the female participation gap.  The EADA scholarship standalone metric produces larger counts

while Title IX additional financial aid conditions produce smaller counts.  Counting or not counting 5th year team members who have already received a bachelor's degree has a de minimis impact on male or female counts.  Adjusting counts up or down after the first day of competition produces lower Title IX female participation counts.  EADA allows no subtractions because most adjustments are subtractions -- athletes leaving the program.

In the December 4, 2020 letter from MSU Legal Counsel Brian Quinn to Jill M. Zwagerman mentioned above, Mr. Quinn states at page 2 the participation numbers he used to determine MSU's 2018-19 and 2019-20 calculation of the Title IX Prong One proportionality standard:

> *During the 2018-19 academic year, women represented 51.2% of MSU's full-time undergraduate enrollment and 49.8% of the athletics population. The 1.4% disparity equaled a female participation gap of 25. The average female team size that season was 35. Because the gap was smaller than the average female team size, MSU's participation numbers were substantially proportional under OCR's guidance.*
>
> *During the 2019-20 academic year, women represented 50.9% of MSU's full-time undergraduate enrollment and 50.3% of the athletics population. This 0.6% disparity equaled a female participation gap of 12 while the average female team size remained 35. MSU therefore continued to meet the substantial proportionality test. Indeed, although female enrollment decreased that year, the participation opportunities for women increased.*

For 2018-19, these numbers exactly match MSU's EADA report numbers and the Quinn correspondence.  I was able to retrieve all EADA data from 2003-04 through 2018-19 from the online EADA database at https://ope.ed.gov/athletics/#/.  I assume the 2019-20 numbers are those MSU has submitted for its 2019-20 report that has not yet been posted in this online database.  I have not been provided with the underlying participation numbers by team for 2019-20.

**Ex. 13, Pg. 19**

Table 1 that follows shows MSU's Prong One female participation gaps for the last 17 years using EADA data.

TABLE 1.  Prong One Proportionality Analysis Based on Annual EADA Reports
Michigan State University Athletic Participation 2003-04 to 2019-20
and Female Participation Gaps

| Survey Year | Male Under Grad | Percent Male Under Grad | Female Under Grad | Percent Female Under Grad | Total Under grads | Male Athletes | Percent Male Athletes | Female Athletes | Percent Female Athletes | Total Athletes | Female Particip. Gap - # Athletes to be added* | Percent Shortfall Female Opport. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003-04 | 14349 | 46.1% | 16766 | 53.9% | 31115 | 360 | 47.3% | 401 | 52.7% | 761 | 20 | 1.2% |
| 2004-05 | 14785 | 46.6% | 16913 | 53.4% | 31698 | 368 | 47.8% | 402 | 52.2% | 770 | 19 | 1.1% |
| 2005-06 | 14855 | 46.1% | 17345 | 53.9% | 32200 | 369 | 48.7% | 389 | 51.3% | 758 | 42 | 2.5% |
| 2006-07 | 14964 | 45.9% | 17624 | 54.1% | 32588 | 385 | 47.5% | 426 | 52.5% | 811 | 27 | 1.6% |
| 2007-08 | 15307 | 46.5% | 17606 | 53.5% | 32913 | 387 | 48.4% | 413 | 51.6% | 800 | 32 | 1.9% |
| 2008-09 | 15425 | 46.6% | 17671 | 53.4% | 33096 | 404 | 47.5% | 447 | 52.5% | 851 | 16 | 0.9% |
| 2009-10 | 15709 | 47.3% | 17529 | 52.7% | 33238 | 426 | 47.6% | 469 | 52.4% | 895 | 6 | 0.3% |
| 2010-11 | 15627 | 47.8% | 17093 | 52.2% | 32720 | 423 | 47.9% | 460 | 52.1% | 883 | 3 | 0.1% |
| 2011-12 | 16036 | 48.6% | 16980 | 51.4% | 33016 | 458 | 48.3% | 491 | 51.7% | 949 | -6 | -0.3% |
| 2012-13 | 16749 | 49.4% | 17153 | 50.6% | 33902 | 452 | 49.2% | 466 | 50.8% | 918 | -3 | -0.2% |
| 2013-14 | 17111 | 49.5% | 17465 | 50.5% | 34576 | 460 | 50.2% | 456 | 49.8% | 916 | 14 | 0.7% |
| 2014-15 | 17257 | 49.3% | 17781 | 50.7% | 35038 | 470 | 50.1% | 469 | 49.9% | 939 | 15 | 0.8% |
| 2015-16 | 17376 | 49.1% | 18049 | 50.9% | 35425 | 479 | 49.8% | 482 | 50.2% | 961 | 16 | 0.8% |
| 2016-17 | 17245 | 48.9% | 18035 | 51.1% | 35280 | 465 | 50.5% | 456 | 49.5% | 921 | 30 | 1.6% |
| 2017-18 | 17314 | 49.1% | 17935 | 50.9% | 35249 | 459 | 48.8% | 481 | 51.2% | 940 | -6 | -0.3% |
| 2018-19 | 17360 | 48.8% | 18231 | 51.2% | 35591 | 451 | 50.1% | 449 | 49.9% | 900 | 25 | 1.3% |
| 2019-20** | 17530 | 49.1% | 18192 | 50.9% | 35722 | ?? | 49.7% | ?? | 50.3% | ?? | 12 | 0.6% |

*The female participation gap represents the number of female participation opportunities that would need to be added if male participation remained constant AND was equal to the percent males in the undergraduate student body.  It is doubtful that MSU can meet any participation standard other than Prong One which requires that participation opportunities for male and female athletes correspond to their percentages respectively in the undergrad student body

**Full-time undergraduate enrollment retrieved from:  Institutional Research, Office of Planning and Budgets, Michigan State University. (2021).  MSU Data Digest - Students - Enrollment. [Tableau Dashboard] Retrieved from: https://opb.msu.edu/functions/institution/datadigest/. Last updated:  12/3/2020.  No male or female participation numbers were provided in the Dec. 4, 2020 letter from MSU General Counsel but that document reported female undergraduate enrollment of 50.9% and 50.3% of athletics population with no data on actual athletics participation count.

I opine that the Table 1 MSU EADA female participation count and female participation gap numbers are inaccurate for a Title IX gender equity determination and therefore should not be utilized for the following reasons.

1. <u>MSU is Counting Male Practice Players as Female Athletes</u>.  There are only two original sources of data for male practice players.  In the institution's compliance office, the NCAA requires male practice players' eligibility to be determined (see NCAA Division I Manual, 12.7.5, p. 81) and such numbers are also displayed in the "caveat" field of the most current year posted on the EADA online database.  Neither of these was available to me as the caveat field for 2018-19 had no content.  However, the male practice player distortion can be identified in two ways: (1) by comparing the women's basketball web roster count to the EADA women's basketball roster count because male practice players never appear on athletic department women's team web rosters and (2) demonstrating that the difference is consistent with the same men's basketball comparison because men's basketball uses no practice players and the minor differences between the EADA and Web rosters reflect normal roster decreases after the first day of competition. The one year (2007-08) in which the web roster was higher than the EADA roster by one player, probably reflected a mid-year transfer or other late addition.  See Table 2 below for these comparisons.

TABLE 2.  MSU Example of EADA Male Practice Player Distortion of Female Participation Count during Nine of Fourteen Years of Reports

| Basketball EADA and Web Rosters | 04-05 | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Men's Basketball-EADA | 17 | 18 | 18 | 14 | 16 | 15 | 17 | 17 | 18 | 16 | 16 | 17 | 18 | 16 | 16 |
| Men's Basketball-Web | 15 | 18 | 14 | 15 | 16 | 15 | 13 | 16 | 14 | 16 | 16 | 17 | 16 | 16 | 16 |
| Women's Basketball-EADA | 15 | 15 | 13 | 14 | 27 | 29 | 25 | 27 | 28 | 29 | 31 | 36 | 16 | 34 | 15 |
| Women's Basketball-Web | 15 | 13 | 13 | 13 | 14 | 16 | 15 | 15 | 16 | 13 | 14 | 15 | 15 | 15 | 13 |
| Probable Male Practice Players |  |  |  |  | 13 | 13 | 10 | 12 | 12 | 16 | 17 | 21 |  | 19 |  |

Thus, I opine that the difference between the women's basketball EADA and web roster numbers reveals the counting of male practice players as female players during the 9 years highlighted in Table 2 and, as a result, the overcounting of female participations and the undercalculation of the female participation gap.

**Ex. 13, Pg. 21**

The male practice player distortion resulting in a female overcount may be even greater than the numbers shown in Table 2.  Women's basketball is the women's sport that most commonly uses male practice players and uses the largest number of male practice players.  When women's volleyball and women's soccer use practice players they typically use 1-4 players compared to basketball which will typically use eight or more.  Because the NCAA requires MSU to determine the eligibility of male practice players, a request for that data during discovery will be required to accurately determine this number.

2. <u>EADA counts are always higher than web roster counts because of the EADA first-day-of-competition counting mandate.</u>  Table 3 is a comparison of total male and female EADA compared to Web total male and female roster counts, adjusted to remove the EADA male practice player distortion.

TABLE 3.  MSU Comparison of EADA and Web Roster Total Male and Female Participant Counts 2005-06 to 2018-2019 (except for 2008-09[3])

| Participants | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EADA Men | 369 | 385 | 387 | 404 | 426 | 423 | 458 | 452 | 460 | 470 | 479 | 465 | 459 | 451 |
| WEB Men | 338 | 344 | 349 | | 362 | 378 | 385 | 383 | 390 | 405 | 387 | 392 | 387 | 398 |
| EADA Overcount - Men's Sports | 31 | 41 | 38 | | 64 | 45 | 73 | 69 | 70 | 65 | 92 | 73 | 72 | 53 |
| EADA Women | 389 | 426 | 413 | 447 | 469 | 460 | 491 | 466 | 456 | 469 | 482 | 456 | 481 | 449 |
| WEB Women | 263 | 274 | 283 | | 332 | 318 | 333 | 310 | 340 | 345 | 372 | 334 | 358 | 373 |
| EADA Overcount-Women's Sports | 126 | 152 | 130 | | 137 | 142 | 158 | 156 | 116 | 124 | 110 | 122 | 123 | 76 |
| Subtract male practice players | | | | | 13 | 13 | 10 | 12 | 12 | 16 | 17 | 21 | | 19 |
| EADA Women Adjusted web overcou | 126 | 152 | 130 | | 124 | 129 | 148 | 144 | 104 | 108 | 93 | 110 | 123 | 57 |

I opine that the Table 3 EADA Men's Overcount is what I would normally see in my experience and that the women's Web Roster overcount, because it is significantly larger, most likely indicates that there is female participant overcounting in sports other than women's basketball. Further, I

---

[3]   No Web Rosters were available on the MSU athletics website for 2008-09 men's or women's indoor or outdoor track and field.  Therefore, no overall web computations were made or considered for that year.

**Ex. 13, Pg. 22**

opine that the Web roster almost always more closely approximates the Title IX participant count because it does not include male practice players and, as required by Title IX counting instructions, players are removed from the Web roster when they quit or become ineligible for other reasons.

**(d)  I opine that MSU, in addition to relying on the overcounting that is a function of the different EADA counting instructions, has inaccurately counted female participants and/or improperly inflated several women's team rosters.**  I explain these additional inaccuracies in sections 1, 2, 3, 4 and 5 which immediately follow.

1. <u>Inflated women's rowing rosters.</u> Table 4 below reveals that the MSU athletics web site rowing roster numbers in <u>ALL</u> years except for 2018-19 do not come close to the number of female athletes reported on its EADA report.  2019-20 EADA participant counts have not yet been posted and 2020-21 rosters would not be counted under Title IX until the close of the rowing season in 2021.

TABLE 4.    Comparison of EADA Participant Counts and
MSU Web Site Roster Counts for Women's Rowing - 2004-05 to 2020-21

| Women's Rowing | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 **** | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EADA Roster | 89 | 97 | 85 | 87 | 83 | 86 | 88 | 91 | 88 | 86 | 90 | 85 | 68 | 89 | N/A | N/A |
| MSU Web Roster | 33 | 31 | 37 | 30 | 40 | 33 | 35 | 27 | 53 | 55 | 61 | 57 | 61 | 83 | 67 | 88 |
| # NOVICE- Actually rowed Novice | N/A | 24* | 21* | 24* | 23* | 26** | 19** | 23*** | 22 | 20 | 20 | 23 | 23 | 22 | 33**** | 32***** |
| NOVICE as percent of EADA roster | N/A | 25% | 25% | 28% | 28% | 30% | 22% | 25% | 25% | 23% | 22% | 27% | 26% | 25% | N/A | N/A |
| NOVICE as percent of Web roster | N/A | 0%* | 0%* | 0%* | 0%* | 0%** | 0%** | 0%*** | 42% | 36% | 33% | 40% | 38% | 27% | 49% | 36% |

Several important points about the asterisks on this chart:

"*" MSU produced a separate Novice roster from 2006-07 through 2009-10.  These freshmen were NOT listed on the web rowing roster, but each name appeared in the annual rowing "Results" document in the rowing archives section of the MSU athletics web site. All appear to be counted in the EADA report.  The novice and web roster counts combined are lower than the EADA count in each year.

"**" MSU did not produce a separate Novice Roster. These freshmen were NOT listed on the rowing Web roster but appeared in the archive "Results" document as having actually rowed Novice and appear to be counted in the EADA report. The novice and web roster counts combined are still lower than the EADA count in each year.

"***" In 2012-13, 27 varsity rowers were listed on the web roster while 29 varsity rowers were listed on the archive web roster.  In addition to the varsity rowers, an additional 23 novice rowers participated in novice events per the archive "Results" document but were not listed on the web roster.

"****" In 2019-20, the rowing season was cancelled. 67 rowers were listed on the Web roster of which 33 were freshmen and presumed would be participating as novices

"*****" In 2020-21, in which there will be no competition until spring, 88 rowers are listed on the web roster of which 32 are listed as freshmen

Rowing is a sport typically selected to add to women's college athletic programs because it is easy to inflate the number of participants in rowing, which is what schools prefer to do rather than adding a new women's sport.  Inflating a roster refers to carrying a larger number of participants than a normal team size.  The average size of a Division I women's rowing team in 2018-19 was 62.[4]  MSU's mean EADA roster from 2003 to 2018, was 77 and the MSU median roster was 88.  The MSU web roster mean was 52 and the median was 46.  This data appears to indicate both overcounting and inaccurate counting.

Inflating rosters creates a different experience for all members of the team. Because there is a limit to the number, of coaches permitted (4 in Division I rowing), players on larger teams get less instructional attention than players on smaller teams (typically termed coach/athlete instructional ratio).  In some sports like rowing, the number of athletes permitted to travel with a team are limited by institutional or conference policy. Scholarships in rowing are limited in number which reduces the opportunity for players on overly large teams to benefit from such financial aid.  Further, novice rowers represent 22

---

[4]    National Collegiate Athletics Association. (2019) Student-Athlete Participation 1981-82 – 2018-19 NCAA Sports Sponsorship and Participation Rates Report.  Retrieved from: https://ncaaorg.s3.amazonaws.com/research/sportpart/2018-19RES_SportsSponsorshipParticipationRatesReport.pdf

**Ex. 13, Pg. 24**

to 30 percent of the EADA rowing rosters and 27 to 49 percent of the Web rowing rosters. "Novice" rowers are female athletes who by definition, are freshmen who have never participated in rowing before.  These are usually high school athletes in sports other than rowing who the coach is trying to convert to rowers.  There are no male athletes at MSU participating on any men's team who have never participated in their respective sports. These novice female rowers are not receiving a genuine Division I varsity sport experience. Rather, they are receiving a sub varsity experience.  None of their male athlete counterparts receive sub varsity experiences.

2.  <u>Over counting female cross country runners.</u> Another idiosyncrasy of the EADA report is the fact that the EADA report does not separate the reporting of cross country from outdoor track and indoor track; rather the school reports "All Track Combined," which includes all three of these sport rosters.  The MSU web site reports cross country separate from track and field but does not report indoor track and field separate from outdoor track and field. Participant counting under Title IX requires separate counts for each of these three programs which cannot be derived from examining EADA participation data.  These three sports are those in which schools typically artificially inflate women's rosters by encouraging women on campus or recruited athletes in other sports to come tryout for the team and keep them on the team through the first day of competition, which is the day of the official EADA participant count, and then, following the first day of competition, they do not continue to participate.  At that point, they either attend practices or not and either participate in no competitions or are purposely entered in one home competition in order to defend counting them as team members.

For example, the 2019 MSU women's cross country web roster listed 41 participants on the MSU      Web roster: 28 of the 41 participated in multiple cross country meets and were obviously legitimate cross country runners; one participated in only one meet; and 12 did not participate in any cross country events.[5]  This was not an isolated occurrence but a pattern; see Table 5 below.

TABLE 5.    Numbers of Women's Cross Country Runners Participating in Two or More Meets, One Meet or No Meets – 2012 to 2019 Seasons

| WOMEN | Web Roster | Participated in 2 or more events | Participated in 1 event | Participated in 0 events |
|---|---|---|---|---|
| 2012 Cross Country | 42 | 14 | 7 | 21 |
| 2013 Cross Country | 35 | 22 | 3 | 10 |
| 2014 Cross Country | 41 | 16 | 3 | 22 |
| 2015 Cross Country | 42 | 21 | 4 | 17 |
| 2016 Cross Country | 42 | 23 | 5 | 14 |
| 2017 Cross Country | 44 | 23 | 3 | 18 |
| 2018 Cross Country | 44 | 25 | 3 | 16 |
| 2019 Cross Country | 41 | 28 | 1 | 12 |

In cross country, there are no limits to competition entries.  A school may enter one or two teams of seven runners, with the five fastest times counting as the team scores for each. There is no limit on the number of additional individual runners who can run the event as "unattached."  In Division I, it is not plausible to maintain that participants just want to practice and never compete.  Thus, any cross country runner who is never entered into an event is suspected to be a "ghost" participant – someone who wasn't really a legitimate member of the team.

---

[5]    The TFRRS online database was used to retrieve the actual competition and performance records of each member of the 2018 MSU women's cross country team.  U.S. Track & Field and Cross Country Coaches Association. TFRRS database.  Retrieve from: https://www.tfrrs.org/

It could be that several of these cross country runners on the team I examined were injured and not able to compete.  However, that there were 12 such injured athletes in 2019, 16 in 2018, and 18 in 2017 who could not compete is unusual based on my experience as an athletic director.  Again, without looking at the NCAA Squad List and the institution's NCAA Hour Limitation Record,[6] I cannot make an accurate participant count.  However, just looking at the Table 5 women's cross country team roster fact situation, based on my experience with institutions cheating on participant counts, and knowing that the average size of a Division I women's cross country team is 17,[7] while MSU reports 35 to 44 team members in each of the eight years depicted, I suspect that this participant count reflects purposefully inflating the women's cross country teams by the mechanism I described. During discovery, I would consider the cross country counts to be suspect, reserving the right to carefully examine these numbers.

3.  <u>Over counting female indoor and outdoor track participants</u>. As previously mentioned, the EADA report does not separate the reporting of cross country from outdoor track and indoor track; rather the school reports "All Track Combined," which includes all three of these sport rosters.  The MSU web site reports cross country separate from track and field but does not report indoor track and field separate from outdoor track and field.  Participant counting under Title IX requires separate counts for each of these three programs.  Like

---

[6]   Note that participation in a competition is not required in order to count as a participant      .; An athlete who participates in the majority of teams practices and never gets into a game does count.  The *NCAA 2020-21 Division I Manual* at pg. 259, describes the record: **17.1.7.3.4 Hour-Limitation Record.** Countable hours must be recorded on a daily basis for each student    athlete regardless of whether the student-athlete is participating in an individual or team sport. Any countable individual or group athletically related activity must count against the time limitation for each student athlete who participates in the activity but does not count against time limitations for other team members who do not participate in the activity.

[7]   National Collegiate Athletics Association. (2019) Student-Athlete Participation 1981-82 – 2018-19 NCAA Sports Sponsorship and Participation Rates Report.  See 2018-19 data at pg. 82.  Retrieved from: https://ncaaorg.s3.amazonaws.com/research/sportpart/2018-19RES_SportsSponsorshipParticipationRatesReport.pdf

cross country, indoor and outdoor track are sports in which schools typically artificially inflate women's rosters by encouraging women on campus or recruited athletes in other sports to come tryout for the team, keep them on the team through the first day of competition (which is the day of the official EADA participant count), and then not continue to participate.  Or, a school just counts everyone who comes out for track twice, once for indoor and once for outdoor regardless of whether they participate in an indoor or outdoor competition.

Because 2018-19 was the last year of the EADA reports for which I also could access a web roster, I used TFRRS[8] to compare indoor and outdoor track and field to see whether all those reported on the web roster actually participated in both seasons in the years 2009-10 through 2019-20 for indoor track and from the 2010 through 2019 outdoor seasons (the 2020 outdoor season was cancelled due to Covid).  Table 6 on the next page reveals the same pattern as my Table 5 cross country analysis with an extraordinary number of participants who participated in 1 or 0 meets.

---

[8]   Id., The TFRRS online database.

TABLE 6.    Numbers of Women's Indoor and Outdoor Track and Field Athletes
Participating in Two or More Meets, One Meet or No Meets – 2009-10 to 2019-20
Seasons

| WOMEN'S INDOOR | Web Roster | Participated in 2 or more events | Participated in 1 event | Participated in 0 events |
|---|---|---|---|---|
| 2009-10 Indoor | 73 | 28 | 3 | 42 |
| 20010-11 Indoor | 71 | 36 | 6 | 29 |
| 2011-12 Indoor | 76 | 40 | 5 | 31 |
| 2012-13 Indoor | 65 | 35 | 5 | 25 |
| 2013-14 Indoor | 69 | 34 | 4 | 31 |
| 2014-15 Indoor | 80 | 34 | 2 | 44 |
| 2015-16 Indoor | 87 | 32 | 5 | 50 |
| 2016-17 Indoor | 69 | 37 | 6 | 26 |
| 2017-18 Indoor | 75 | 35 | 7 | 33 |
| 2018-19 Indoor | 66 | 38 | 4 | 24 |
| 2019-20 Indoor | 67 | 33 | 5 | 29 |
| WOMEN'S INDOOR | Web Roster | Participated in 2 or more events | Participated in 1 event | Participated in 0 events |
| 2010 Outdoor | 73 | 36 | 9 | 28 |
| 2011 Outdoor | 71 | 43 | 1 | 27 |
| 2012 Outdoor | 76 | 48 | 1 | 27 |
| 2013 Outdoor | 65 | 39 | 1 | 25 |
| 2014 Outdoor | 69 | 41 | 3 | 25 |
| 2015 Outdoor | 80 | 35 | 3 | 42 |
| 2016 Outdoor | 87 | 36 | 4 | 47 |
| 2017 Outdoor | 69 | 38 | 10 | 21 |
| 2018 Outdoor | 75 | 42 | 7 | 26 |
| 2019 Outdoor | 66 | 43 | 1 | 22 |

A track meet runs a sufficient number of heats to accommodate all entries.  Thus,
unless an athlete is injured and unable to run or being held out purposefully as a redshirt,
it is not plausible to maintain that Division I athletes just want to practice and never
compete.  Thus, any participant who is never entered into an event is suspected to be a
"ghost" participant – someone who was not really a legitimate member of the team.  Based
on my experience as an athletic director, I opine that the numbers of participants not
participating in any meets are simply too large to represent a typical number of injured or

redshirt athletes.  Again, without looking at the NCAA Squad List and the institution's NCAA Hour Limitation Record,[9] I cannot make an accurate participant count, but I can reasonably opine that female participants are being overcounted and inaccurately counted.

4. The EADA "Combined Cross Country, Indoor Track and Outdoor Track" rosters reported are highly suspect with regard to accuracy.   Table 7 compares the participant counts reported on the annual EADA report, the MSU web roster counts, and the TFRRS combined count which consists of all cross country, indoor and outdoor participants who participated in at least one meet during the seven years in which I had complete information for all three metrics.

TABLE 7.    Comparison of MSU EADA, Web Roster and TFRRS Combined Cross Country, Indoor Track and Outdoor Track Participant Data – 2012-13 to 2018-19

| Cross Country, Indoor and Outdoor Track Combined | EADA Combined | WEB ROSTER Combined | TFRRS Combined (participated in 1 or more meets) | Range of Difference from TFRRS |
|---|---|---|---|---|
| 2012-13 Combined | 173 | 172 | 101 | **71-72** |
| 2013-14 Combined | 162 | 173 | 107 | **55-66** |
| 2014-15 Combined | 177 | 201 | 93 | **84-108** |
| 2015-16 Combined | 181 | 216 | 102 | **79-114** |
| 2016-17 Combined | 185 | 180 | 119 | **61-66** |
| 2017-18 Combined | 186 | 194 | 117 | **69-77** |
| 2018-19 Combined | 173 | 176 | 114 | **59-62** |

Because of my experience with institutions cheating on participant counts, and knowing that the average size of a NCAA Division I women's cross country team is 17.2 participants, indoor track is 40 participants and outdoor track is 39.7 participants,[10] I

---

9    NCAA Division I Manual, p. 259
10   National Collegiate Athletics Association. (2019) Student-Athlete Participation 1981-82 – 2018-19 NCAA Sports Sponsorship and Participation Rates Report.  See 2018-19 data at pg. 82.  Retrieved from: https://ncaaorg.s3.amazonaws.com/research/sportpart/2018-19RES_SportsSponsorshipParticipationRatesReport.pdf

**Ex. 13, Pg. 30**

always check this metric against at least a ten year sample of roster ranges, means and medians.  See Table 8 below.

TABLE 8. Comparison of MSU EADA and Web Roster Range, Mean, and Median Data for Women's Cross Country, Indoor Track and Outdoor Track Compared to 2018-19 NCAA Division I Average Team Size - 2004-05 to 2020-21*

| Women's Teams | 04-05 | 05-06 | 06-07 | 07-08 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19* | 19-20* | 20-21* | Range | Mean | Median | Avg. D-I roster 18-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cross Country-Web | 19 | 24 | 26 | 31 | 37 | 40 | 42 | 42 | 35 | 41 | 42 | 42 | 44 | 44 | 41 | 44 | 19-44 | 37 | 41 | 17.2 |
| Indoor T&F-Web | 51 | 48 | 55 | 51 | 73 | 71 | 76 | 65 | 69 | 80 | 87 | 69 | 75 | 66 | 67 | 67 | 41-77 | 57 | 67 | 40 |
| Outdoor T&F-Web | 51 | 48 | 55 | 51 | 73 | 71 | 76 | 65 | 69 | 80 | 87 | 69 | 75 | 66 | 67 | 67 | 41-77 | 57 | 67 | 39.7 |
| Total - Combined Web | 121 | 120 | 136 | 133 | 183 | 182 | 194 | 172 | 173 | 201 | 216 | 180 | 194 | 176 | 175 | 178 | 120-216 | 145 | 177 | 96.9 |
| Combined Xctry-T&F - EADA | 114 | 126 | 151 | 152 | 189 | 180 | 200 | 173 | 162 | 177 | 181 | 185 | 186 | 173 | | | 114-200 | 140 | 173 | 96.9 |

*No EADA data available for 2019-20 or 2020-21; 2008-09 eliminated because neither the indoor nor outdoor Web rosters were available.

I opine that these comparisons to NCAA Division I average roster sizes support my opinion that MSU's cross country, indoor track, and outdoor track women's rosters are inflated (higher than normal).  During discovery, I would consider these team counts to be highly suspect, reserving the right to carefully examine these numbers.

5.  <u>Comparing the MSU roster means, and medians in all sports to average NCAA Division I team sizes.</u>  Another test I use to detect the possibility of over counting or purposely inflating team rosters is to compare actual EADA reported roster numbers and actual Web site reported roster numbers to the mean and median of a multi-year roster sample (as far back as data is available) and to NCAA Division I average team sizes as reported in the most recent NCAA sports sponsorship and participation report.  Tables 9 and 10 that follow show that analysis with my observations noted below each table.

TABLE 9.  Comparison of MSU Men's and Women's Sport Roster Sizes, EADA 16-year
Mean and Median Values and 2018-19 NCAA Reported Average Division I Team Sizes

| Sports | 03-04 | 04-05 | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | Range | Mean | Med | Avg. D-I roster 2018-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Men's Sports** | | | | | | | | | | | | | | | | | | | | |
| Baseball | 30 | 33 | 33 | 30 | 34 | 32 | 35 | 34 | 35 | 35 | 34 | 36 | 35 | 36 | 35 | 36 | 30-36 | 34 | 34.5 | 36.4 |
| Basketball | 18 | 17 | 18 | 18 | 14 | 14 | 15 | 17 | 17 | 18 | 16 | 16 | 17 | 18 | 16 | 16 | 14-18 | 17 | 16 | 15.7 |
| Football | 104 | 103 | 104 | 105 | 105 | 102 | 115 | 113 | 116 | 120 | 116 | 115 | 120 | 118 | 117 | 117 | 103-120 | 112 | 115.5 | 121.8 |
| Golf | 9 | 10 | 10 | 9 | 11 | 11 | 11 | 12 | 12 | 12 | 11 | 11 | 13 | 12 | 12 | 9 | 9-13 | 11 | 11 | 9.8 |
| Ice Hockey | 27 | 30 | 30 | 27 | 28 | 28 | 26 | 28 | 28 | 30 | 27 | 26 | 26 | 25 | 28 | | 25-30 | 28 | 27.5 | 28.5 |
| Soccer | 26 | 28 | 26 | 25 | 26 | 26 | 24 | 26 | 26 | 27 | 29 | 31 | 27 | 27 | 28 | | 24-31 | 27 | 26 | 29.5 |
| Swimming | 22 | 25 | 24 | 24 | 24 | 25 | 26 | 25 | 27 | 25 | 28 | 27 | 27 | 27 | 29 | | 22-29 | 26 | 26 | 28.8 |
| Tennis | 10 | 11 | 9 | 12 | 12 | 12 | 11 | 12 | 12 | 12 | 10 | 10 | 9 | 9 | 12 | 9 | 9-12 | 11 | 11 | 10.1 |
| Xctry/Indoor/Outdoor T&F* | 84 | 80 | 84 | 103 | 105 | 121 | 131 | 125 | 152 | 142 | 154 | 164 | 167 | 159 | 154 | 139 | 80-167 | 129 | 135 | 92.6* |
| Wrestling | 30 | 31 | 31 | 32 | 30 | 31 | 30 | 33 | 33 | 34 | 34 | 33 | 34 | 37 | | | 30-37 | 33 | 33 | 33.1 |
| TOTAL | 360 | 368 | 369 | 385 | 387 | 404 | 426 | 423 | 458 | 452 | 460 | 470 | 479 | 465 | 459 | 451 | | 426 | 435.5 | |
| **Women's Sports** | | | | | | | | | | | | | | | | | | | | |
| Basketball** | 13 | 15 | 15 | 13 | 14 | 27 | 29 | 25 | 27 | 28 | 29 | 31 | 36 | 16 | 34 | 15 | 13-36 | 23 | 27 | 14.4 |
| Field Hockey | 25 | 22 | 23 | 22 | 24 | 24 | 24 | 22 | 23 | 26 | 24 | 24 | 22 | 23 | 22 | | 22-26 | 24 | 24 | |
| Golf | 17 | 16 | 15 | 16 | 15 | 13 | 13 | 13 | 12 | 12 | 13 | 13 | 12 | 13 | | | 12-17 | 14 | 13.5 | 8.2 |
| Gymnastics | 17 | 20 | 16 | 18 | 19 | 15 | 16 | 16 | 17 | 21 | 21 | 17 | 19 | 17 | 19 | 18 | 15-21 | 18 | 17.5 | 18.2 |
| Rowing | 91 | 97 | 89 | 97 | 85 | 87 | 83 | 86 | 88 | 91 | 88 | 86 | 90 | 85 | 88 | 89 | 83-97 | 89 | 88 | 62.2 |
| Soccer | 29 | 31 | 30 | 29 | 31 | 30 | 27 | 31 | 30 | 29 | 36 | 34 | 32 | 35 | | | 27-36 | 31 | 31 | 28.4 |
| Softball | 18 | 22 | 20 | 19 | 18 | 16 | 18 | 21 | 21 | 18 | 20 | 19 | 21 | 24 | 21 | 24 | 16-24 | 20 | 19.5 | 21.7 |
| Swimming | 36 | 35 | 32 | 35 | 31 | 35 | 40 | 35 | 40 | 38 | 34 | 36 | 36 | 33 | 32 | 34 | 31-40 | 35 | 35 | 29.6 |
| Tennis | 13 | 13 | 9 | 10 | 10 | 14 | 14 | 14 | 13 | 12 | 14 | 16 | 11 | 9 | 12 | 12 | 9-14 | 12 | 12 | 9.1 |
| Xctry/Indoor/Outdoor T&F | 124 | 114 | 126 | 151 | 152 | 173 | 189 | 180 | 200 | 173 | 162 | 177 | 181 | 185 | 186 | 173 | 114-200 | 165 | 173 | 96.9*** |
| Volleyball | 18 | 17 | 14 | 16 | 14 | 13 | 15 | 18 | 16 | 16 | 17 | 18 | 17 | 20 | 20 | 16 | 13-20 | 17 | 16.5 | 16.6 |
| TOTAL | 401 | 402 | 389 | 426 | 413 | 447 | 469 | 460 | 491 | 466 | 490 | 482 | 456 | 481 | 449 | | | 447 | 457 | |

*NCAA Division I average team sizes by sport were:  Cross Country = 15.5, Indoor = 38.2, Outdoor = 38.9
**Women's basketball rosters in the 20's and 30's indicate the counting of male practice players
***NCAA Division I average team sizes by sport were: Cross Country = 17.2, Indoor = 40, Outdoor = 39.7

Observations:  Extreme swings in team size as indicated by the ranges, large differences between mean and median values, and differences between the means and medians and the Division I average squad sizes are red flags indicating skewed distributions which should be examined to determine whether there is a pattern to the control or inflation of roster sizes.  There is almost no variability between the mean and median metrics for men's and women's sports which would indicate normal variance/fluctuations in squad size) except for men's and women's cross country/indoor track/outdoor track, and women's basketball in which the range, mean and median exhibit significant variability. Comparing means and medians to the NCAA Division I average squad sizes, there are large differences in men's football, men's and women's cross country and track and field, women's basketball and women's rowing.  The undersized football roster

**Ex. 13, Pg. 32**

compared to the Division I average has no impact on the overcounting of female participants.  The data reenforce my analysis as presented in previous sections 1 through 4 -- that overcounting of female participants and undercounting of the female participation gap has occurred in women's basketball, cross country, indoor track, outdoor track and women's rowing.  While an inflated team size occurs in men's cross country, indoor track, outdoor track, it occurs to a lesser extent compared to women's cross country, indoor track, outdoor track and produces a net result in which women's counts are 35 to 38 participants higher.

I also examined the MSU Web rosters in the same manner, noting that complete data was only available for 15 years.  See Table 10 that follows.

TABLE 10.  Comparison of MSU Men's and Women's Web Site Reported
Sport Roster Sizes, 15-year Mean and Median Values and
2018-19 NCAA Reported Average Division I Team Sizes

| SPORTS | 04-05 | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21 | Range | Mean | Med | Avg. D-I roster 2018-19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Men's Sports** | | | | | | | | | | | | | | | | | | | | | |
| Baseball | 32 | 33 | 30 | 34 | 32 | 33 | 35 | 35 | 34 | 34 | 34 | 35 | 32 | 36 | 32 | 36 | 42 | 30-42 | 34 | 34 | 36.4 |
| Basketball | 15 | 18 | 14 | 15 | 16 | 15 | 13 | 16 | 14 | 16 | 16 | 17 | 16 | 16 | 16 | 18 | 15 | 13-18 | 16 | 16 | 15.7 |
| Cross Country | 16 | 19 | 22 | 24 | 20 | 27 | 30 | 33 | 30 | 29 | 35 | 31 | 31 | 31 | 31 | 28 | 31 | 16-35 | 28 | 29 | 15.5 |
| Football | 105 | 103 | 106 | 105 | 106 | 103 | 111 | 110 | 112 | 111 | 113 | 115 | 116 | 113 | 119 | 112 | 117 | 103-119 | 110 | 111 | 121.8 |
| Golf | 10 | 10 | 10 | 12 | 11 | 11 | 12 | 11 | 11 | 11 | 10 | 13 | 12 | 12 | 12 | 9 | 11 | 9-13 | 11 | 11 | 9.8 |
| Ice Hockey | 27 | 29 | 26 | 26 | 27 | 27 | 26 | 26 | 27 | 27 | 26 | 26 | 24 | 28 | 25 | 26 | 24 | 24-29 | 27 | 27 | 28.5 |
| Soccer | 27 | 26 | 25 | 26 | 27 | 24 | 26 | 26 | 27 | 27 | 28 | 29 | 26 | 28 | 26 | 26 | 26 | 24-29 | 26 | 26 | 29.5 |
| Swimming & Diving* | | 24 | 23 | 24 | 25 | 25 | 26 | 26 | 25 | 28 | 24 | 25 | 27 | 26 | 28 | 29 | 30 | 23-30 | 26 | 25 | 28.8 |
| Tennis | 10 | 8 | 12 | 11 | 11 | 12 | 10 | 12 | 11 | 12 | 10 | 9 | 9 | 8 | 10 | 10 | 10 | 8-12 | 10 | 10 | 10.1 |
| Track and Field** | 45 | 37 | 44 | 39 | | 57 | 55 | 59 | 57 | 64 | 75 | 55 | 64 | 63 | 55 | 55 | 52 | 37-75 | 55 | 55 | 38.9 |
| Wrestling | 30 | 31 | 32 | 33 | 31 | 30 | 32 | 31 | 35 | 33 | 34 | 33 | 31 | 34 | 36 | 35 | 40 | 30-40 | 33 | 32 | 33.1 |
| TOTAL | | 338 | 344 | 349 | | 362 | 378 | 385 | 383 | 390 | 405 | 387 | 392 | 387 | 398 | 379 | 400 | | | | |
| **Women's Sports** | | | | | | | | | | | | | | | | | | | | | |
| Basketball | 15 | 13 | 13 | 13 | 14 | 16 | 15 | 15 | 16 | 13 | 14 | 15 | 15 | 15 | 13 | 15 | 15 | 11-16 | 14 | 15 | 14.4 |
| Cross Country | 19 | 24 | 26 | 31 | 29 | 37 | 40 | 42 | 42 | 35 | 41 | 42 | 42 | 44 | 41 | 44 | 44 | 19-44 | 37 | 41 | 17.2 |
| Field Hockey | 22 | 19 | 22 | 21 | 21 | 24 | 23 | 21 | 23 | 26 | 24 | 17 | 22 | 23 | 19 | 24 | | 17-26 | 22 | 21 | 23 |
| Golf | 12 | 12 | 12 | 13 | 12 | 12 | 13 | 14 | 14 | 15 | 11 | 13 | 12 | 12 | 14 | 10 | 8 | 8-15 | 12 | 12 | 8.2 |
| Gymnastics | 19 | 11 | 15 | 17 | 14 | 12 | 15 | 15 | 16 | 18 | 16 | 15 | 19 | 18 | 16 | | | 11-19 | 16 | 18 | 18.2 |
| Rowing | 46 | 33 | 31 | 37 | 30 | 40 | 33 | 35 | 27 | 53 | 55 | 61 | 57 | 61 | 83 | 67 | 88 | 27-88 | 52 | 46 | 62.2 |
| Soccer | 30 | 30 | 28 | 30 | 30 | 29 | 29 | 29 | 35 | 34 | 32 | 31 | 35 | 36 | 33 | 26 | 36 | 26-36 | 32 | 33 | 28.4 |
| Softball | 19 | 18 | 18 | 18 | 16 | 17 | 20 | 20 | 18 | 18 | 19 | 18 | 22 | 20 | 17 | 22 | | 16-22 | 19 | 18 | 21.7 |
| Swimming & Diving | 34 | 32 | 32 | 27 | 35 | 42 | 34 | 38 | 35 | 34 | 23 | 35 | 30 | 32 | 34 | 31 | 28 | 22-42 | 33 | 33 | 29.6 |
| Tennis | 13 | 9 | 7 | 11 | 11 | 12 | 14 | 10 | 11 | 13 | 12 | 10 | 9 | 10 | 10 | 11 | 11 | 7-14 | 11 | 11 | 9.1 |
| Track and Field** | 51 | 48 | 55 | 51 | | 73 | 71 | 76 | 65 | 69 | 80 | 87 | 69 | 75 | 66 | 67 | 67 | 41-80 | 57 | 67 | 40 |
| Volleyball | 16 | 14 | 15 | 14 | 13 | 15 | 13 | 14 | 16 | 16 | 18 | 13 | 15 | 13 | 15 | | | 13-18 | 16 | 15 | 16.6 |
| TOTAL | 296 | 263 | 274 | 283 | | 332 | 318 | 333 | 310 | 340 | 345 | 372 | 334 | 358 | 373 | 348 | 379 | | | | |
| *Blank yellow highlighted cells indicate no Web roster available | | | | | | | | | | | | | | | | | | | | | |
| **Track and field rosters are not separated into indoor and outdoor track on the MSU web site; 2008-09 men's and women's track web rosters could not be found | | | | | | | | | | | | | | | | | | | | | |

**Ex. 13, Pg. 33**

Observations:  Web rosters reveal similar patterns.  There is almost no variability between the mean and median metrics for men's and women's sports which would indicate normal variance/fluctuations in squad size) except for men's and women's cross country/indoor track/outdoor track in which the range, mean and median exhibit significant variability.  The EADA women's basketball skew created by the male practice players disappears as suspected.  Comparing means and medians to the NCAA Division I average squad sizes, there are large differences in men's football, men's and women's cross country and track and field, and women's rowing.  The undersized football roster compared to the Division I average has no impact on the overcounting of female participants.  The data reenforce my analysis as presented previous sections 1 through 4 -- that overcounting of female participants and undercounting of the female participation gap has occurred in women's basketball, cross country, indoor track, outdoor track and women's rowing.  While an inflated team size occurs in men's cross country, indoor track, outdoor track is also present, it occurs to a lesser extent compared to women's cross country, indoor track, outdoor track and produces a net result in which women's counts are 16 to 27 participants higher.

**(e)   I opine that MSU Web roster counts more accurately approximate (compared to Table 1 EADA participation data) Title IX Prong One proportionality standards for all of the reasons listed above.  I also opine that for the past 15 years of full data, MSU female participation counts have not met the Title IX proportionality standard.  Finally, I emphasize that in Table 11 I have made no attempt to adjust these numbers to account for the major overcounting of females which I described in detail above.  Therefore I opine that the female participation gaps in Table 11 are significantly underestimated.**  Note that Table 11 below uses the MSU Web roster counts detailed in Table 10 above.  Because roster data was incomplete

for 2008-09 (no men's or women's indoor or outdoor track rosters), 2008-09 was not included.

Also, because Title IX requires both an indoor and outdoor track and field count and only one

men's and women's track and field roster is shown for each on the MSU web site, I simply doubled

the roster count, entering the same roster data for indoor and outdoor track and field.  Because of

the inflated size of these rosters, I am certain that the female participation gaps are underestimated.

TABLE 11.  Prong One Analysis Based on MSU Web Roster Counts (see Table 10) of
Athletic Participation 2005-06 to 2019-20 (except for 2008-09*) - Female Participation Gaps**

| Survey Year | Male Under Grad | Percent Male Under Grad | Female Under Grad | Percent Female Under Grad | Total Under grads | Male Athletes | Percent Male Athletes | Female Athletes | Percent Female Athletes | Total Athletes | Female Particip. Gap - # Athlete to be added* | Percent Shortfall Female Opport. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2005-06 | 14855 | 46.1% | 17345 | 53.9% | 32200 | 375 | 54.7% | 311 | 45.3% | 686 | 127 | 8.5% |
| 2006-07 | 14964 | 45.9% | 17624 | 54.1% | 32588 | 388 | 54.1% | 329 | 45.9% | 717 | 128 | 8.2% |
| 2007-08 | 15307 | 46.5% | 17606 | 53.5% | 32913 | 388 | 53.7% | 334 | 46.3% | 722 | 112 | 7.2% |
| 2009-10 | 15709 | 47.3% | 17529 | 52.7% | 33238 | 419 | 50.8% | 405 | 49.2% | 824 | 63 | 3.6% |
| 2010-11 | 15627 | 47.8% | 17093 | 52.2% | 32720 | 433 | 52.7% | 389 | 47.3% | 822 | 85 | 4.9% |
| 2011-12 | 16036 | 48.6% | 16980 | 51.4% | 33016 | 444 | 52.1% | 409 | 47.9% | 853 | 61 | 3.5% |
| 2012-13 | 16749 | 49.4% | 17153 | 50.6% | 33902 | 440 | 54.0% | 375 | 46.0% | 815 | 76 | 4.6% |
| 2013-14 | 17111 | 49.5% | 17465 | 50.5% | 34576 | 454 | 52.6% | 409 | 47.4% | 863 | 54 | 3.1% |
| 2014-15 | 17257 | 49.3% | 17781 | 50.7% | 35038 | 480 | 53.0% | 425 | 47.0% | 905 | 70 | 3.8% |
| 2015-16 | 17376 | 49.1% | 18049 | 50.9% | 35425 | 442 | 49.1% | 459 | 50.9% | 901 | 0 | 0.0% |
| 2016-17 | 17245 | 48.9% | 18035 | 51.1% | 35280 | 456 | 53.1% | 403 | 46.9% | 859 | 74 | 4.2% |
| 2017-18 | 17314 | 49.1% | 17935 | 50.9% | 35249 | 450 | 51.0% | 433 | 49.0% | 883 | 33 | 1.8% |
| 2018-19 | 17360 | 48.8% | 18231 | 51.2% | 35591 | 453 | 50.8% | 439 | 49.2% | 892 | 37 | 2.0% |
| 2019-20*** | 17530 | 49.1% | 18192 | 50.9% | 35722 | 434 | 51.1% | 415 | 48.9% | 849 | 35 | 2.0% |

* Because 2008-09 men's and women's track and field rosters were not available, this year was not included in this compilation
** The female participation gap represents the number of female participation opportunities that would need to be added if male participation remained constant AND was equal to the percent males in the undergraduate student body.  It is doubtful that MSU can meet any participation standard other than Prong One which requires that participation opportunities for male and female athletes correspond to their percentages respectively in the undergrad student body
***Full-time undergraduate enrollment retrieved from:  Institutional Research, Office of Planning and Budgets, Michigan State University. (2021).  MSU Data Digest - Students - Enrollment. [Tableau Dashboard] Retrieved from: https://opb.msu.edu/functions/institution/datadigest/.

Statistically, if MSU were not purposefully manipulating participant counts and was in compliance

with Title IX, we would observe random variances in the female participation gap and the percent

difference in opportunity shortfall, some years favoring male athletes and some years favoring

**Ex. 13, Pg. 35**

female athletes.  Clearly such random variances did not occur.  Female athletes were always underrepresented.

**4.  I opine that MSU, both in regard to its current and proposed athletic program restructure, does not appear to have assessed the interests and abilities of female athletes in order to provide them with equal levels of competition or sports based on their interests and abilities, as required by Title IX.**  Title IX states:

> *§ 106.41 Athletics.*
> *A recipient which operates or sponsors interscholastic, intercollegiate, club, or intramural athletics shall provide equal athletic opportunity for members of both sexes. In determining whether equal opportunities are available the Director will consider, among other factors:*
> *(1) **Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes**…*
> *-- 34 C.F.R. 106.41(c) [bold emphasis added]*

Simply explained, rather than requiring that the same sports be provided for males and females, Title IX requires that the sports offered meet the respective interests and abilities of each sex recognizing that their interests and abilities differ.

In determining "whether the selection of sports and levels of competition effectively accommodates the interests and abilities of members of both sexes," I relied upon the 1979 Policy Interpretation, which I helped write. This government guidance explains the Title IX effective accommodation regulation, (34 CFR 106.41(c)(1)), the policy behind it, and the factors that must go into assessing whether a school complies with it. (44 Fed. Reg. at 71417-71418) Its policy section states that OCR will assess compliance with the effective accommodation regulation by examining:

> a. *The determination of athletic interests and abilities of students; and*
> b. *The selection of sports offered; and*

*c. The levels of competition available, including the opportunity for team competition.*

> *-- 44 Fed. Reg. at 71417*

<u>Note that these policy factors do not even mention numbers</u>. The 1979 Policy Interpretation explains in subpart "a" how institutions are required to determine athletics interests and ability. In subpart "b" it addresses issues that schools should consider when selecting which sports they should offer. Subpart "c" has two parts, the "three-part test" that does focus on numbers of participation opportunities (already discussed in Section 3 above) and the "competition test" that requires institutions to provide proportionally similar quality competition opportunities. Thus, it should be emphasized that numbers of participation opportunities and the often referenced "three-part test" are merely one of four subsets of the effective accommodation requirement and a small part of the overall policy with which MSU must comply.  With regard to its current athletic program and, certainly, if MSU decided to engage in a major restructure of its athletics program, it had an obligation to ensure that its restructured program complied with all four of these Title IX requirements.

The 1979 Policy Interpretation provides great detail about each of these three factors ("a" determination of interest and abilities, "b" selection of sports offered, and "c" levels of competition, and how they should be applied.

**(a)  I opine that MSU has not complied with its obligation to assess the interests and abilities of female athletes with regard to its current program or the development of the proposed restructured program.**  The 1979 Policy Interpretation specifies:

**(a) How schools must assess the interests and abilities of their students.**
[3] Application of the Policy - Determination of Athletic Interests and Abilities
Institutions may determine the athletic interests and abilities of students by nondiscriminatory methods of their choosing provided:

**Ex. 13, Pg. 37**

a. The processes take into account the nationally increasing levels of women's interests and abilities;

b. The methods of determining interest and ability do not disadvantage the members of the under-represented sex;

c. The methods of determining ability take into account team performance records; and

d. The methods are responsive to the expressed interests of students capable of intercollegiate competition who are members of the under-represented sex.

-- 44 Fed. Reg. at 71417

When MSU added its women's rowing team in 1998, there were only 63 Division I women's rowing teams (NCAA Sports Participation and Sponsorship Report, 2018-19) and only 34 high schools with 1,008 female participants in the nation (NFHS Statistics).  Sports like ice hockey (271 schools/3,016 female participants), lacrosse (509 schools/20,189 female participants), skiing (387 schools/4,268 female participants) and wrestling (619 schools/1,907 female participants) were more popular among high school girls, the population recruited by MSU.   At the time, MSU was not in compliance with Prongs One, Two or Three and was obligated to *annually* conduct assessments and as soon as women's interest and abilities were identified to add sports to meet one of these participation standards.  I have not been provided with any evidence that the latter occurred.

With regard to the 2021-22 plan to restructure the program, I saw no evidence of an assessment of interests and abilities of male or female athletes to determine which men's or women's programs were to be eliminated.  Women's swimming and diving was selected for elimination, a sport in which there are 194 Division I programs.  Not selected were existing sports in which there appears to be less interest such as field hockey (77 Division I programs), gymnastics (61 Division I programs) and rowing (88 Division I programs).  Swimming is among the top ten most popular girls high school sports.  See Table 12.

TABLE 12.  National Federation of State High School Association
2018-19 Girls Participation Statistics

**TEN MOST POPULAR GIRLS PROGRAMS**

| | Schools | | | Participants | |
|---|---|---|---|---|---|
| 1. | Basketball | 18,210 | 1. | Track and Field – Outdoor | 488,267 |
| 2. | Track and Field – Outdoor | 17,012 | 2. | Volleyball | 452,808 |
| 3. | Volleyball | 16,572 | 3. | Basketball | 399,067 |
| 4. | Softball – Fast Pitch | 15,877 | 4. | Soccer | 394,105 |
| 5. | Cross Country | 15,435 | 5. | Softball – Fast Pitch | 362,038 |
| 6. | Soccer | 12,107 | 6. | Cross Country | 219,345 |
| 7. | Golf | 10,402 | 7. | Tennis | 189,436 |
| 7. | Tennis | 10,290 | 8. | Swimming & Diving | 173,088 |
| 9. | Swimming & Diving | 8,007 | 9. | Competitive Spirit | 161,358 |
| 10. | Competitive Spirit | 7,214 | 10. | Lacrosse | 99,750 |

Similarly, men's swimming and diving was eliminated (131 Division I programs) and this sport is among the top ten most popular boys' high school sports.  See Table 13.

TABLE 13.  National Federation of State High School Association
2018-19 Boys Participation Statistics

**TEN MOST POPULAR BOYS PROGRAMS**

| | Schools | | | Participants | |
|---|---|---|---|---|---|
| 1. | Basketball | 18,617 | 1. | Football – 11-Player | 1,006,013 |
| 2. | Track and Field – Outdoor | 17,052 | 2. | Track and Field – Outdoor | 605,354 |
| 3. | Baseball | 16,170 | 3. | Basketball | 540,769 |
| 4. | Cross Country | 15,632 | 4. | Baseball | 482,740 |
| 5. | Football – 11-Player | 14,247 | 5. | Soccer | 459,077 |
| 6. | Golf | 13,590 | 6. | Cross Country | 269,295 |
| 7. | Soccer | 12,552 | 7. | Wrestling | 247,441 |
| 8. | Wrestling | 10,843 | 8. | Tennis | 159,314 |
| 9. | Tennis | 9,809 | 9. | Golf | 143,200 |
| 10. | Swimming & Diving | 7,704 | 10. | Swimming & Diving | 136,638 |

In my experience, I have found that decisions related to keeping women's sports are sex-based rather than interest and ability based. The primary purpose of such decisions is to manipulate women's sports participation numbers while saving money.  Institutions pick the women's sports with the highest participation numbers, lowest per capita operating cost, and lowest staffing costs

**Ex. 13, Pg. 39**

to retain or to add to their programs in order to comply with Title IX.  Also based on my experience, rowing and cross country/indoor track/outdoor track are the sports of choice for artificially inflating women's participation numbers.

**(b)   I opine that MSU has not complied with its Title IX obligation to ensure that the selection of sports offered in the current program and proposed for the 2021-22 restructured program equally meets the interests and abilities of men and women.** The second element of the "effective accommodation" regulation cited above is "selection of sports offered".  The 1979 Policy Interpretation discusses the issues that schools should consider when selecting which sports they should offer, including whether the same sports must be offered for men and women, whether the excluded sex must be permitted to try out for a team for the opposite sex, how schools should treat sports categorized as contact or noncontact sports, and whether teams are chosen by athletic skill. See 44 Fed. Reg. at 71417-71418, Part [C][4]. Sports selected for men and women do not have to be identical. Respectively, they should meet the interests and abilities of males and females. Certainly, they should not be selected for the purpose of treating female athletes in a lesser and discriminatory manner.  There was no indication that the decision to drop sports in 2021-22 was prefaced by the required Title IX assessments of interest and ability.

During discovery, I also intend to examine whether male and female participants are treated equally with regard to the opportunity to be selected for teams – whether there is policy and practice to require all teams to conduct tryouts.  At many institutions, sports such as wrestling, football and track and field do not conduct tryouts and accept all-comers or do not apply roster limits to teams.

**(c)   I opine that MSU has not complied with its Title IX obligation to ensure that women are provided with the same levels of competition as men's teams either in the current**

**program or the 2021-22 restructured program.** For "(c) Levels of Competition Offered," the third effective accommodation factor, the 1979 Policy Interpretation sets out two separate tests regarding levels of competition: (1) participation, which has already been examined in Section 3 of this report, and (2) competitive team schedules, *both* of which schools must satisfy in order to comply with the effective accommodation regulation. In particular,

> [5] Application of the Policy - Levels of Competition.
> In effectively accommodating the interests and abilities of male and female athletes, institutions must provide **both** the opportunity for members of each sex to **participate** in intercollegiate competition **and** for athletes of each sex **to have competitive team schedules which equally reflect their abilities** .
> -- 44 Fed. Reg. at 71418 [bold emphasis added].

No MSU men's sports include junior varsity, freshmen, novice, or other sub varsity programs.  No other women's teams support junior varsity, freshmen, novice, or sub varsity programs except for women's rowing, which offers a novice program (the equivalent of a freshmen program, a novice rower is a first-year college rower who has never previously rowed and who competes against other novice rowers).  Thus, a portion of what has been represented as varsity rowing participation opportunities, are actually novice opportunities.  Novice rowers participate in fewer regular season events, are "newbies" to rowing who do not receive athletic scholarships, and do not have national championships.  News reports and MSU Web site archive "Results" documents detailing individual athletes that actually participated in events, reported that the MSU rowers were regularly competing in the novice category. I could not determine the actual number of participants in the varsity versus the novice women's rowing program.  MSU intends to keep the rowing program as part of the 2021-22 restructure. The novice rowing program raises significant questions.  Female athletes are currently underrepresented overall.  Certainly, current women's participation opportunities should not be sub-varsity experiences unless an equal proportion of male athletes are provided with similar sub varsity experiences and these sub varsity

Ex. 13, Pg. 41

experiences should not be considered genuine varsity athletic opportunities.  I repeat Table 4 here to emphasize the numbers of female athletes being counted as varsity athletes who are being given this sub varsity experience.

TABLE 4.    Comparison of EADA Participant Counts and
MSU Web Site Roster Counts for Women's Rowing - 2004-05 to 2020-21

| Women's Rowing | 05-06 | 06-07 | 07-08 | 08-09 | 09-10 | 10-11 | 11-12 | 12-13 | 13-14 **** | 14-15 | 15-16 | 16-17 | 17-18 | 18-19 | 19-20 | 20-21* |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EADA Roster | 89 | 97 | 85 | 87 | 83 | 86 | 88 | 91 | 88 | 86 | 90 | 85 | 88 | 89 | N/A | N/A |
| MSU Web Roster | 33 | 31 | 37 | 30 | 40 | 33 | 35 | 27 | 53 | 55 | 61 | 57 | 61 | 83 | 67 | 88 |
| # NOVICE- Actually rowed Novice | N/A | 24* | 21* | 24* | 23* | 26** | 19** | 23*** | 22 | 20 | 20 | 23 | 23 | 22 | 33**** | 32***** |
| NOVICE as percent of EADA roster | N/A | 25% | 25% | 28% | 28% | 30% | 22% | 25% | 25% | 23% | 22% | 27% | 26% | 25% | N/A | N/A |
| NOVICE as percent of Web roster | N/A | 0%* | 0%* | 0%* | 0%* | 0%** | 0%** | 0%*** | 42% | 36% | 33% | 40% | 38% | 27% | 49% | 36% |

I also opine that MSU may have precipitated this sub-varsity participant predicament as part of an effort to increase women's participation by inflating participation in rowing rather than adding a new women's varsity sport.  There is no sport in the MSU men's program in which male participants have never participated in that sport, such as is the case with novice rowing.  When MSU decided to engage in a major restructure of its athletics program, this factor should have been taken into consideration.

**5.   I opine that MSU female athletes have been significantly shortchanged over the 2003-04 to 2018-19 period (16 years) with regard to the provision of athletics financial aid.** In addition to the Title IX 106.41 athletics provision, the financial aid section of the regulation has a direct reference to its application to athletics:

*§ 106.37   Financial assistance.*

*(c) Athletic scholarships. (1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.*

**Ex. 13, Pg. 42**

*(2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and §106.41.*

In this area, scholarship equity is tied to the percentage of male and female student       athletes rather than the percentage of males and females in the general student body.  Specifically, Title IX requires that total dollars awarded to male and female student athletes be proportional to their athletics program participation percentages.  A disparity of less than one percentage point is permissible.  This specification of distribution based on percentage of athletes rather than percentage of males and females in the student body is because an institution may be in compliance with Title IX participation requirements by using the Prong Two or Three options which do not require male/female athletics participation equal to the percentage of males and females in the undergraduate student body.

While I did not have access to NCAA squad lists in order to examine how scholarships were packaged, care must also be taken to determine that the institution does not engage in discriminatory packaging of athletics aid because §106.37 also prohibits:

*(1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate;*

Because MSU was not eligible to utilize Prong Two or Three to comply with Title IX's participation requirements (as previously explained in Section 3) and was obligated to meet Prong One proportionality requirements with regard to athletic participants, in each year depicted in Table 12, female athlete participation should have been equal to the percent of females in the undergraduate student body and the female athlete entitlement of athletics financial aid should also have been equal to or within one percent of that participation percentage.  Table 14 reveals that

Ex. 13, Pg. 43

female athletes were shortchanged a total of $4,944,355 in athletics financial aid over this 16-year period.

TABLE 14.  MSU Athletics Financial Aid - Computation of Female Athlete Entitlement Based on Prong One Female Athlete Participation Equal to Percent Females Full-time Undergraduates – 2003-04 to 2018-19

| Survey Year | Men's Teams Athletics Financial Aid Actually Awarded | Percent Financial Aid to Male Athletes | Actual Percent of Male Athletes | Difference Between Aid Received & Aid Entitled | Male athlete **Overpayment** Beyond One Percent Allowable Variance | Women's Teams Athletics Financial Aid Actually Awarded | Percent Financial Aid to Female Athletes | Actual Percent of Female Athletes | Difference Between Aid Received & Aid Entitled | Female Athlete **Shortfall** Beyond One Percent Allowable Variance | Percent Female Under Grads |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003-04 | $3,709,776 | 52.8% | 47.3% | 5.5% | $165,896 | $3,319,238 | 47.2% | 52.7% | -5.5% | -$214,817 | 53.9% |
| 2004-05 | $3,732,412 | 49.4% | 47.8% | 1.6% | $24,041 | $3,817,526 | 50.6% | 52.2% | -1.6% | -$100,940 | 53.4% |
| 2005-06 | $4,133,718 | 52.6% | 48.7% | 3.9% | $120,420 | $3,725,980 | 47.4% | 51.3% | -3.9% | -$183,062 | 53.9% |
| 2006-07 | $4,492,164 | 54.6% | 47.5% | 7.1% | $274,359 | $3,738,295 | 45.4% | 52.5% | -7.1% | -$303,082 | 54.1% |
| 2007-08 | $4,670,949 | 53.1% | 48.4% | 4.8% | $175,621 | $4,119,795 | 46.9% | 51.6% | -4.8% | -$237,294 | 53.5% |
| 2008-09 | $4,896,410 | 53.6% | 47.5% | 6.2% | $253,157 | $4,231,222 | 46.4% | 52.5% | -6.2% | -$303,389 | 53.4% |
| 2009-10 | $5,135,253 | 53.7% | 47.6% | 6.1% | $261,904 | $4,427,977 | 46.3% | 52.4% | -6.1% | -$314,392 | 52.7% |
| 2010-11 | $5,296,131 | 52.9% | 47.9% | 5.0% | $210,895 | $4,717,934 | 47.1% | 52.1% | -5.0% | -$282,229 | 52.2% |
| 2011-12 | $5,800,990 | 52.3% | 48.3% | 4.0% | $173,413 | $5,301,235 | 47.7% | 51.7% | -4.0% | -$264,498 | 51.4% |
| 2012-13 | $6,403,695 | 54.0% | 49.2% | 4.8% | $242,374 | $5,450,087 | 46.0% | 50.8% | -4.8% | -$315,282 | 50.6% |
| 2013-14 | $6,676,983 | 54.2% | 50.2% | 4.0% | $197,698 | $5,646,897 | 45.8% | 49.8% | -4.0% | -$280,136 | 50.5% |
| 2014-15 | $6,966,671 | 55.9% | 50.1% | 5.8% | $335,511 | $5,502,941 | 44.1% | 49.9% | -5.8% | -$375,077 | 50.7% |
| 2015-16 | $7,997,219 | 55.1% | 49.8% | 5.2% | $338,666 | $6,522,399 | 44.9% | 50.2% | -5.2% | -$406,659 | 50.9% |
| 2016-17 | $8,058,797 | 54.4% | 50.5% | 3.9% | $234,729 | $6,754,812 | 45.6% | 49.5% | -3.9% | -$331,844 | 51.1% |
| 2017-18 | $8,865,731 | 56.0% | 48.8% | 7.2% | $547,939 | $6,963,048 | 44.0% | 51.2% | -7.2% | -$569,606 | 50.9% |
| 2018-19 | $9,262,219 | 55.3% | 50.1% | 5.2% | $385,834 | $7,493,855 | 44.7% | 49.9% | -5.2% | -$462,047 | 51.2% |
| | | | | OVERPAYMENT | $3,942,457 | | | | UNDERPAYMENT | -$4,944,355 | |

*Based on Equity in Athletics Disclosure Act Data at https://ope.ed.gov/ath

**6. I opine that there are significant inequities in per capita recruiting expenses between male and female participants.**  In addition to the Title 106.41 athletics participation and laundry list provisions and the 106.37 financial aid sections of the regulation that have direct references to how requirements are applied to athletics, recruiting is a non-athletics specific provision which must be assessed:

*106.23   Recruitment....a recipient shall not:*

**Ex. 13, Pg. 44**

*(1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate;*

Coaches must be provided with substantially equal opportunities and financial and other resources to recruit.  Prospective male and female student athletes must be provided with the same benefits, treatment, and opportunities such as paid trips to campus, equal expenditures for on- or off- campus entertainment during campus visits, etc.  Specifically, the presence of any restrictions on recruiting (such as coaches being limited to geographical areas such as state, regional, national or international, limits on the number of paid trips that a sport can provide to visiting prospects, limits on per athlete or athlete hosts entertainment expenses when prospective recruits visit campus, etc.) are examined.  If there are no policy restrictions and the allocation of recruiting budgets is the sole limiter of recruiting support, a comparison of per capita recruiting expense is the most reasonable metric that should be carefully examined to ensure equal treatment of male and female athletes.

Utilizing MSU EADA reports that include annual recruiting expenditures for men's and women's sports from 2003-04 to 2018-19, I created the following Table 15 which shows the percentage of total recruiting expenditures provided to the men's and women's program and computes a per capita expenditure as well as the difference between per capita expenditures spent on recruiting male versus female athletes.  For ease of understanding, the last column of Table 11 shows how much more MSU spent to recruit a male athlete than a female athlete as a percent of recruiting expense.  Note that these calculations are understated because I have opined that the MSU EADA participation numbers reflective overcounting of female athletes resulting in lower per capita computations. These per capita recruiting expense differences are so substantial and the pattern in favor of male athletes so consistent that there is good reason to believe that there are gender inequities in this area.

TABLE 15.  Comparison of MSU Per Capita Recruiting Expenditures on Male and Female Athletes – 2003-04 to 2018-19

| Survey Year | Men's Team Recruiting Expenses | Percent Male Athletes | % Male Recruiting Expenditures | Women's Team Recruiting Expenses | Percent Female Athletes | % Female Recruiting Expenditures | Number of Male Athletes | Number of Female Athletes | Per Capita Male Athlete Recruiting | Per Capita Female Athlete Recruiting | Per Capita Difference Favoring Males | MSU spent X percent more to recruit a male athlete |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2003-04 | $644,531 | 47.3% | 72.0% | $251,200 | 52.7% | 28.0% | 360 | 401 | $1,790 | $626 | $1,164 | 65% |
| 2004-05 | $700,236 | 47.8% | 73.6% | $251,473 | 52.2% | 26.4% | 368 | 402 | $1,903 | $626 | $1,277 | 67% |
| 2005-06 | $746,073 | 48.7% | 70.6% | $310,140 | 51.3% | 29.4% | 369 | 389 | $2,022 | $797 | $1,225 | 61% |
| 2006-07 | $765,204 | 47.5% | 69.6% | $333,597 | 52.5% | 30.4% | 385 | 426 | $1,988 | $783 | $1,204 | 61% |
| 2007-08 | $744,715 | 48.4% | 69.8% | $322,373 | 51.6% | 30.2% | 387 | 413 | $1,924 | $781 | $1,144 | 59% |
| 2008-09 | $634,169 | 47.5% | 70.4% | $266,970 | 52.5% | 29.6% | 404 | 447 | $1,570 | $597 | $972 | 62% |
| 2009-10 | $677,958 | 47.6% | 70.9% | $277,617 | 52.4% | 29.1% | 426 | 469 | $1,591 | $592 | $1,000 | 63% |
| 2010-11 | $653,640 | 47.9% | 69.5% | $287,517 | 52.1% | 30.5% | 423 | 460 | $1,545 | $625 | $920 | 60% |
| 2011-12 | $718,053 | 48.3% | 70.5% | $300,773 | 51.7% | 29.5% | 458 | 491 | $1,568 | $613 | $955 | 61% |
| 2012-13 | $1,010,252 | 49.2% | 74.8% | $341,192 | 50.8% | 25.2% | 452 | 466 | $2,235 | $732 | $1,503 | 67% |
| 2013-14 | $1,080,216 | 50.2% | 74.8% | $363,572 | 49.8% | 25.2% | 460 | 456 | $2,348 | $797 | $1,551 | 66% |
| 2014-15 | $1,087,467 | 50.1% | 71.3% | $437,690 | 49.9% | 28.7% | 470 | 469 | $2,314 | $933 | $1,381 | 60% |
| 2015-16 | $1,016,881 | 49.8% | 73.4% | $368,548 | 50.2% | 26.6% | 479 | 482 | $2,123 | $765 | $1,358 | 64% |
| 2016-17 | $1,312,436 | 50.5% | 76.1% | $412,884 | 49.5% | 23.9% | 465 | 456 | $2,822 | $905 | $1,917 | 68% |
| 2017-18 | $1,291,228 | 48.8% | 76.6% | $393,538 | 51.2% | 23.4% | 459 | 481 | $2,813 | $818 | $1,995 | 71% |
| 2018-19 | $1,360,191 | 50.1% | 76.6% | $414,564 | 49.9% | 23.4% | 451 | 449 | $3,016 | $923 | $2,093 | 69% |

*Based on Equity in Athletics Disclosure Act Data at https://ope.ed.gov/a

7.   **I opine that MSU is able to comply with the proportionality provision of Title IX without dropping any men's or women's teams.**   Prior to evaluating the MSU proposal to restructure its athletic program effective 2021-22, it is important to understand that there is no Title IX regulation that would compel MSU to restructure its program in a manner which requires the dropping of any men's or women's sport program.  It is inaccurate in most instances for an athletics administrator to maintain that financial exigencies *require* the athletic program to eliminate sports teams.   It appears that MSU is alleging that this is the case:

> *As you surely know, the pandemic has caused extreme budgetary shortfalls for colleges and universities, including MSU. MSU has been forced to cut costs across the university. In analyzing how best to position the athletics program for long-term financial stability, MSU determined that it cannot provide its high standard of student-athlete experience for the men's and women's swimming and diving teams.*
>
> -- Quinn to Zwagerman at pg. 2

In my textbook, *Athletic Director's Desk Reference*, chapter four explains how to restructure an athletic program to significantly reduce expenses and keep all sports programs.  In short, instead of the current MSU program structure that attempts to treat all men's and women's sports lavishly with regard to coaching staffs, scholarships, operating expenses, etc., this chapter describes how sports can be distributed among two or three different funding tiers, each tier serving an equal proportion of male and female athletes, and male and female athletes within their respective tiers fully meeting Title IX gender equity obligations of equal athletics financial aid, recruiting support, and treatment and benefits.  This approach would allow MSU to keep several priority sports like football and basketball for males and whatever number of women's sports is required to have an equal proportion of all female athletes in this tier, at high funding levels while other sports are distributed among significantly lower funding tiers (equal proportions of male and female athletes in each tier).  This system is a common sports management approach to meeting financial exigency.

**8. I opine that MSU should not be allowed to proceed with reducing female participation opportunities based on an assertion of current or future Title IX compliance after programs are eliminated.**   What the MSU restructure plan reveals is a common pattern among institutions that have never met the Prong One proportionality requirement -- the hope that they will be permitted:

(a) to pursue a configuration of an athletic program in which a smaller number of sports are treated equally and lavishly, using the funds saved through the elimination of sports to support remaining priority sports and their excessively paid coaches and administrators which the institution would like to retain;

(b) ignore 18 years of treating female athletes inequitably to allow the program to "reset" with no consequences for probable past discrimination on the basis of sex;

(c) allow the proposed program reconfiguration to include one final insult to female participants – doing further harm to the underrepresented and less favorably treated female class – in this case, those female swimmers and divers whose sport would be terminated;

(d) allow MSU to continue to misrepresent the actual number of participation opportunities afforded female athletes or treat female athletes less favorably than male athletes; and

(e) allow this "paper" plan to proceed without MSU actually demonstrating for a specified period of time that it is capable of actually conducting an athletic program that provides female athletes an equal opportunity to participate and equal treatment as the law requires.

It is within this context that, in sections 9 and 10 of this report which follow, I opine on the gender equity issues created by the proposed plan to drop men's and women's swimming and diving.

**9.  I opine that MSU's counting or plans to count prospective participants for the 2021-22 academic year do not comport with proper Title IX participant counting methodology and how equity in athletics participation is assessed because the participant counts are projected, proposed, or promised rather than being actual.**

**(a) Counting Prospective Participants Rather than Actual Participants is <u>Incorrect</u> under Title IX counting regulations.** The assessment of athletics gender equity is institution specific. Comparisons are made with regard to the actual participation opportunities and actual treatment and benefits afforded to male and female athletes within each institution rather than any future promise of such treatment.  No comparisons are made to the treatment of males and females at other institutions.  Participant counting in any year cannot be validated until a sport season is completed.  Quinn, in his December 4, 2020 letter to Zwagerman admits this fact:

**Ex. 13, Pg. 48**

*A full analysis cannot yet be conducted for the 2020-21 academic year because, under OCR guidelines, participation counts are tied to the various sports' seasons, many of which have not begun, but MSU anticipates meeting the substantial proportionality test this year as it has in the past.    - –pg. 2*

He also suggests that MSU should be trusted to meet their Title IX obligations which he contends MSU has met in the past.  I have opined that any contention of MSU meeting the proportionality requirement in the past is inaccurate.

Title IX participant counts in each sport are normally based upon an examination of three athletic department documents:   NCAA Squad Lists, NCAA Hour-Limitation records, and competition results.  The NCAA "Squad Lists" are official records of recruiting, eligibility, and participation status on the first day of competition, whether financial assistance received by the student is countable athletics financial assistance subject to Title IX distribution requirements, and whether the athlete quit the sport or otherwise changed his/her status after the first day of competition:

**15.5.11 Squad List.**
**15.5.11.1 Eligibility Requirement.** To be eligible to represent an institution in intercollegiate athletics competition, a student-athlete shall be included on the institution's squad-list form. **[D]**
**15.5.11.2 Squad-List Form.** The institution shall compile a list of the squad members in each sport on the first day of competition and shall indicate thereon the status of each member in the categories listed
    **15.5.11.2.1 Procedures.** The following procedures shall be used for the squad list:
    (a) The form shall be available for examination upon request by an authorized representative of another member institution, the NCAA, and, if the institution is a member of a conference, an authorized representative of the conference;
    (b) A supplementary form may be filed to add names of persons not initially on the squad or to indicate a change of status;
    (c) A student-athlete's name must be on the official institutional form to qualify to represent the institution in intercollegiate athletics; and

(d) The athletics director (or his or her designee, who may not be a coaching staff member) shall sign the form for each sport. The head coach in each sport shall sign the form for the applicable sport.

-- 2020-21 Division I NCAA Manual, pp. 230-31

The record of receipt of countable athletics financial aid is important because a scholarship recipient counts no matter if the athlete has no eligibility remaining, is injured, is academically ineligible or does not continue to practice with the team, as long as that athlete is still receiving other benefits of being an athlete such as tutoring, academic advising, access to athletics program services, etc. Because the athlete is receiving a significant athletic benefit (financial aid) as well as other services, the athlete is counted as a participant.

However, Title IX does not require an athlete to participate in a competition in order to count, only to have regularly participated in practices and team meetings and received the treatment and benefits normally provided to athletes competing.  Thus, the NCAA Hour-Limitation Record is used to determine whether an athlete who never actually participated in a competition should count because he/she participated in practices and received the benefits of coaching and training throughout the year:

**17.1.7.3.4 Hour-Limitation Record.** Countable hours must be recorded on a daily basis for each student-athlete regardless of whether the student-athlete is participating in an individual or team sport. Any countable individual or group athletically related activity must count against the time limitation for each student-athlete who participates in the activity but does not count against time limitations for other team members who do not participate in the activity.

Event results and statistics are usually maintained by the Sports Information Director in the athletics department and posted on the institution's web site.  If the athlete participates in one or more competitions, the athlete is counted as a participant.

Thus, while participants are generally counted as participants on the first day of competition in that sport, counting on the first day is a matter of convenience.  An athlete recorded

on the Squad List as present on the team on the first day of competition would not necessarily count as a participant if the athlete was not entered to participate in at least one competition in sports in which competition entries are unlimited.[11]   Neither would an athlete who never participated in a competition and failed to regularly attend team practices and meetings throughout the year be counted as a participant.  It is therefore impossible to verify participation numbers until the end of the season and only if all of these documents are available.  Further, as previously noted, careful examination of these documents is essential because MSU participation counting is highly suspect in multiple sports.

**(b)  The MSU 2021-22 Proposed Plan is simply a promise to comply without even a hypothetical construction tied to any reality with regard to actual past participation of male and female athletes.**  A Prong One plan to comply with Title IX must be more than any promise. As I explain to my clients, at the very least there should be a projection of undergraduate enrollment and a projected sport-by-sport roster management cap (the number of athletes to be selected for each team) that is tied to reasonable team size that produces the goal of a variance from proportionality of "0."  "0" variance is necessary to accommodate one or more coaches not achieving their roster management caps (optimum team size).  It doesn't make sense to start any year with a goal of non-compliance with proportionality.

Given the fact that MSU has provided no projections regarding team sizes other than men's and swimming programs would no longer exist, I looked at seven different team size options tied to reality.  Table 16 depicts these team sizes, noting that I continue to opine that female athletes are significantly overcounted for all reasons previously discussed.  Thus, Table 16 estimates of

---

[11]   See *Biediger et al. v. Quinnipiac University*, U.S. Dist. Court (Conn..) Case No. 3:09-CV-6211

**Ex. 13, Pg. 51**

female participation gaps are UNDER estimates.  The raw data for this summary is displayed in

Tables 10 and 11 on p. 33 and p. 35 respectively.

Table 16.  Various Participation Possibilities That Could Be Justified
for Use to Test the MSU Plan Regarding the Selection of Sports and Potential
for Achieving Prong One Participation Proportionality

| ROSTERS SIZES USED TO TEST 2021-22 RECONFIGURED ATHLETIC PROGRAM WITHOUT SWIMMING AND DIVING | EADA Actual 2018-19 | WEB Actual 2018-19 | WEB Actual 2019-20 | Based on 16 yrs EADA Data | | | NCAA Avg. D-I Roster 2018-19 |
|---|---|---|---|---|---|---|---|
| | | | | Range | Mean | Med | |
| **Men's Sports** | | | | | | | |
| Baseball | 36 | 36 | 32 | 30-42 | 34 | 34 | 36.4 |
| Basketball | 16 | 16 | 18 | 13-18 | 16 | 16 | 15.7 |
| Football | 117 | 119 | 112 | 103-119 | 110 | 111 | 121.8 |
| Golf | 12 | 12 | 9 | 9-13 | 11 | 11 | 9.8 |
| Ice Hockey | 28 | 28 | 25 | 24-29 | 27 | 27 | 28.5 |
| Soccer | 28 | 28 | 26 | 24-29 | 26 | 26 | 29.5 |
| Tennis | 9 | 9 | 10 | 8-12 | 10 | 10 | 10.1 |
| Xctry/Indoor/Outdoor T&F | 139 | 141 | 138 | 87-185 | 138 | 139 | 92.6 |
| Wrestling | 37 | 36 | 35 | 30-40 | 33 | 32 | 33.1 |
| TOTAL | 422 | 425 | 405 | | 405 | 406 | 378 |
| **Women's Sports** | | | | | | | |
| Basketball* | 15 | 15 | 13 | 12-26 | 14 | 15 | 14.4 |
| Field Hockey | 23 | 19 | 21 | 17-22 | 22 | 21 | 23 |
| Golf | 13 | 14 | 10 | 7-11 | 12 | 12 | 8.2 |
| Gymnastics | 18 | 16 | 22 | 13-22 | 16 | 16 | 18.1 |
| Rowing | 89 | 83 | 67 | 64-108 | 52 | 46 | 62.2 |
| Soccer | 35 | 35 | 30 | 24-36 | 33 | 32 | 28.4 |
| Softball | 21 | 20 | 25 | 15-25 | 19 | 18 | 21.7 |
| Tennis | 12 | 12 | 11 | 7-11 | 11 | 11 | 9.1 |
| Xctry/Indoor/Outdoor T&F | 173 | 176 | 151 | 101-204 | 151 | 150 | 96.9 |
| Volleyball | 16 | 15 | 13 | 14-20 | 16 | 15 | 16.6 |
| TOTAL | 415 | 405 | 363 | | 346 | 336 | 298.6 |

I first examined the 2018-19 EADA data and the 2018-19 and 2019-20 Web roster sizes

against 2018-19, 2019-20 and 2020-21 actual MSU enrollment because actual athlete participation

**Ex. 13, Pg. 52**

and undergraduate enrollment are the two factors determining proportionality.   The following Table 17 show the results of these six proportionality solutions.

Table 17.   Examination of Six Possible MSU Roster Scenarios Based on Recent EADA Reported and MSU Web Rosters

| 2021-22 SPORTS PLAN | | | | 2021-22 SPORTS PLAN | | |
|---|---|---|---|---|---|---|
| A. Actual 2018-19 EADA Participation/2018-19 Actual Enrollment | | | | D.  Actual 2018-19 Web Rosters/2018-19 Actual Enrollment | | |
| | Male | Female | | | Male | Female |
| Total -Athletes | 422 | 415 | | Total -Athletes | 425 | 405 |
| % - Athletes | 50.4% | 49.6% | | % - Athletes | 51.20% | 48.80% |
| Total- Undergrad Students  (18-19) | 17360 | 18231 | | Total- Undergrad Students  (18-19) | 17360 | 18231 |
| % - Undergrad Students | 48.8% | 51.2% | | % - Undergrad Students | 48.8% | 51.2% |
| Percentage Difference | 1.64% | -1.64% | | Percentage Difference | 2.43% | -2.43% |
| Male Participation Gap | | 28 | | Female Participation Gap | | 41 |

| 2021-22 SPORTS PLAN | | | | 2021-22 SPORTS PLAN | | |
|---|---|---|---|---|---|---|
| B. Actual 2018-19 EADA Rosters/2019-20 Actual Enrollment | | | | E.  Actual 2019-20 Web Rosters/2019-20 Actual Enrollment | | |
| | Male | Female | | | Male | Female |
| Total -Athletes | 422 | 415 | | Total -Athletes | 405 | 363 |
| % - Athletes | 50.4% | 49.6% | | % - Athletes | 52.73% | 47.27% |
| Total- Undergrad Students  (19-20) | 17530 | 18192 | | Total- Undergrad Students  (20-21) | 17530 | 18192 |
| % - Undergrad Students | 49.1% | 50.9% | | % - Undergrad Students | 49.1% | 50.9% |
| Percentage Difference | 1.34% | -1.34% | | Percentage Difference | 3.66% | -3.66% |
| Female Participation Gap | | 23 | | Female Participation Gap | | 57 |

| 2021-22 SPORTS PLAN | | | | 2021-22 SPORTS PLAN | | |
|---|---|---|---|---|---|---|
| C. Actual 2018-19 EADA Rosters/2020-21 Actual Enrollment | | | | F. Actual 2019-20 Web Rosters/2020-21 Actual Enrollment | | |
| | Male | Female | | | Male | Female |
| Total -Athletes | 422 | 415 | | Total -Athletes | 405 | 363 |
| % - Athletes | 50.42% | 49.58% | | % - Athletes | 52.7% | 47.3% |
| Total- Undergrad Students  (20-21) | 16639 | 17949 | | Total- Undergrad Students  (20-21) | 16639 | 17949 |
| % - Undergrad Students | 48.1% | 51.9% | | % - Undergrad Students | 48.1% | 51.9% |
| Percentage Difference | 2.31% | -2.31% | | Percentage Difference | 4.63% | -4.63% |
| Female Participation Gap | | 40 | | Female Participation Gap | | 74 |

I then tested three other hypothetical rosters – see Table 18 - based on the MSU mean and median team sizes and NCAA Division I average team sizes using 2020-21 undergraduate enrollment that produced female participation gaps ranging from 102 to 122.

Table 18.  Title IX Prong One Participation Computation Using
Five Other Roster Scenarios Based on Table 13 Data

| 2021-22 SPORTS PLAN | MSU MEAN TEAM SIZE | |
| --- | --- | --- |
| Based on MSU Mean Roster/Actual 2020-21 Enrollment | | |
| | Male | Female* |
| Total -Athletes | 405 | 346 |
| % - Athletes | 53.9% | 46.1% |
| Total- Undergrad Students  (20-21) | 16639 | 17949 |
| % - Undergrad Students | 46.4% | 53.6% |
| Percentage Difference | 7.53% | -7.53% |
| Female Participation Gap | | 122 |

| 2021-22 SPORTS PLAN | NCAA AVG. TEAM SIZE | |
| --- | --- | --- |
| E.  NCAA Division I Avg. Rosters/2020-21 Actual Enrollment | | |
| | Male | Female |
| Total -Athletes | 378 | 298.6 |
| % - Athletes | 55.87% | 44.13% |
| Total- Undergrad Students (20-21) | 16639 | 17949 |
| % - Undergrad Students | 48.1% | 51.9% |
| Percentage Difference | 7.76% | -7.76% |
| Female Participation Gap | | 109 |

| 2021-22 SPORTS PLAN | MSU MEDIAN TEAM SIZE | |
| --- | --- | --- |
| D.  MSU Median Roster/2020-21 Actual Enrollment | | |
| | Male | Female |
| Total -Athletes | 406 | 336 |
| % - Athletes | 54.72% | 45.28% |
| Total- Undergrad Students (20-21) | 16639 | 17949 |
| % - Undergrad Students | 48.1% | 51.9% |
| Percentage Difference | 6.61% | -6.61% |
| Female Participation Gap | | 102 |

If MSU was my client, given my previously expressed concerns regarding the inaccuracy of participant counting, the inflation of women's rosters, the inclusion of a novice level of competition created by inclusion of the current women's rowing program in the 2021-22 plan, and the inability of MSU in the past to demonstrate the ability to produce a Prong One compliant athletic program for the past 18 years, I would advise my client to start from scratch and conduct a comprehensive Title IX assessment.  Participation is just one aspect of the gender equity issue. That Title IX element alone requires MSU     to assess and accommodate the interests and abilities of both sexes, produce accurate Title IX participation counts, deal with the sub varsity rowing "level of competition" discrepancy and meet with coaches to ensure the development of a roster management plan in which the size of each team is optimum for each sport. Other gender equity elements requiring MSU's immediate attention are scholarships and recruiting.  I opine that, based upon my examination to date, MSU does not appear to fully understand its Title IX obligations and how to construct a fully Title IX compliant program.

Ex. 13, Pg. 54

**9.  I opine that the student-athlete plaintiffs in this case have already and would be likely to suffer considerable harm in the future as a result of the elimination of the MSU swimming and diving program effective 2021-22 and the removal of MSU's current obligation to expand rather than diminish participation opportunities for female athletes.**  I reviewed plaintiffs' declarations but have not yet interviewed them or their coaches.   In the following paragraphs I offer the reasons for this opinion.

**(a)  I opine that commencing with the announcement of the 2021-22 elimination of the MSU men's and women's swimming and diving programs on October 22, 2020, that it will be incredibly difficult to restart these programs if they are not immediately reinstated.**

Based on my 18 years of experience as an athletic director and five years as a college coach, I believe it will be difficult if not impossible for the women's swimming and diving program, if the decision to drop the team effective during the 2021-22 season is not stayed, to field a full team of reasonably skilled athletes before 2024-25 at the earliest.   My reasons for this opinion are:

(i)  Head and assistant coaches will seek employment at institutions other than MSU as soon as possible.  In this case, the head coach is retiring.  Whether an assistant has been groomed to take over or a new hire replaces the retiring head coach, neither the current assistant or a new hire will consider coaching MSU without an assurance that the team will be restored to its previous varsity sport status in the athletic program.   Thus, absent a stay of the proposed program cuts, recruiting a permanent replacement would have to wait until any court case and appeal was completed and resulted in a judgment in favor of the plaintiffs' eliminated team, easily a one to two-year process.  Even then, prospective coaches would have to be assured of the long-term stability of the program in some way.  Thus, it is unlikely that a favorable court judgment could occur prior to mid-2022-23, which means a

new coach would likely not be hired until the end of the 2022-23 academic year.  This would be well after a 2023-24 freshman recruiting class committed to their institutions – which would not include MSU as a choice.

(ii) Realistically, recruiting varsity quality athletes to reconstitute the team would have to wait for the hiring of a new coach.  Assuming a coach could be hired for the 2023-24 season at the earliest, the first recruiting class of athletes would not arrive on campus until the 2024-25 season, and it is doubtful that sufficient numbers or a balanced roster of freshmen, sophomores, juniors and seniors could be assembled for that season.

(iii) 2021-22 and 2022-23 team schedules do not exist and rescheduling could occur for the 2023-24 seasons only if all judicial processes were completed, a judgment rendered in favor of the plaintiffs, there was a sufficient number of current athletes who had not yet graduated or transferred who, combined with transfers and less than high quality athletes could be assembled to participate in a 2023-24 season.

(iv) Current MSU freshmen and sophomore swimmers will most likely seek to transfer to other institutions for the spring 2021 or fall 2022 semesters, because of the academic and financial reasons cited below. It would be almost impossible to transfer for the spring 2021 semester at this late date, except to institutions in immediate proximity to athletes' hometowns.  Thus, the viability of the team with regard to sufficient numbers of skilled players is likely to be quickly depleted.

(v) It would take two to four years beginning in 2024-25 for MSU to rebuild its reputation and gain the confidence of the most highly sought-after prospective student-athletes, who will look at MSU's decision to drop their respective sports as a lack of commitment.  Only a very good coach hire would minimize this liability.

**(b)  I opine that there will be a high likelihood of academic harm to individual student athletes who transfer for the purpose of being able to continue their collegiate sports participation.**  It would be impractical and very unusual for sophomore, junior and senior transfers to other institutions not to be adversely affected academically.  Institutions of higher education seldom accept 100 percent of all courses previously taken by transfer students because they are not exact matches to the courses offered at the new institution.  In addition, almost every institution of higher education has minimum residency or credits-earned requirements in order to earn the baccalaureate degree from that institution.  Depending on the number of credits accepted upon transfer, the student may be forced to extend her time in college or may have to take heavier academic loads to meet minimum credit or actual residency requirements. Also, it is usually more difficult for transfers to be accepted into more highly desired academic majors due to prerequisite academic courses that may only be available at the new institution. MSU student athletes have been admitted to a state flagship institution, among the nation's most selective institutions of higher education.  Thus, it is unlikely that there will be a successful transfer to another Big Ten or other FBS institution unless the athlete is an exceptional student or proficient enough to qualify for an athletic scholarship or be the beneficiary of special admissions privileges associated with that status.  Thus, the transfer student-athlete may be forced to attend an academically less-selective institution.

**(c)  I opine that there will be a high likelihood of financial harm to transferring student    athletes.**  Because swimming and diving is an NCAA equivalency sport, athletes are more likely to receive partial athletic scholarships rather than full scholarships unless the athlete is nationally ranked and highly desired.  Recruited student athletes usually receive preferred packaging of need-based and merit financial aid, meaning that a larger portion of their financial

aid package will be non-repayable grants rather than loans.  Typically, large enrollment major state universities like MSU have significant endowments, the proceeds of which are used to provide larger proportions of their financial aid package as non-repayable grant aid.  If the student-athlete cannot transfer to another Big Ten school, it is likely that she will seek to attend a lesser resourced Division I institution with a comparable quality athletic program that may or may not have athletic aid available and may or may not have the financial resources available to offer an attractive financial aid package that includes a significant percentage of non-repayable aid.

There are two other factors that will minimize the availability of athletic aid for transfer students: (a) the Covid-19 economic crisis has caused reductions in athletics budgets nationwide and (b) the unplanned extension of the eligibility of college athlete seniors who would have completed their athletic eligibility in the spring of 2020, but, because of Covid-19, did not use their last year of eligibility and plan to return to their original institutions for a "do over."  This may well occur with winter sports athletes in the midst of the 2020-21 2nd wave pandemic. The NCAA is permitting member institutions to exceed normal NCAA scholarship limits in 2020-21 in order to accommodate these athletes but it is unclear what will happen with similarly situated 2020-21 athletes needing to extend their eligibility into 2021-22.  In any event, unanticipated athletic scholarship costs ranging from $250,000 to $600,000 per institution (depending on number of athletes and differences in cost of tuition) to support athletes whose eligibility has been extended makes it more unlikely that athletic aid and non-athletics non-repayable financial aid will be widely available to new transfer student     athletes.  Thus, the combination of lack of availability of athletics aid and more loans than non-repayable grants in the packaging of other non-athletics aid increases the likelihood of significant additional financial costs to complete the transfer student-athlete's education.

**(d)  I opine that there will be a high likelihood of harm to individual athletes who remain at MSU with regard to physical health and well-being and loss of the opportunity to achieve athletic performance outcomes.**  Because swimming and diving is a winter sport, we don't know what will happen if the 2020-21 season is cut short or eliminated.  However, what happened to 2020 spring sport athletes who lost their spring eligibility because of Covid-19, but graduated, provides historical precedent.  Most would most likely end their athletic careers, rather than seek another institution to complete their eligibility.  Those athletes who must remain at MSU because of the previously mentioned factors face additional, different types of harm.  The Division I athlete's decision to attend a college or university because of the coach and participation in athletics is equally as important, and in some cases, even more important, than the academic opportunities offered.  Daily physical conditioning, being pushed by the coach to achieve growth in the acquisition of skills, a commitment to devote 30 to 50 hours per week within a narrow window of time during which an athlete is physically capable of achieving high levels of performance, is a way of life for the athlete.  Division I swimming and diving is not a recreational sport activity common to most club sports or programs and the experience offered by lower NCAA competitive divisions is not comparable.  Division I college sport has become the primary training ground for aspiring USA national team members and Olympians.  When coaches are no longer available because they have departed, when access to athletics facilities and services is limited because the athlete is no longer a member of the varsity athletic teams, this is a huge culture change that affects the mental health and well-being of athletes that should not be underestimated.

Coaches are the people who help balance the athlete's life, especially when that need is created by the pressures of classes, training, competition, dealing with injuries, etc.  They guide the development of team chemistry and instill the player's trust in teammates – relationships that

Ex. 13, Pg. 59

last for a lifetime.  Breaking up the team construct of highly valued intrapersonal relationships is a significant harm – losing your best friend times ten.

**(e)  I opine that all of the plaintiffs have and will continue to experience moral injury because of the fact that their institutions failed to fulfill the promises made when they were recruited and the realization that the institution has ignored its obligation to treat male and female athletes equally.**  MSU's lack of notice to athletes regarding the intent to eliminate programs represents a "moral injury" in that athletes trusted that the higher education institution they chose to attend would fulfill its recruiting commitment -- four years of an outstanding education and athletic program benefits. They expected the institution to provide the same certainty with this promise as the availability of academic classes and outstanding faculty.  When the proverbial "rug is pulled out from under" student    athletes with no notice and no justification, the student    athletes are harmed. The harm was particularly severe in this case, where the decision was unexpected and all plaintiffs were on campus training for the upcoming season.  The female student    athletes were also injured by the inequitable ways in which their varsity athletic team was not equally supported prior to the termination decision, then injured again with a terminated decision.  They have received a clear message that MSU does not value their participation or equal treatment obligations under Title IX.

Respectfully submitted,

Donna A. Lopiano, Ph.D.

Date:  January 12, 2021

# DONNA A. LOPIANO, B.S., M.A., Ph.D

452 Fisher Court
Shelton, CT 06484     516-380-1213 (c)    203-538-5280 (w)
SportsManagementResources@gmail.com

*Revised as of 1-1-2021*

## EDUCATION

| | |
|---|---|
| Doctor of Philosophy in Physical Education | University of Southern California January 11, 1974 |
| Master of Arts in Physical Education | University of Southern California August 20, 1969 |
| Bachelor of Science in Health and Physical Education | Southern Connecticut State College June 8, 1968 |
| Institute for Non-Profit Consulting Certificate of Completion | CompassPoint Nonprofit Services December 7, 2007 |

## PREVIOUS EMPLOYMENT

2012-present    Adjunct Professor, Sports Management, Southern Connecticut State University

2008-present    President and Founder, Sports Management Resources
- a consulting firm specializing in educational sport
- helping sports organizations solve integrity, growth and development challenges
- www.SportsManagementResources.com

1992-2007    Chief Executive Officer, Women's Sports Foundation
Built an internationally respected education, research and public policy organization:
- Secured funds that enabled the Women's Sports Foundation to award more than $50 million in cash grants and educational materials
- Expanded the Women's Sports Foundation endowment from $1 million to $4 million; grew annual revenues from $1 million to $10 million and built staff from eight to sixty-five
- Driving force behind the development of the award-winning GoGirlGo! educational curriculum that since 2001 has reached more than 625,000 girls; significantly changing their attitudes about healthy lifestyle choices
- Served as a leading expert and national spokesperson on gender equity issues, including Title IX and the Amateur Sports Act, providing expert testimony for numerous court cases on coaches' compensation, athletes' rights, and equitable treatment
- Repeatedly led national efforts to strengthen Title IX legislation and its enforcement, successfully educating elected officials and policy makers on the importance of upholding the law
- Recognized as one of the "100 Most Influential Sports Educators in America" by the Institute for International Sport, "100 Most Influential People in Sports" by *The Sporting News* and "The 50 Most Influential People in College Sports" by *College Sports*

1975-1992    Director of Intercollegiate Athletics for Women and lecturer, Kinesiology and Health Education Department, The University of Texas at Austin
Constructed what many believed to be the premiere women's athletics program during this period; twice earning designation of top program in the nation:
- All eight sports consistently national ranked in the top ten in Division I

Page 1

**Ex. 13, Pg. 61**

**PREVIOUS EMPLOYMENT (continued)**

- o Grew budget from $57,000 in 1975 to over $4 million with 34 endowed academic scholarships for student-athletes in 1992
- o Eighteen national championships in six different sports, 51 individual sport national champion athletes, 57 Southwest Conference championships and 395 All-American athletes, dozens among them Olympians and world champions
- o Ninety percent of women athletes who exhausted their athletic eligibility at the University of Texas received a baccalaureate degree
- o Served as Lecturer, Kinesiology and Health Education Department, teaching sports ethics and athletic management

1971-75      Assistant Professor of Physical Education,  Assistant Director of Athletics and Head Coach of men's and women's varsity teams at Brooklyn College of The City University of New York
- o Led development of new undergraduate curriculum for physical education majors
- o Taught undergraduate courses: Philosophical Perspectives of Physical Education, Women in Sport,  Behavioral Perspectives of Physical Education, Coaching Techniques, and Psycho-Social Aspects of Women in Sport as well as skills and methods courses in volleyball, basketball, softball and officiating
- o Taught graduate courses in Sociology of Sport, Administration of Athletics, Women in Sport
- o Initiated women's intercollegiate volleyball and grew it into a nationally ranked program
- o Head Coach of women's basketball, women's softball, women's volleyball and men's volleyball

1969-70      Graduate Teaching Assistant, Women's Intramural Director, Women's Intercollegiate Volleyball Coach at The University of Southern California
While a graduate assistant and doctoral student:
- o Served as head administrator of the University's women's intramural program
- o Served as head varsity volleyball coach
- o Taught a variety of sports classes for undergraduate students

Visiting Professor/Adjunct Professor/Executive in Residence - Courses Taught at Other Universities

| | |
|---|---|
| Spring 2015-20 | Global Issues in Sport and Entertainment Management, Southern Connecticut State University |
| Fall 2014-20 | Governance and Administration of Sport Organizations, Southern Connecticut State University |
| Fall 2012-20 | Current Issues in Sport Management, Southern Connecticut State University |
| Spring 2014-17 | Sport Ethics, Southern Connecticut State University |
| 2013-2014 | Executive-in-Residence, University of New Haven College of Business |
| Fall, 2011 | Amateur Sports Governance, New York University |
| Spring, 2011 | Amateur Sports Governance, New York University |
| Fall, 2011 | Seminar in Sports Business, Columbia University |
| Spring, 2009 | Community, Educational and Open Amateur Sports Organization and Governance, University of Massachusetts at Amherst |
| Summer, 1981 | Sports Programs for Girls and Women, University of Illinois @ Chicago Circle |
| Summer, 1980 | Coaching Softball, University of Iowa |
| Summer, 1979 | Athletic Administration, University of Iowa |
| Summer, 1976 | Administration of Girls' and Women's Athletics, University of Denver |
| Summer, 1975 | Psycho-Social Aspects of Women in Sport, University of Washington |

**TEACHING, COACHING AND ADMINISTRATIVE RESPONSIBILITIES**

***Administrative Experience:***
Assistant Director of Athletics, Brooklyn College of The City University of New York
Director of Intercollegiate Athletics for Women, The University of Texas at Austin
Chief Executive Officer, Women's Sports Foundation
President, Sports Management Resources

Ex. 13, Pg. 62

**TEACHING, COACHING AND ADMINISTRATIVE RESPONSIBILITIES**

*Courses Taught:*

Undergraduate

| | |
|---|---|
| Contemporary Issues in Sport Management | Philosophical Perspectives of Physical Education |
| Behavioral Perspective of Physical Education | Coaching for Women |
| Psycho-Social Aspects of Women in Sport | Intermediate and Advanced Volleyball |
| Intermediate and Advanced Basketball | Beginning and Intermediate Softball |
| Methods in Team Sports | Officiating Team Sports |
| Women in Sport | Coaching Techniques in Volleyball |
| Ethics in Sport | Contemporary Issues in Sport and Entertainment Management |

Graduate

| | |
|---|---|
| Sociology of Sport | Administration of Athletics |
| Women in Sport | Sport Ethics |
| Community, Educational and Open Amateur Sport | Amateur Sports Governance |
| Seminar in Sports Business | Governance and Administration of Sport |
| Governance and Administration of Sport Organizations | Global Issues in Sport Management |
| | Current Issues in Sport Management |

*Coaching Experience:*
Head Coach of Women's Intercollegiate Volleyball, Basketball and Softball
Head Coach of Men's Intercollegiate Volleyball
Head Coach, Italian National Softball Team
Pitching Coach, Professional Women's Softball

**PROFESSIONAL ORGANIZATIONAL AFFILIATIONS**
American Alliance for Health, Physical Education, Recreation and Dance
National Association of Collegiate Women Athletics Administrators
Women's Sports International
The Drake Group

**HONORARY DEGREES**
Honorary Doctorate, Monmouth University, West Branch, New Jersey, May 20, 1998
Honorary Doctorate, Ripon College, Ripon, Wisconsin, May 16, 1998
Honorary Doctorate, St. Joseph's College, Hartford, Ct., September 14, 1994
Honorary Doctorate, United States Sports Academy, July 8, 1994
Honorary Doctorate as Outstanding Alumnus, Southern Connecticut State University, May 28, 1993
Ethics Fellow, Institute for International Sport, 1990

**HALL OF FAME AWARDS**
Texas Sports Hall of Fame, 2011
Fairfield County (CT) Sports Hall of Fame, 2007
Public Schools Athletic League Hall of Fame Award, Brooklyn, NY, November 22, 2003
Verizon Academic All-American Hall of Fame, Cleveland, OH, June 28, 2003
Connecticut Women's Basketball Hall of Fame 16th Anniversary Induction, New Haven, CT, April 10, 2003
Connecticut High School Coaches Association Hall of Fame, Southington, CT, November 14, 2002
National Italian American Sports Hall of Fame, Inc., Chicago, IL, 2001
International Scholar-Athlete Hall of Fame, Institute for International Sport, Kingston, Rhode Island, June 27, 1999
Connecticut Women's Hall of Fame, 1995
Texas Women's Hall of Fame, 1987, by the Governor's Commission for Women
Communiplex National Women's Sports Hall of Fame, 1987, Cincinnati, Ohio
Southern Connecticut State University Alumni Sports Hall of Fame, 1986, SCSU Alumni Association
National Sport Hall of Fame, 1985, by the National Association for Sport and Physical Education
National Softball Hall of Fame, 1983, American Softball Association

## OTHER AWARDS AND HONORS

Lalia Rach Profile in Excellence Award, NYU Preston Robert Tisch Center for Hospitality, Tourism, and Sports Management Sports Business and Graduate Sports Business Societies, April, 2014

NCAA Gerald R. Ford Award, 2013, honors an individual who has provided significant leadership as an advocate for intercollegiate athletics over the course of his or her career

100 Most Influential Sports Educators in America, 2013

American Civil Liberties Union, Nine of the Most Influential Actors in Title IX's History, April, 2012

Elm City Legend, Connecticut March of Dimes, New Haven, CT, November, 2011

"The Champions:  Pioneers and Innovators in Sports Business" Award, Sports Business Journal/Sports Business Daily, March, 2010

Cal Ramsey Distinguished Lecturer in Sports Management, New York University, 2009

Sports Lawyers Association, 2008 Award of Excellence

Women in Sports Business Symposium 2008 Woman of the Year Award, University of Oregon Warsaw Center for Sports Marketing

Institute for International Sport, 100 Most Influential Sports Educators in America, 2007

Adelphi University Sports Leadership Institute, Community Leadership Award, 2007

New York Institute of Technology William T. "Buck" Lai Wonderful Life Achievement Award, June 21, 2007

Ithaca College Department of Sport Management and Media, Distinguished Sports Industry Leader Award, 2007

*The Sporting News*, "The 100 Most Influential People in Sport," 1997 (#67), 1996 (#46), 1995 (#41), 1994 (#43), 1993 (#62), 1992 (#72)

*College Sports*, "The 50 Most Influential People in College Sports," 1996-97 (#22) 1995-96 (#10),  1994-95 (#31)

International Olympic Committee Women and Sport Trophy, 2005

Miami-Dade Community College Honor Award, Champion of Equal Opportunity for Women in Sports and Education, 2005

Columbia-Barnard Athletic Consortium Award for Exemplary Contributions to the Advancement of Athletic Opportunities for Girls and Women, Feb. 6, 2004

Patsy Mink Memorial Title IX at 30 Award, National Association for Girls and Women in Sports, 2003

Women in Leadership Award, The Center for Women of NY, Elmhurst, NY, June 19, 2003

Jacobs Institute for Women's Health, Excellence in Women's Health Award, Washington, D.C., May 16, 2002

National Association of Collegiate Directors of Athletics (NACDA) 30th Anniversary of Title IX Award, 2002

United States Sports Academy Distinguished Service Award, 2001

International Olympic Committee, Women and Sport Achievement Award, 2000

San Antonio Sports Foundation Appreciation Award, 2000

The Feminist Majority Foundation Contribution Award "for unique contribution to the historic struggle for women's equality and human rights", 2000

Town of North Hempstead Recognition Award for Support of the Education and Assistance Corporation, 1999

Nassau County, State of New York, Special Commendation for Outstanding Service to Local Citizenry, 1999

National Association of Collegiate Women Athletic Administrators Honor Award for Outstanding Support of Women Athletes and their Sports, 1998

National Association of Sports Commissions Recognition Award, 1998

Sporting Goods Business Woman of the Year (Non-Profit Organization), 1998

Stamford Old Timers Athletic Association National Honoree, 1998

Women's Sports and Fitness Magazine, The 20 Most Influential Women in Sports, 1997

NCSC Lifetime Achievement Award, 1997

Girl Scouts of Nassau County Juliette Low Award of Distinction, 1996

New York State Public High School Association, Inspiration Award, Young Women in Sport Forum, April, 1995

Tennessee Lawyers Association for Women Recognition Award, 1995

NAFFY Award (National Association for Female Executives), 1995

King County and NYSAC Award for Contributions in Sports,, 1994

National Collegiate Athletic Association Silver Anniversary Award, 1993

Dallas All Sports Association Distinquished Service Award, 1992

**OTHER AWARDS AND HONORS (cont.)**

National Association for Girls and Women in Sports Guiding Woman in Sport Award, 1992

National Association of Collegiate Women Athletic Administrators, District 7 NACWAA
  Administrator of the Year, 1992 and 1991

National Association for Girls and Women in Sport Guiding Woman in Sport Award, 1992

Recipient of the 1987 Flo Hyman Memorial Gazelle Award "to honor a person who exemplifiesfeminist
  values in athletics and scholarship."  Presented by the Project on Equal Education Rights of the NOW
  Legal Defense and Education Fund, 1987.

Margaret C. Berry Award for Outstanding Contribution to Student Life, 1985, by the Eyes of Texas

**LEADERSHIP EXPERIENCE**

*Current:*

  Member, President, Board of Directors, The Drake Group (2015 to present)

  Member, Advisory Board, Fishlinger Center for Public Policy Research, College of Mount St. Vincent
    (2015 to present)

  Member, Advisory Board, The Drake Group, (2010 to present)

  Member, Advisory Board, Champion Women (2015-present)

  Chair, Drake Working Group on Collegiate Athletics Reform (2013 –present)

  Member, Advisory Board, Sports Law Institute, Vermont Law School (2013 to present)

  Member, Advisory Board, Friends of the Tisch Center – Sports (2011 to present)

  Member, Advisory Board, Center for Research on Sport & Physical Activity, D'Youville College (2010
    to present)

  Member, Foundation for Global Sports Development (formerly Justice for Athletes), Advisory Board
    (2005 to present)

  Member, Advisory Board PowerPlay NYC, (2001 to present)

  Member, Advisory Board of the MBA in Sport Management, Florida Atlantic University (2000 to present)

  Member, Committee of Advisors, Positive Coaching Alliance (1999 to present)

  Member, Editorial Advisory Board of *Athletic Business* (1997 to present)

*Past:*

  Member, National Honors Committee of The National Women's Hall of Fame (1994 to 2015)

  Chair, International Baseball Federation (IBAF) Women's Baseball Committee (2009)

  Member, Advisory Board, 2003 World Congress of Sports

  Member, The ESPY Academy, (2002 to 2004)

  Member, United States Olympic Committee Board of Directors, Public Sector member (2000 to 2004)

  National Gambling Task Force, National Association of Student Personnel Administrators (1999)

  Member, Major League Golf Advisory Board (1999)

  Member, 1999 FIFA Women's World Cup Advisory Board (1997)

  Member, Advisory Board of SportsBridge (1997)

  Member, Nassau County (NY) Sports Commission (1995 to 2007)

  Member, Sara Lee Frontrunners Award Selection Committee, (1995-2000)

  Member, National Advisory Board to the National Consortium for Academics and Sports (1993 to
    2004)

  Editorial Board, *Training Table* magazine, United States Sports Academy (1993)

  Advisory Board, *Fitness* magazine (1993-2000)

  ESPN American Sports Awards, Select Nominating Committee (1992-2000)

  SMART Eureka Advisory Board (1992-1998)

  NCAA Gender Equity Task Force (1992 to 1993)

  NACDA Foundation Blue Ribbon Review Committee, (1992)

  Ethics Fellow, Institute for International Sport (1990 to 1998)

  Member, Southern Association of Colleges and Schools Commission on Colleges Committee on
    Intercollegiate Athletics (1990-91)

  Babe Zaharias Award Selection Committee (1990)

  Chair, Education Division of Capital Area United Way (1990)

  Member, National Advisory Board of the Center for the Study of Sport in Society (1989 to 2008)

  Member, Advisory Board, Center for Athletes' Rights and Education (1989 to 2003)

  Chair, NCAA Legislative Review Committee (1989-1992)

  Member, NCAA Cost Reduction Committee (1989-90)

**LEADERSHIP EXPERIENCE (cont.)**

*Past (cont.)*

Chair, National Association of Collegiate Women Athletic Administrators Television Committee (1988 to 1992)

Member, Executive Committee, Project Fair Play of Texas (1988-92)

Member, Future Directions Committee, University of Texas Ex-Students' Association (1988-90)

Member, Sports Foundation Feasibility Committee of the Austin Chamber of Commerce (1988-89)

Member, Community Advisory Board for Austin's Ronald McDonald House (1987-1992)

Trustee, Women's Sports Foundation (1987-1991)

Member, Council of Collegiate Women Athletic Administrators Legislation Committee (1986 to 1992)

Member, Board of Directors of the Women's Advocacy Project (1986-1992)

Member, NCAA Manual Revision and Deregulation Committee (1986-89)

Member, Executive Committee of the Texas University Interscholastic League (1986-88)

Member, City of Austin Parks and Recreation Board (1986)

Member, Board of Governors of the Texas Foundation for Intercollegiate Athletics for Women (1984-92)

Member, United States Olympic Development Committee (1984-88)

President, Association for Intercollegiate Athletics for Women (AIAW) (1981)

President-Elect, Association for Intercollegiate Athletics for Women (1980)

Past-President, Association for Intercollegiate Athletics for Women (1982)

President, Southwest Association for Intercollegiate Athletics for Women (1980)

President-Elect, Southwest Association for Intercollegiate Athletics for Women (1979)

Consultant to Office of Civil Rights, U.S. Department of Education on Title IX Investigations of Athletic Programs (1979)

Investigator, American Council on Education Study of the Financial Problems of Intercollegiate Athletics (1978-79)

Member, AIAW Ethics and Eligibility and Eligibility Committee (1978)

Chair, AIAW Television Committee (1976-77)

Chair, AIAW President's Summit Conference on Intercollegiate Athletics (1976)

Member, NAGWS Development Committee (1975-76)

Member, AIAW Restructure Committee (1975)

Chair, AAHPERD/DGWS Softball Guide Committee (1974-76)

Member, Eastern Association of Intercollegiate Athletics for Women Volleyball Committee (1974-76)

Member, AAHPERD Secondary Physical Education Commission Ad Hoc Committee for the Development of a Secondary Physical Education Program Assessment Instrument (1974-75)

Chair, United States Collegiate Sports Council Volleyball Committee (1973-75)

Director, National Softball Program, Italian Olympic Committee (1973-75)

Chair, AAHPERD/DGWS Softball Examinations and Rating Committee (1973-75)

Chair, New York State Association for Intercollegiate Athletics for Women's Volleyball Sport Committee (1972-74)

**EXPERT WITNESS/CONSULTANT – LAWSUITS**

Association of Intercollegiate Athletics for Women  v. the National Collegiate Athletic Association (Washington, DC - antitrust)

Pam Bowers v. Baylor University (Texas – employment discrimination/Title IX)

Pam Pederson, Lisa Oller and Semantha Clark v. Louisiana State University (Louisiana – Title IX)

Ann A. Pitts v. State of Oklahoma (Oklahoma State University – employment discrimination)

Marianne Stanley v. University of Southern California (California – employment discrimination)

Jennifer Roberts et al v. Colorado State University (Colorado – Title IX)

Rachel Sanders et al v. University of Texas at Austin (Texas – Title IX)

Cohen et al v. Brown University (Rhode Island – Title IX)

Roth v. School Board (sexual harassment/Title IX)

Sonya Tyler v. Howard University (Washington, D.C.- employment/Title IX)

Weaver v. Ohio State University (Ohio – employment discrimination/Title IX)

Haffer et all v. Temple University (Pennsylvania – Title IX)

Blair et al v. Washington State University (Washington – Title IX)

Hession et al v. Rollins College (Florida – sexual harassment of students/Title IX)

Joanne A. Fortunato v. Keene State College, et al  (New Hampshire – employment discrimination)

Tannisha Stevens v. Univ. of Michigan (Michigan - injury)

**EXPERT WITNESS/CONSULTANT – LAWSUITS (cont.)**

Molly Perdue v. City University of New York et. al.  (New York – employment discrimination/Title IX)

Vicki Dugan v. Oregon State University (Oregon – employment discrimination/Title IX)

Norman Law, et al. v. National Collegiate Athletic Association (Kansas – employment discrimination)

Jan Lowrey v. Texas A&M University System, et al. (Tarleton U./Texas – employment discrimination/Title IX)

Grandson v. University of Minnesota-Duluth, et al (Minnesota-Title IX athletics)

Thompson, Lindahl, Jeffries v. University of Minnesota-Duluth, et al. (Minnesota – Title IX athletics)

Julian v. Southwest Baptist University (Missouri – Title IX retaliation against coach)

Kevin Alston and Sandra Alston, et. al., v. Virginia High School League, Inc., et al. (Virginia – girls playing in non traditional seasons)

Daniel Daniels, as next friend of Jessica Daniels and Jennifer Daniels, as representatives of a class of similarly situated persons v. School Board of Brevard County California (Florida – Title IX facilities, benefits)

Kaitlin Baca, et al v. City of Los Angeles, et al (U.S. District Court-Central District of California – city recreational facilities)

Communities for Equity vs. Michigan High School Athletic Association (US District Court-Western District Court of Michigan-non-traditional seasons)

Mason et al v. Minnesota State High School League (U.S. District Court-Minnesota-Title IX facilities)

Ries v. Montana High School Association (Montana Human Rights Act/State Equal Protection – non-traditional seasons)

Ashley Bellum, et all v. City of Grants Pass  (Oregon gender inequality in assignment of softball facilities by parks and recreation)

Humphreys, Karen Moe v. Regents of the University of California, University of California, Berkeley (employment sex discrimination)

Burch v. Regents of the University of California, et. al (Title IX retaliation against coach)

Mansourian et al. v. Regents of the University of California, et al. (Title IX retaliation against coach)

Ollier et al v. Sweetwater Union High School District, et al (Title IX)

Young v. Indiana High School Athletic Association and Monroe County Community School Corporation (Title IX denial of baseball participation opportunity)

Biediger et al. v. Quinnipiac University (Title IX athletics participation)

Surina Dixon v. Texas Southern University (Title IX retaliation against coach)

Kathleen Bull v. Ball State University (Title IX retaliation against coach)

Bigge v. Citrus County School Board (Title IX relaliation against parents)

POST 2012

Brenny v. Board of Regents of the University of Minnesota and John Harris (employment-gender and sexual orientation discrimination)

Burns v. Board of Trustees California State University, San Diego State University (employment-Title IX retaliation)

Miller, Banford and Miles v. Board of Regents v. University of Minnesota, University of Minnesota-Duluth (employment-gender and sexual orientation discrimination, Title IX retaliation)

Jane Doe No. 1 (a pseudonym) v. Bikram Choudhury, Bikram Yoga College of India (gender discrimination, sexual assault)

Jane Doe No. 3 (a pseudonym) v. Bikram Choudhury, Bikram Yoga College of India (gender discrimination, sexual assault)

Alexie Portz, et al on behalf of all those similarly situated vs.St. Cloud State University and Minnesota State Colleges and Universities (Title IX athletics participation)

Jane Meyer vs. The University of Iowa, Board of Regents, State of Iowa, and the State of Iowa (employment-gender and sexual orientation discrimination, Title IX retaliation)

Tracey Griesbaum vs. The University of Iowa, Board of Regents and the State of Iowa (employment-gender and sexual orientation discrimination, Title IX retaliation)

Lauren Working, et al v. Lake Oswego School District (Oregon) (Title IX athletics)

B.W. v. Black Hills Football Club (Title IX sexual harassment)

Struthers and Brandt v. Red Bluff Joint Union High School District (California) (Title IX athletics)

Videckis and White v. Pepperdine University (Title IX sexual harassment/sexual orientation)

Robb et al. v. Lock Haven University of Pennsylvania (Title IX athletics)

Christine A. Cochran v. Bethune-Cookman University (employment-gender, Title IX retaliation)

**EXPERT WITNESS/CONSULTANT – LAWSUITS (cont.)**

Sheila Hudson v. California State University (employment-gender, Title IX retaliation)

C.B.. v. Black Hills Football Club (Title IX sexual harassment)

K.H. v. Black Hills Football Club (Title IX sexual harassment)

Noriana Radwan v. University of Connecticut (Title IX – athlete treatment)

Jamie Howard v. William Jessup University (Title VI and IX employment)

A.B., by her parents and next friends, C.B. and D.B., and T.T., by her parents and next friends, K.T. and S.T. v. Hawaii State Department of Education and Oahu Interscholastic Association

Bonnie J. Kenny, Cindy Gregory v. University of Delaware, et al.

A.C. v. United States Bowling Congress, Greater Seattle USBC, Northwest Challenge League f/k/a Puget Sound Travel League, Washington State Young American Bowling Alliance, Lee Treddenbarger

J.L. v. United States Bowling Congress, Greater Seattle USBC, Northwest Challenge League f/k/a Puget Sound Travel League, Washington State Young American Bowling Alliance, Lee Treddenbarger

T.M. v. United States Bowling Congress, Greater Seattle USBC, Northwest Challenge League f/k/a Puget Sound Travel League, Washington State Young American Bowling Alliance, Lee Treddenbarger

S.G., by and through her general guardian, BRENT GORDON; et al v. Jordan School District, et al U.S. District Court - Utah

Amy Cohen, et al v. Brown University, Christina Paxson (2020)

Sage Ohlensehlen, et al v. The University of Iowa, Bruce Harreld, Gary Barta

**PUBLICATIONS**

**Books, Books Chapters, Handbooks and Research Reports**

Lopiano, D. and C. Zotos (2013) *Restructuring A College Athletic Program to Protect Olympic Sports During Financial Uncertainty*. Champaign, IL: Human Kinetics.

Gurney, G., Lopiano, D. and Zimbalist, A. (2017)  *Unwinding Madness:  What Went Wrong with College Sports and How to Fix It.*  The Brookings Institution:  Washington, DC.

Lopiano, D. (2015)  The roots of corruption in US collegiate sport.  Global Corruption Report:  Sport. Transparency International.  Routledge: London/New York

Lopiano, D. and C. Zotos  (2015) "Athlete welfare and protection policy development in the USA" in *Safeguarding, Child Protection and Abuse in Sport:  International perspectives in research, policy and practice* edited by Melanie Lang and Mike Hartill, London and New York:  Routledge, pp. 97-106.

Lopiano, D. and C. Zotos (2013) *Athletic Director's Desk Reference*. Champaign, IL: Human Kinetics.

Lopiano, D., Fortunato, J, Hogshead-Makar, N. and Starr, K. (2012)  Safe4Athletes Handbook: Local Sport Club Policies and Procedures to Provide Athletes with a Safe and Positive Environment Free of Sexual Abuse, Bullying and Harassment. Safe4Athletes.org   See:  http://safe4athletes.org/4-clubs/model-policy

Lopiano, D., M. Snyder and L. Zurn. (2007). The Women's Sports Foundation Report: The Status of Female Youth Health and Physical Activity in the Boston Metropolitan Area. East Meadow, NY: Women's Sports Foundation.

Lopiano, D. (2006) "Gender and Sport" in *New Game Plan for College Sport* edited by Richard E. Lapchick, American Council on Education and Praeger Publishing, pp. 127-155.

Lopiano, D., and Lakowski, T. (2006). *Increasing Youth Sports & Physical Activity Participation: A Women's Sports Foundation Public Policy Guide*. East Meadow, NY: Women's Sports Foundation.

Lopiano, D.  (2002)  Advocating for Gender Equality in Sport:  The Experience of the Women's Sports Foundation in the United States.  A Guide and Education Kit.  Women's Sports Foundation, East Meadow, NY.

Lopiano, D. and C. Zotos. (2001)  Women's Sports Foundation Education Guide:  Special Issues for Coaches of Women's Sports.  East Meadow, NY:  Women's Sports Foundation.

## PUBLICATIONS

**Books, Books Chapters, Handbooks and Research Reports**

"Women's Sports:  Coming of Age in the Third Millennium", in *The Olympics at the Millennium:  power, politics, and the games*, edited by Kay Schaffer and Sidonie Smith, Rutgers University Press, pp. 117-127, 2000.

"Gender Equity in Sports" in *Medical and Orthopedic Issues of Active and Athletic Women*, edited by Rosemary Agostini, M.D., Hanilye & Belfus, Inc., Philadelphia, PA, pp. 13-22, 1994.

"Modern Athletics:  The Pressure to Perform," with Connee Zotos in *Eating, Body Weight, and Performance in Athletes:  Disorders of Modern Society,* 1991.

"Equity Issues and Policy Problems in Women's Intercollegiate Athletics" with Connee Zotos in *The Rules of the Game:  Ethics in College Sport*, edited by Richard Lapchick and John Slaughter, McMillan, 1989.

"A Political Analysis of the Possibility of Impact Alternatives for the Accomplishment of Feminist Objectives Within American Intercollegiate Sport," *Fractured Focus:  Sport as a Reflection of Society*, Richard E. Lapchick, editor.  Lexington, MA:  Lexington Books, 1986.

*The Baseball-Softball Playbook* with Ron Polk, Ron Polk, Mississippi State University, 1980.

*The Money Game:  Financing Collegiate Athletics* with Robert H. Atwell and Bruce Grimes, American Council on Education, Washington, D.C., 1980.

*Coaching Clinic* with David Pierce, Canadian Amateur Softball Association, Ottawa, Ontario, 1974.

**Journal Articles**

"Re-Affirming the Value of the Sports Exception to Title IX's General Non-Discrimination Rule" with Doriane Lambelet Coleman and Michael J. Joyner.  Duke Journal of Gender Law & Policy, March, 2020

"Fixing enforcement and due process will not fix what Is wrong with the NCAA." *Roger Williams University Law Review,* 20:2, Spring, 2015, pp. 250-291.

"It's Time for the NCAA and Other Educational Sport Governance Organizations to Get Serious about Gender Equity".  *Journal of Physical Education, Recreation and Dance, Vol. 85, No. 2, February, 2014.*

"Time for a Sport Sex-Discrimination Uprising of a Different Sort".  *Journal of Physical Education, Recreation and Dance, Vol. 84, No. 1, January, 2013.*

"Women's Impact on Sport", in *Perspectives, 2001, The Multidisciplinary Series of Physical Education and Sport Science, Volume 3, The Business of Sport,* edited by Darlene Kluka and Guido Schilling, Oxford: Meyer & Meyer Sport (UK) Ltd., 2001, pp. 131-142.

"Equity in Women's Sports:  A Health and Fairness Perspective", *Clinics in Sports Medicine:  The Athletic Woman*, Vol. 13, No. 2, April, 1994, pp. 281-296.

"Colleges Can Achieve Equity in College Sports," *Texas Entertainment and Sports Law Journal*, Volume 3, No. 1, Spring, 1993, pp. 6-8.

"Recruiting, Retention and Advancement of Women in Athletics, Coaching and Administration" in *Perspectives:  Journal of the Western Society for Physical Education of College Women*, Volume 12, 1992, pp. 5-11.

"Perceived Problems and Sources of Dissatisfaction for Coaches of Women Sports, with Dorothy J. Lovett and Carla Lowry  in*" The Applied Research in Coaching and Athletics Annual 1991*, March 1991, pp. 207-241.

"The Good News/Bad News About Women's Athletics," *Southern Feminist*, Vol. 4, No. 2, Spring, 1987.

**Congressional Testimony**

"Statement of Donna A. Lopiano Before Subcommittee on Commerce, Consumer Protection, and Competitiveness, U.S. House of Representatives, February 17, 1993".

**Ex. 13, Pg. 69**

**Congressional Testimony**

"Statement of Donna A. Lopiano Before Subcommittee on Post Secondary Education of the Committee on Education and Labor, U.S. House of Representatives, *Hearings on the Roles of Athletics in College Life*, May 18, 1989.

"Statement of Donna A. Lopiano, Women's Athletic Director of the University of Texas at Austin," *Prohibition of Sex Discrimination: Hearings on S.2106* Before the Subcommittee on Education of the Senate Committee on Labor and Public Welfare, 94th Congress, First Session (1975), (Washington, D.C.- U.S. Government Printing Office), pp. 105-113, 115-136.

## PUBLICATIONS

**Editorials, Opinion, Business Magazine and .com Articles**

Donna Lopiano and Andrew Zimbalist. (December 20, 2020) The NCAA Sports Model is Broken and It's Time for Congress to Step In. *Forbes.com.* Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2019/12/20/the-ncaa-sports-model-is-broken-and-its-time-for-congress-to-step-in/?sh=734fbf23d09c

Donna Lopiano. (October 4, 2020) Why Cutting College Sports Programs is a Bad Idea – Especially Now. *Forbes.com.* Retrieve at: https://www.forbes.com/sites/donnalopiano/2020/10/04/why-cutting-college-sports-programs-is-a-bad-idea--especially-now/#4a237ea053fd

Donna Lopiano and Andrew Zimbalist. (September 15, 2020) Message to Congress on NCAA Reform: NIL Income Yes, Cash Income No.. *Forbes.com.* Retrieve at: https://www.forbes.com/sites/donnalopiano/2020/09/15/message-to-congress-on-ncaa-reform-nil-income-yes-cash-income-no/#5692ad6617fc

Donna Lopiano. (August 5, 2020) College Athletics Minority Hiring Initiatives Long Past Due. *Forbes.com.* Retrieve at: https://www.forbes.com/sites/donnalopiano/2020/08/05/college-athletics-minority-hiring-initiatives-long-past-due/#43cb77e45774

Donna Lopiano. (August 1, 2020) State High School Organizations Should Have Proper Resources Before Supporting Esports? *Forbes.com.* Retrieve at: https://www.forbes.com/sites/donnalopiano/2020/08/01/state-high-school-organizations-should-have-proper-resources-before-supporting-esports/#7a2871c6259c

Donna Lopiano and Andrew Zimbalist. (June 28, 2020) Theatre of the Absurd and Immoral: College Football 2020. *Forbes.com.* Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2020/06/28/theater-of-the-absurd-and-the-immoral-college-football-2020/#251d353622e5

Donna Lopiano and Andrew Zimbalist. (June 13, 2020) Has Higher Education Lost Its Mind? *Forbes.com.* Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2020/06/13/has-higher-education-lost-its-mind/#52e78c7a39c0

Gerald Gurney, Donna Lopiano, Andrew Zimbalist. *(*April 25, 2020*) Sports Hiatus Gives NCAA An Opportunity to Rethink the Structure of College Sports.* Forbes.com. Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2020/04/25/sports-being-on-hiatus-gives-ncaa-an-opportunity-to-rethink-the-structure-of-college-sports/#6a38d2a93b54

Donna Lopiano and Andrew Zimbalist. (December 20, 2019) *The Collegiate Sports Model Is Broken: It's Time for Congress to Step In.* Forbes.com Retrieve at: https://www.forbes.com/sites/andrewzimbalist/2019/12/20/the-ncaa-sports-model-is-broken-and-its-time-for-congress-to-step-in/#487a474c3d09

**Ex. 13, Pg. 70**

**PUBLICATIONS (cont.)**

**Editorials, Opinion, Business Magazine and .com Articles**

Brian Porto, Gerald Gurney, Donna Lopiano, Mary Willingham, B. David Ridpath, Allen Sack, and Andrew Zimbalist.  (2019) *The Drake Group Position Statement:  Congress Granting a Limited Antitrust Exemption to the NCAA and Its Member Institutions*.  Retrieve at: https://www.thedrakegroup.org/2013/06/04/congress-granting-a-conditional-limited-antitrust-exemption-to-the-ncaa-and-its-member-institutions/ This paper was originally issued on June 1, 2015 and revised on October 4 and 28, 2019)

Donna Lopiano, Brian Porto, Gerald Gurney, B. David Ridpath, Allen Sack, Mary Willingham, and Andrew Zimbalist, (2017) *The Drake Group Position Statement: Compensation of College Athletes Including Revenues Earned from Commercial Use of Their Names, Images and Likenesses and Outside Employment*.  (March 24, 2015, Revised February 12, 2016, December 2, 2017, December 27, 2017, September 27, 2019 and October 14, 2019).  Retrieve at: https://www.thedrakegroup.org/2019/10/14/compensation-of-college-athletes-including-revenues-earned-from-commercial-use-of-their-names-images-and-likenesses-and-outside-employment/

Donna Lopiano, Janet Blade, Gerald Gurney, Sheila Hudson, Brian Porto, Allen Sack, David Ridpath and Andrew Zimbalist  (2019) The Drake Group Position Statement:   *College Athlete Health and Protection from Physical and Psychological Harm.*  (October 1, 2019).  Retrieve at: http://thedrakegroup.org

Ridpath, D., G. Gurney and D. Lopiano. *Presidents Choose to Enable Academic Fraud in Athletics. Journal of NCAA Compliance.*  July-August, 2019.  Hackney Publications.

The Drake Group Position Statement: *Athletic Governance Organization and Institutional Responsibilities Related to Professional Coaching Conduct.*   December, 2016  with Gurney, G., Polite, F., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A. (2016) Retrieve at:  http://thedrakegroup.org/

 "The Drake Group Position Statement: Institutional Integrity Issues Related to Athlete Sexual Misconduct and Other Forms of Violence." May, 2020 revised; August, 2016 with Gurney, G., Porto, B., Ridpath, D.B., Sack, A., Sommer, J., Willingham, M., and Zimbalist, A. *TheDrakeGroup.org.*  Retrieve at: https://www.thedrakegroup.org/2016/09/11/institutional-integrity-issues-related-to-college-athlete-sexual-assault-and-other-forms-of-serious-violence/

"The Drake Group Position Statement: *A Critical Analysis of Proposed Models of College Athlete Compensation.*" February, 2019 with Gerald Gurney, Fritz Polite, David B. Ridpath, Allen Sack, Sandy Thatcher, Andrew Zimbalist.  *TheDrakeGroup.org.* Retrieve at: http://thedrakegroup.org/

"The Drake Group Position Statement:   *College Athlete Codes of Conduct and Issues Related to Freedom of Speech and Expression*," November 2018 with Sanford G. Thatcher, Brian Porto, Gerald Gurney, Fritz Polite, B. David Ridpath, Allen Sack, and Andrew Zimbalist.  *TheDrakeGroup.org.  Retrieve at*:  http://thedrakegroup.org.

"The Drake Group Position Statement: *Excessive Athletics Time Demands Undermine College Athletes' Health and Education and Required Immediate Reform.*"  July, 2016 with Gurney, G., Sack, A., Meyer, J., Porto, B., Ridpath, D.B., Willingham, M., and Zimbalist, A. *TheDrakeGroup.org*  Retrieve at: https://thedrakegroup.org/2016/08/04/drake-group-urges-significant-changes-to-reduce-athlete-time-demands/

"The Drake Group Position Statement:  *Why the NCAA Academic Progress Rate (APR) and Graduation Success Rate (GSR) Should Be Abandoned and Replaced with More Effective Academic Metrics.*" October, 2015 with Gurney, G., Snyder, E.,Willingham, M., Meyer, J., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A. *TheDrakeGroup.org*, Retrieve at:  https://thedrakegroup.org/2015/06/07/drake-group-questions-ncaa-academic-metrics/

## PUBLICATIONS (cont.)

**Editorials, Opinion, Business Magazine and .com Articles**

"The Drake Group Position Statement:  *Rights of College Athletes*."  June 4, 2015 with Gurney, G., Willingham, M., Meyer, J., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A.  *TheDrakeGroup.org.,* Retrieve at:  https://thedrakegroup.org/2015/06/05/rights-of-college-athletes/

"The Drake Group Position Statement:  *Congress Granting a Limited Antitrust Exempiton to the NCAA and Its Member Institutions*." June 1, 2015 with Porto, B., Meyer, J., Gurney, G., Willingham, M., Ridpath, D.B., Sack, A., and Zimbalist, A. *TheDrakeGroup.org*  Retrieve at: https://thedrakegroup.org/2013/06/04/congress-granting-a-conditional-limited-antitrust-exemption-to-the-ncaa-and-its-member-institutions/

"The Drake Group Position Statement:  Freshmen Ineligibility in Intercollegiate Athletics." April 20, 2015 with Gurney, G., Willingham, M., Porto, B., Ridpath, D.B., Sack, A., and Zimbalist, A. *TheDrakeGroup.org*. Retrieve at:  https://thedrakegroup.org/2015/04/20/freshmen-ineligibility-proposals/

"The Drake Group Calls Upon the NCAA, Its Member Institutions and Higher Education Regional Accreditation Agencies to Fulfill Athlete Academic Protection Responsibilities."  April 16, 2015 with Gurney, G , Porto, B., Ridpath, D.B., Sack, A., Willingham, M., Zimbalist, A.  *TheDrakeGroup.org* Retrieve at:  https://thedrakegroup.org/2015/06/02/academic-protection-responsibilities/

"The Drake Group Position Statement: Fixing the Dysfunctional NCAA Enforcement System."  April 7, 2015 with Porto, B., Gurney, G., Ridpath, D.B., Sack, A., Willingham, M., Zimbalist, A. *TheDrakeGroup.org*.  Retrieve at:  https://thedrakegroup.org/2015/06/03/drake-group-addresses-dysfunctional-ncaa-enforcement-system/

"The Drake Group Position Statement: Establishment of a Presidential Commission on Intercollegiate Athletics Reform." March 31, 2015; revised February 12, 2016 with Gurney, G., Porto, B., Ridpath, D.B., Sack, A., Willingham, M., and Zimbalist, A.  *TheDrakeGroup.org*  Retrieve at: https://thedrakegroup.org/2015/06/09/bill-to-establish-a-presidential-commission/

 "The Drake Group Position Statement: Compensation of College Athletes Including Revenues from Commercial Use of Their Names, Likenesses, and Images"  March 24, 2015; Revised February 12, 2016 with Porto, B., Gurney, G., Ridpath, D.B., Sack, A., Willingham, M., Zimbalist, A. *TheDrakeGroup.org* Retrieve at:  https://thedrakegroup.org/2015/06/08/position-statement-032615/

"The Drake Group Position Statement:  Student Fee Allocations to Fund Intercollegiate Athletics." March 2, 2015 with Ridpath, D.B., Porto, B., Gurney, G., Sack, A., Willingham, M., and Zimbalist, A. *TheDrakeGroup.org*  Retrieve at:  https://thedrakegroup.org/2015/06/06/studentfeeinstitutionalsubsidy/

"The Drake Group Position Statement:  Guidelines for Academic Integrity in Athletics."  October 28, 2014 with Gurney, G., Sack, A., Willingham, M., Porto, B., Ridpath, D.B., and Zimbalist, A. *TheDrakeGroup.org*. Retrieve at:  https://thedrakegroup.org/2012/03/06/the-drake-group-issues-guidelines-for-academic-integrity-in-athletics/

"Don't Reform the NCAA - Replace It".  *Inside Higher Education.com, September 11, 2014* with Gerald Gurney available at:  *https://www.insidehighered.com/views/2014/09/11/ncaa-cant-be-reformed-congress-should-replace-it-essay*

"Big Five Power Grab".  *Chronicle of Higher Education.com, June 19, 2014* with B. Porto, D. Ridpath, A. Sack, M. Willingham, A. Zimbalist available at:
 http://chronicle.com/article/The-Big-Five-Power-Grab-/147265/?cid=pm&utm_source=pm&utm_medium=en

Page 12

**Ex. 13, Pg. 72**

**PUBLICATIONS (cont.)**

**Editorials, Opinion, Business Magazine and .com Articles**

"Time for a Sport Sex-Discrimination Uprising of a Different Sort". *Journal of Physical Education, Recreation and Dance.* Vol. 84, Issue 1, 2013 available at http://www.tandfonline.com/eprint/yeQmfD7xdPWszEHpJAag/full

"With the Olympic Games Around the Corner, Coaches Need a Wake-Up Call". *Sports Litigation Alert.* Volume 9, Issue 13 July 27, 2012. hhackney@hackneypublications.com

"Consider a Policy for Medical Screening, Records, Emergencies". *Legal Issues in Collegiate Athletics.* April, 2012, 13:6, pp. 7-8.

"Recommended Actions in Response to April 4, 2011 OCR Sexual Harassment and Sexual Violence Guidance", *At Issue: A Risk Management Newsletter for Elementary and Secondary Schools,* Fall, 2011, Uniondale, NY: Wright Risk Management America.

"The Cost of Gender Equity", in *School Business Affairs*, November 2008, Volume 74, No. 10, pp. 30-32.

"Their Lives May Depend on It", in *The Chautauqua Daily*, June 24, 2008, Chautauqua, NY, p. 3.

"Fair Play", in *Southern Alumni Magazine, 2003, A Publication for Alumni and Friends of Southern Connecticut State University,* New Haven, CT, pp. 21-22, 31.

"College Football Woes Not the Fault of Title IX", in *Sports Business Journal*, October 21, 2002, p. 28.

"Title IX Turns 30" in *ABC News.co*m, July 1, 2002.

"Sex May Sell, But Sexism Sells Women Short", in *Sports Business Journal*, February 4, 2002..

"Look Around…What Can You Do To Remind Others of Women/Sports Day?", in *Sports Business Journal*, January 15, 2001, p. 46.

"The Soul of Women's Sports Comes Cloaked in Diverse Bodies", in *Sports Business Journal*, February 19, 2001, p. 46.

"…No Answer Except, 'You Weren't Picked Because You Are A Girl'", in *Sports Business Journal*, March 26, 2001, p. 50.

"It's Time for Straight Talk About Title IX", in *Sports Business Journal*, April 30, 2001, p. 33

"Division I Cranks Up A Sports 'Arms Race'", in *Sports Business Journal*, June 11, 2001, p. 33.
.
"Bowling Proprietors Roll a Gutter Ball", in *Sports Business Journal*, August 20, 2001, p. 35.

"Sept. 11 Attacks Give New Purpose to Sport", in *Sports Business Journal*, October 1, 2001, p. 35.

"Soccer Team's Treatment A Kick in the Teeth", in *Sports Business Journal*, February 7, 2000, p. 46.

"Marketplace Values, Not Title IX, Threaten Nonrevenue Sports", in *Sports Business Journal*, March 6, 2000, p. 54.

"Answers Must Come Quickly for New World of U.S. Amateur Athletics", in *Sports Business Journal*, April 3, 2000, p. 54.

"Looking for an Olympic Hero? Vive DeFrantz", in *Sports Business Journal*, May 29, 2000, p. 54.

"Get Involved, Help Bring Sports to Our Children", in *Sports Business Journal*, June 26, 2000, p. 70.

**PUBLICATIONS (cont.)**
**Editorials, Opinion, Business Magazine and .com Articles**

"Diversity Stars in Many Recent Sports Headlines", in *Sports Business Journal*, July 24, 2000, p. 46.

"Bare Breasts Are A Distraction from Issue At Hand", in *Sports Business Journal*, August 28, 2000, p. 50.

"Posing Nude:  What's OK, What Isn't?", in *Sports Business Journal*, September 18, 2000, p. 62.

"The Final Word:  Heather Mercer's Fight Stretches Far Beyond the Football Field", in *Sports Business Journal*, November 13, 2000, p. 78.

"Girls Deserve the Gift of Physical Activity Just As Much As Boys", in *Sports Business Journal*, December 11, 2000, p. 62.

"Coaching Debate Should Extend Beyond WNBA Into Men's Game", in *Sports Business Journal*, January 25, 1999.

"Women's Sports Marketing:  Dabblers Need Not Apply", in *Sports Business Journal*, March 8, 1999.

"Mismanaged Men's Sporting Goods Market Hurts Women", in *Sports Business Journal*, April 5, 1999.

"Sex There's No Economic Justification for Disobeying Title IX", in *Sports Business Journal*, May 31, 1999.

"Sports Must Work to Make Our Society Better, Not More Violent", in *Sports Business Journal*, May 3, 1999.

"Medical, Media Reaction to Injuries Deserves Scrutiny", in *Sports Business Journal*, June 28, 1999.

"Next Goal for Women:  Commitment From the Keepers of Capital", in *Sports Business Journal*, July 26, 1999.

"Amateur, Pro Female Athletes Deserve Title IX-Style Gains", in *Sports Business Journal*, August 23, 1999.

"Auto Racing Gives Little Opportunity to Women and Minorities", in *Sports Business Journal*, September 20, 1999.

"Sex In Union Vote, Are WNBA Players in Control of Their Own Business?", in *Sports Business Journal*, November 23, 1998.

"WNBA's Remarkable 1999 Blows the Vultures Out of the Sky", in *Sports Business Journal*, December 13, 1999, p. 62.

"Donna Lopiano Rebuttal:  The Strong Fem Side of  Women's Sports" in *Brandweek*, February 2, 1998.

"Colleges Can Achieve Gender Equity in Sport" in *Chronicle of Higher Education*, December 2, 1992, volume 39, No. 15.

"Savings Should Be Reinvested to Boost Women's Programs," editorial in *USA Today,* January 15, 1991, Section C, p. 4.

"A Good Case for the Books," *The Austin American Statesman*, March 31, 1991.

"Women's Opportunities in Sports Still Far Behind," *Houston Chronicle*, February 25, 1990, p. 23B.

**Ex. 13, Pg. 74**

## PUBLICATIONS (cont.)

### Editorials, Opinion, Business Magazine and .com Articles

"Final Four Site:  Women and Men Together?" *The National Sports Daily*, March 27, 1990, p. 18.

"Fair Play for All (Even Women)," editorial in *The New York Times*, April 15, 1990, p. 10s.

"The Character of American Higher Education and Intercollegiate Sport," book review in *Academe*, Nov.-Dec., 1990, p. 57.

"Where We Are in the Development of Women's Athletics," Public Affairs Symposium, Dickinson College, Sport:  Its Place in Society, February, 1987.

"Colleges Should Serve All, Not Just Some," editorial in *The New York Times*, Sunday, June 26, 1987, Section S, pg. 7.

"The Certified Coach:  A Central Figure," *Journal of Physical Education, Recreation & Dance*, March, 1986.

"How to Pursue a Sport Management Career," *Journal of Physical Education, Recreation and Dance*, Vol. 55, No. 7, September, 1984.

"Promotion and Fundraising for Men's and Women's Non-Revenue Sports (Part I)," *Athletic Business*, Vol. 7, No. 10, October, 1983.

"Promotion and Fundraising for Men's and Women's Non-Revenue Sports (Part II)," *Athletic Business*, Vol. 7, No., 11, November, 1983.

"Will the Women in the Pros Survive?," *The Dallas Times Herald*, June 27, 1982.

"AIAW Landmarks," *Coaching:  Women's Athletics*, VII, No. 2, March/April, 1981.

"The NCAA, NAIA and Women's Sports:  The Price of Control," *Athletic Purchasing and Facilities*, IV, No. 12, December, 1980.

"Selling Women's Athletics:  Realities and Potentials," *Athletic Purchasing and Facilities*, IV, No. 10, October, 1980.

"What Women Coaches and Administrators Can Do to Cope With the Current Situation in High School Athletics," *The Athletic Educator's Report*, Issue No. 846, September, 1980.

"A Look at the Forest:  What's Happening to Women in High School Athletics," *The Athletic Educator's Report*, Issue No. 846, September, 1980.

"A Fact-Finding Model for Conducting a Title IX Self-Evaluation Study in Athletic Programs," *Journal of Physical Education, Recreation and Dance*, Vol. 47, No. 5, May, 1976.

"Developing the Exceptional Slingshot Pitcher," *1974-76 DGWS Softball Guide*, AAHPER:  Washington, D.C., January, 1974.

"The Glove as a Foreign Object," *1974-76 DGWS Softball Guide*, AAHPER:  Washington, D.C., January, 1974.

"Eerst Moet Je Snelheid Hebben, Dan Komt Controle Aan DeBeurt" (translated by Janke Nydam), *Inside*, Amsterdam, The Netherlands, III, No. 1, January, 1973.

"Chauvinists Beware:  Odds are Against Sexist Gamblers," *Kingsman*, Brooklyn College, 1973.

**PUBLICATIONS (cont.)**
**Editorials, Opinion, Business Magazine and .com Articles**

"De Meeste Mensen Die Softball Doceren Weten Er Weinig Van" with Joan Joyce (translated by Janke Nydam), *Inside*, Amsterdam, the Netherlands, II, No. 12, December, 1972.

"Concepts and Issues in Administrative Behavior:  A Book Review," *A Compendium of Analytical Book Reviews in Organizational Behavior* (Percy G. Rogers, editor), University of Southern California Press, Los Angeles, CA, 1972.

"Enforcement Machinery Needed Now for Girls' Athletic Competition," J*ournal of Physical Education, Recreation and Dance*, XLII, No. 1, January, 1971.

 "The Brakette Formula:  Anatomy of a Winner," *Balls and Strikes*, American Softball Association, Fall, 1971.

**Copyrighted Videotapes**
Fast Pitch Softball:  Developing the Pitcher (Part I), Truckee River Studios, Inc. (Verdi, Nevada), 1983.
Fast Pitch Softball:  Developing the Pitcher (Part II), Truckee River Studios, Inc. (Verdi, Nevada), 1984.
Fast Pitch Softball:  Defensive Strategies (Part I), Truckee River Studios, Inc. (Verdi, Nevada), 1984.
Fast Pitch Softball:  Defensive Strategies (Part II), Truckee River Studios, Inc. (Verdi, Nevada), 1985.

## ATHLETIC PARTICIPATION

Participated in 26 National Championship tournaments in four different sports
Softball:
- National Hall of Fame, American Softball Association
- Participated in Ten National ASA Softball Championship tournaments (as member of six national championship and four national championship runner-up teams)
- Nine-Time Softball All-American at four different positions (pitcher, shortstop, first base and second base)
- 3-time National Tournament Most Valuable Player and 1-time Batting Champ (.429)
- U.S. National Team Player at 1967 Pan American Games and 1966 first World Softball Championships
- Amateur softball career marks as a pitcher:
  183-18 won/lost record                                 15-2 in National Championship play
  .910 winning percentage                            1,633 strikeouts in 817 innings
  ERA .25 (51 earned runs in 10 years)
- Played professional softball for three years-in two national championship finals (both times runner-up)

Volleyball:
- Participant in Five National USVBA Volleyball Championship Tournaments
Basketball:
- Participant in Five National AAU Basketball Championship Tournaments
Field Hockey:
- Participant in Three National Field Hockey Championship Tournaments



**Donna A. Lopiano, Ph.D.**

**Fees for Expert Consultation and Services Related to Pending or Probable Litigation**

| Expense Type | Fee Basis |
|---|---|
| **Consultation with attorneys** related to preparation for depositions, trial testimony, expert reports, compliance plans or legal theories | **$200/hour** |
| **Preparation of written reports** including review of case materials, research/data collection related to preparation of such reports | **$250/hour** |
| **Deposition or court testimony** | **$500/hour** |
| **Hours traveling**<br>Exception: consultant travels for court testimony and such appearance does not occur for any reason - $2,000/day flat rate.<br>Exception: assumes a video capability for deposition; consultant shall not be required to travel a distance greater than 50 miles from Shelton CT | **No charge** |
| **Site Visits** for assessment, presentations, or other purposes requested by client | **$2,500/day flat rate** |
| **"Out-of-pocket" expenses for site visits** including: | **Actual** |

- postage, mailing or overnight shipping costs or reproduction of materials detailed above upon which analysis will be based
- actual cost of coach class travel (except for for airline trips in excess of 1,000 miles, "extra space" seating if available in coach class and for international travel, business class airfare)
- actual cost of transfers to and from Shelton, Connecticut and LaGuardia or JFK airports for departure and return travel and, at the destination, transfers from and to the airport and hotels and/or the site to be visited
- actual cost of accommodations, including internet service
- provision of meals or reimbursement for actual cost not to exceed $75.00 per diem

## Invoicing and Payment Terms

**"Out-of-pocket" expenses** - Receipts shall be submitted for all out-of-pocket expenses with payment due within 30 days of receipt of invoice.

**Fees –** Written invoice with work record of billable hours shall be submitted for all fees upon completion of reports, site visits, and deposition and/or trial testimony with payment due within 30 days of receipt of invoice.

## Interim Reports

Interim report(s) of hours spent or fees/expenses-to-date shall be submitted upon the request of client at any time.

**Sports Management Resources, LLC**
**452 Fisher Court    Shelton, CT 06484**
**Phone/Fax: 203-538-5280  E-mail: Info@SportsManagementResources.com**
**www.SportsManagementResources.com**

Ex. 13, Pg. 77

**APPENDIX C**

**DOCUMENTS, DATA OR INFORMATION CONSIDERED IN THE FORMATION OF**

**EXPERT OPINIONS**

The following documents and sources were relied upon in the formulation of opinions contained in this initial report.

Institutional Research, Office of Planning and Budgets, Michigan State University. (2021).  MSU Data Digest - Students - Enrollment. [Tableau Dashboard] Retrieved from: https://opb.msu.edu/functions/institution/datadigest/

Quinn, B., MSU Legal Counsel, letter to Jill M. Zwagerman dated December 4, 2020 re: response to Zwagerman November 16, 2020 correspondence.

Lopiano, D. and Zotos, C.  (2013) Athletic Director's Desk Reference.  Human Kinetics: Champaign, IL.

Lopiano, D. and Zotos, C.  (2020) Restructuring A College Athletic Program to Protect Olympic Sports During Financial Uncertainty. Human Kinetics: Champaign, IL.

Michigan State University Athletics web site (https://msuspartans.com/) and the Michigan State (Sport) Archives (search Michigan State (insert sport) archives)

National Collegiate Athletics Association. (2019) Student-Athlete Participation 1981-82 – 2018-19 NCAA Sports Sponsorship and Participation Rates Report.  Retrieved from: https://ncaaorg.s3.amazonaws.com/research/sportpart/2018-19RES_SportsSponsorshipParticipationRatesReport.pdf

National Collegiate Athletic Association.  NCAA Division I Squad Lists and Instructions - Form 20-2. Retrieve from:  https://ncaaorg.s3.amazonaws.com/compliance/d1/2020-21D1Comp_Form20-2-SquadLists.pdf

National Federation of State High School Associations.  Participation Statistics.  Retrieved from: https://members.nfhs.org/participation_statistics

United States Department of Education Office for Civil Rights. Assurance of Compliance – Civil Rights Certificate.  Retrieved from:  https://www2.ed.gov/about/offices/list/ocr/letters/boy-scouts-assurance-form.pdf

United States Department of Education Equity in Athletics Disclosure Act Database. Retrieved at: http://ope.ed.gov/athletics/#/

United States Department of Education Office of Postsecondary Education (OPE). (2016) Equity in Athletics Disclosure Act (EADA) Data Analysis Cutting Tool User Guide:  June, 2016. Retrieved from: https://ope.ed.gov/athletics/public/html/help/2016%20EADA%20Data%20Analysis%20Cutting%20Tool%20User%20Guide.pdf

United States Department of Education Office of Postsecondary Education (OPE). (2009) User's Guide for the Equity in Athletics Act Web-Based Data Collection.

United States Government Title IX Resources:
- 20 U.S.C. '1681 et seq. ("Title IX")
- 24 CFR Part 106 (the "Title IX regulations")
- OCR's 1979 Policy Interpretation on Title IX and Intercollegiate Athletics
- OCR's 1996 Policy Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test
- OCR's 2003 Further Policy Clarification on the Three-Part Test
- OCR's 2010 Dear Colleague Letter re: Prong Three of the Three-Part Test
- OCR's 1990 Title IX Athletics Investigator's Manual

U.S. Track & Field and Cross Country Coaches Association.  TFRRS database.  Retrieve from: https://www.tfrrs.org/

OMB Approval No. 1870-0503

*United States Department of Education, Office for Civil Rights*

# ASSURANCE OF COMPLIANCE – CIVIL RIGHTS CERTIFICATE
TITLE VI OF THE CIVIL RIGHTS ACT OF 1964, TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, SECTION 504 OF THE REHABILITATION ACT OF 1973, THE AGE DISCRIMINATION ACT OF 1975, AND THE BOY SCOUTS OF AMERICA EQUAL ACCESS ACT OF 2001

The applicant provides this assurance for the purpose of obtaining Federal grants, loans, contracts (except contracts of insurance or guaranty), property, discounts, funds made available through the U.S. Department of Education, or other Federal financial assistance from the Department. This assurance applies to all Federal financial assistance from or funds made available through the Department, including any that the applicant may seek in the future.

The applicant assures that it will comply with:

1. Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000d *et seq.*, which prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving Federal financial assistance.
2. Title IX of the Education Amendments of 1972, as amended, 20 U.S.C. 1681 *et seq.*, which prohibits discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.
3. Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. 794, which prohibits discrimination on the basis of disability in any program or activity receiving Federal financial assistance.
4. The Age Discrimination Act of 1975, as amended, 42 U.S.C. 6101 *et seq.*, which prohibits discrimination on the basis of age in any program or activity receiving Federal financial assistance.
5. If applicable, the Boy Scouts of America Equal Access Act of 2001, 20 U.S.C. 7905, which requires equal access for the Boy Scouts of America and other designated youth groups to meet at public schools. This law applies to any public elementary school, public secondary school, local educational agency, or State educational agency that has a designated open forum or limited public forum and that receives funds made available through the Department.
6. All regulations, guidelines, and standards issued by the Department under any of these statutes.

The applicant understands that it must comply with items 1-6 in order to continue receiving Federal financial assistance from the Department. The applicant also understands that this Assurance is binding on the applicant, its successors, transferees, and assignees at any time during which federal financial assistance is provided. The applicant will ensure that all contractors, subcontractors, subgrantees, or others with whom it arranges to provide services or benefits are not discriminating in violation of items 1-6. Otherwise, the financial assistance can be terminated and the applicant can be declared ineligible to receive further assistance. The applicant also understands that the Department may seek a court order requiring compliance with items 1-6 or seek other appropriate judicial relief.

By signing this form, the applicant is agreeing to the above provisions.

_____
Signature of Authorized Official

_____
Print Name

_____
Date

PLEASE RETURN TO:

U.S. Department of Education
Office for Civil Rights
400 Maryland Avenue, SW
Washington, DC 20202-1100

_____
Title

_____
Name of Institution or Agency

_____
Street

_____
City, State, Zip Code

_____
Office Email Address

---

## Paperwork Burden Statement
According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number. Public reporting burden for this collection of information is estimated to average 20 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. The obligation to respond to this collection is required to obtain or retain benefit (42 U.S.C. 2000d *et seq.*; 20 U.S.C. 1681 *et seq.*; 29 U.S.C. 794; 42 U.S.C. 6101 *et seq.*; 20 U.S.C. 7905). Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Education, 400 Maryland Ave., SW, Washington, DC 20202-4536 or email ICDocketMgr@ed.gov and reference the OMB Control Number 1870-0503. Note: Please do not return the completed Assurance of Compliance – Civil Rights Certificate to this address.