**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| SOPHIA BALOW, AVA BOUTROUS, JULIA COFFMAN, KYLIE GOIT, EMMA INCH, SHERIDAN PHALEN, MADELINE REILLY, OLIVIA STARZOMSKI, SARAH ZOFCHAK, TAYLOR ARNOLD, and ELISE TURKE, Individually and on behalf of all those similarly situated, | Civil Action No. 1:21-cv-00444 |
| Plaintiffs, | Hon. Hala Y. Jarbou |
| v. | Magistrate Judge Phillip J. Green |
| MICHIGAN STATE UNIVERSITY, MICHIGAN STATE UNIVERSITY BOARD OF TRUSTEES, SAMUEL L. STANLEY JR. and BILL BEEKMAN, | |
| Defendants. | |

NEWKIRK ZWAGERMAN, PLC
Jill Zwagerman, AT0000324
Lori Bullock AT0012240
Danya Keller AT0012300
521 E. Locust Street, Suite 300
Des Moines, IA 50309
Telephone: (515) 883-2000
Fax: (515) 883-2004
jzwagerman@newkirklaw.com
dkeller@newkirklaw.com
lbullock@newkirklaw.com
*Attorney for Plaintiffs*

BOGAS & KONCIUS, PC
Brian E. Koncius (P69278)
Local Counsel for Plaintiffs
31700 Telegraph Road, Suite 160
Bingham Farms, MI 48025
Telephone: (248) 502-5001
bkoncius@kbogaslaw.com
*Attorney for Plaintiffs*

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
Scott R. Eldridge (P66452)
Brian M. Schwartz (P69018)
Ashley N. Higginson (P83992)
Erika L. Giroux (P81998)
One Michigan Ave. Suite 900
Lansing, MI 48933
eldridge@millercanfield.com
schwartzb@millercanfield.com
higginson@millercanfield.com
giroux@millercanfield.com
*Attorneys for Defendants*

MICHIGAN STATE UNIVERSITY OFFICE OF THE GENERAL COUNSEL
Uriel Abt (P84350)
426 Auditorium Rd., Rm. 494
East Lansing, MI 48824-2600
(517) 353-4934
abturiel@msu.edu
*Attorneys for Defendants*

**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION TO STRIKE AND EXCLUDE PLAINTIFFS' EXPERT REPORT AND UNDERLYING TESTIMONY**

## TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................................... 1
II. STATEMENT OF RELEVANT FACTS ....................................................................... 2
III. LEGAL STANDARD ..................................................................................................... 3
IV. ARGUMENT .................................................................................................................. 5
    A. WITH MSU'S FACT-BASED PARTICIPATION DATA BEFORE THE COURT, THE LOPIANO REPORT SERVES NO PURPOSE. ........................... 5
    B. THE LOPIANO REPORT IS BASED ON INSUFFICIENT AND INACCURATE FACTS AND DATA ................................................................... 6
        1. OVERARCHING FALSE ASSUMPTIONS ........................................... 6
        2. FALSE ASSUMPTIONS REGARDING MSU'S ROWING TEAM ................................................................................................... 6
        3. FALSE ASSUMPTIONS REGARDING MSU'S WOMEN'S CROSS COUNTRY AND TRACK AND FIELD TEAMS ...................... 8
    C. LOPIANO'S REPORT CONTAINS SEVERAL CONTRADICTIONS UNDERSCORING THE UNRELIABILITY OF HER METHODOLOGY ....... 10
    D. LOPIANO'S REPORT DRAWS IMPERMISSIBLE LEGAL CONCLUSIONS AND INTRUDES ON THE PROVINCE OF THE COURT AND THE JURY .............................................................................................. 11
V. CONCLUSION ............................................................................................................. 14

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Attorney Gen. of Oklahoma v. Tyson Foods*,
   565 F.3d 769 (10th Cir. 2009) ...................................................................................5

*Autotech Tech. Ltd. P'ship v. Automationdirect.com*,
   471 F.3d 745 (7th Cir. 2006) .....................................................................................5

*Biediger v. Quinnipiac Univ.*,
   691 F.3d 85 (2d Cir. 2012)........................................................................................9

*Biediger v. Quinnipiac Univ.*,
   728 F. Supp. 2d 62 (D. Conn. 2010).......................................................................13

*Conwood Co., L.P. v. U.S. Tobacco Co.*,
   290 F.3d 768 (6th Cir. 2002) ....................................................................................4

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
   509 U.S. 579 (1993)...............................................................................................4, 5

*Doe v. Wharton Indep. Sch. Dist.*,
   No. 2:16-CV-48, 2017 WL 932935 (S.D. Tex. Mar. 9, 2017) (Ex 1) ...............12, 13

*Downs v. Perstorp Components, Inc.*,
   126 F. Supp. 2d 1090 (E.D. Tenn. 1999).................................................................5

*Goodwin v. Richland Cty., Ohio*,
   832 F. App'x 354 (6th Cir. 2020) ...........................................................................11

*Keyes v. Ocwen Loan Servicing, LLC*,
   335 F. Supp. 3d 951 (E.D. Mich. 2018)..................................................................12

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1998).................................................................................................4

*L.E. v. Lakeland Joint Sch. Dist. #272*,
   403 F. Supp. 3d 888 (D. Idaho 2019) .....................................................................12

*Portz v. St. Cloud State University*,
   297 F. Supp. 3d 929 (D. Minn. 2018).....................................................................13

*Pride v. BIC Corp.*,
   218 F.3d 566 (6th Cir. 2000) ....................................................................................4

*Samuels v. Allstate Prop. & Cas. Ins. Co.*,
    310 F. Supp. 3d 847 (E.D. Mich. 2018) ..................................................................................8

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ..................................................................................................4

*United States v. Melcher*,
    672 F. App'x 547 (6th Cir. 2016) ........................................................................................11

**Statutes**

20 U.S.C. § 1092(g)(1)(A)–(B)(i) ...................................................................................................1

Equity in Athletics Disclosure Act ........................................................................................ *passim*

**Court Rules**

Federal Rule of Evidence 702 ............................................................................................ *passim*

Federal Rule of Evidence 703 .................................................................................................3, 4

**Other Authorities**

34 C.F.R. § 106.3 ...........................................................................................................................13

34 C.F.R. § 668.47 ..........................................................................................................................1

## I. INTRODUCTION

In support of their motion for a preliminary injunction, Plaintiffs rely on an expert report by Donna Lopiano, Ph.D., in their attempt to establish that MSU does not provide sufficient athletic participation opportunities to women under Title IX. Lopiano concedes that she has not reviewed the primary data necessary to make that determination. Instead, she relies on Equity in Athletics Disclosure Act ("EADA")[1] reports, which she claims can be relied upon to determine a school's participation opportunities. That actual data confirms MSU's compliance with Title IX's participation requirements, but Lopiano employs a cascading series of assumptions to determine that MSU is overcounting women's participation opportunities by an unspecified amount.

Defendants have since provided the Court with factual evidence derived from, among other things, squad lists and countable athletically-related activities ("CARA") data, establishing that MSU provides substantially proportionate athletic opportunities to its student-athletes as Title IX requires. It has done so through sworn declarations and admissible documents. It has also demonstrated that the assumptions upon which Lopiano relies in determining that MSU overcounts female participants are false. Lopiano's report should be stricken for four reasons.

*First*, with evidence establishing MSU's Title IX participation counts before the Court, Lopiano's report, which attempts to reverse engineer numbers by using other data obtained through public sources, does not "help the trier of fact to understand the evidence or to determine a fact in issue."

---

[1] Under the EADA, institutions receiving federal funding are required to submit reports detailing, among other things, the total number of participants on each team measure as of the first date of compensation to the Department of Education. 20 U.S.C. § 1092(g)(1)(A)–(B)(i); *see also* 34 C.F.R. § 668.47. The definition of "participant" under the EADA is not co-extensive with the definition of "participant" for the purpose of Title IX. *Compare* 34 C.F.R. § 668.47(b)(3) *with* Dec. 11, 1979, A Policy Interpretation: Title IX and Intercollegiate Athletics, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html (discussed *infra*).

*Second*, the Lopiano Report relies upon insufficient and inaccurate facts and data.

*Third*, the Lopiano Report is internally inconsistent and unreliable.

*Fourth*, to the extent the Lopiano Report opines about what Title IX requires or MSU's compliance with Title IX, it is an inadmissible legal opinion.

## II.   STATEMENT OF RELEVANT FACTS

Plaintiffs' motion for a preliminary injunction turns, in part, on whether MSU provides athletic participation opportunities to women and men in a ratio that is substantially proportionate to their undergraduate enrollment numbers. If so, then MSU is currently in compliance with Title IX and Plaintiffs' motion must be denied.

The only facts necessary to make this determination are how many Title IX participation opportunities MSU provides to its men and women each year and its enrollment numbers. The Department of Education, Office of Civil Rights ("OCR")'s 1979 Policy Interpretation defines what counts as "participant" for Title IX purposes. It is those athletes:

> A. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, e.g., coaching, equipment, medical and training room services, on a regular basis during a sport's season; and
> B. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and
> C. Who are listed on the eligibility or squad lists maintained for each sport, or
> D. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

The Lopiano Report attacks a different data set, MSU's EADA reports. As Lopiano herself argues, the definition of "participant" under the EADA is different than the definition of "participant" used for Title IX purposes. (Lopiano Report at 18, ECF No. 2-14, PageID.215). Lopiano further concedes that she has not reviewed any of the "primary sources"—squad lists, CARA reports identifying hours spent doing team-related activities, and the like—necessary to

make a determination about MSU's participation counts. (*Id.* at 17, PageID.214). She has not met with or spoken to any MSU coaches and does not profess to have any institution-specific information about MSU or its athletic programs and teams whatsoever beyond the EADA reports and what she can find on the internet.

Lopiano attacks MSU's EADA reports in three ways. First, she claims that MSU counts men who practice on women's teams as women's participation opportunities, which is permitted under the EADA but not Title IX. Second, she claims that the women's rowing team includes women who do not get genuine participation opportunities. Third, she claims that the women's cross country and track and field teams include women who do not get genuine participation opportunities. For the reasons set forth below, the Lopiano Report does not satisfy the requirements of Federal Rule of Evidence 702 and should be stricken and excluded.

### III.    LEGAL STANDARD

Federal Rules of Evidence 702 and 703 govern the admissibility of expert opinions. Rule 702 provides that "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" only if four criteria are met:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 703 further provides that:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them

3

> to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.  Courts generally have discretion to admit expert evidence under these Rules. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 781 (6th Cir. 2002).

The Sixth Circuit has distilled Rules 702 and 703 down to three fundamental prerequisites: "First, the witness must be qualified by 'knowledge, skill, experience, training, or education.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008).  "Second, the testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.*  And third, the testimony must be reliable, *i.e.*, based upon "'sufficient facts or data" and the "'product of reliable principles and methods'" applied "reliably to the facts of the case.'" *Id.*  The burden is on the "party proffering expert testimony [to] show by a 'preponderance of proof' that the expert . . . is qualified and will testify to [specialized] knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case." *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

The U.S. Supreme Court has repeatedly emphasized that the trial judge plays a crucial "gatekeeping" role to ensure that all expert testimony presented can withstand the degree of intellectual rigor required under the Federal Rules:

> *Daubert*'s general principles apply to [all] the expert matters described in Rule 702. The Rule, in respect to all such matters, establishes a standard of evidentiary reliability. It requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.  And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [the relevant] discipline.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1998) (internal quotation marks and citations omitted).  This gatekeeping function is particularly important since "[e]xpert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert v. Merrell Dow*

4


*Pharmaceuticals, Inc.*, 509 U.S. 579, 595 (1993) (internal quotation marks omitted). Consequently, "trial judges have an unequivocal duty to give careful scrutiny to the testimony of paid experts in order to avoid verdicts based on 'junk science.'" *Downs v. Perstorp Components, Inc.*, 126 F. Supp. 2d 1090, 1118 (E.D. Tenn. 1999).

The requirements of Rule 702 and the Court's gatekeeping responsibility apply equally at the preliminary injunction stage. *See, e.g.*, *Autotech Tech. Ltd. P'ship v. Automationdirect.com*, 471 F.3d 745, 749 (7th Cir. 2006) (affirming district court's decision to exclude expert testimony at preliminary injunction hearing as unreliable under *Daubert*); *see also Attorney Gen. of Oklahoma v. Tyson Foods*, 565 F.3d 769, 780 (10th Cir. 2009) (affirming district court's *Daubert*/Rule 702 conclusions on preliminary injunction motion).

## IV.   ARGUMENT

**A.   With MSU's fact-based participation data before the Court, the Lopiano Report serves no purpose.**

Defendants have submitted fact-based evidence regarding participation opportunities through the Declaration of Alexandra Breske and the documents attached to it. Those documents are kept in the ordinary course of business and are based on Ms. Breske's review of squad lists, CARA reports, and discussions with coaching staff, among other things. As the Lopiano Report concedes, this is this data upon which the Court should rely in determining MSU's compliance with Title IX. (Lopiano Report at 17, 27, 30, ECF No. 2-14, PageID.214, 224, 227).

The Lopiano Report is not based on data relevant determining who is a "participant" under Title IX, but instead is based on EADA data which, as Lopiano acknowledges, uses a different counting methodology than what is required under Title IX. With Title IX participation counts based on the primary data before the Court and the Lopiano Report relying on data that she

5

concedes is not accurate for Title IX purposes, the Lopiano Report does "not help the trier of fact to understand the evidence or to determine a fact in issue" and should be excluded.

**B.     The Lopiano Report is based on insufficient and inaccurate facts and data.**

An expert report must be based on sufficient facts and data. Here, the data Lopiano relies on is insufficient and the assumptions she employs are false.

**1.  Overarching false assumptions**

Lopiano begins by assuming that MSU relies on EADA data to internally monitor its Title IX compliance. (Lopiano Report at 10, ECF No. 2-1, PageID.207) That is false. MSU tracks its Title IX participation counts and EADA participation counts separately and relies on the former in monitoring its Title IX compliance. (Breske Dec, ¶6, ECF No. 8-2, PageID.351).

Lopiano goes on to assume that MSU counts male practice players as female participation opportunities on its EADA report. Although that would be permissible under EADA guidelines, (Lopiano Report at 18, ECF No. 2-14, PageID.215), MSU has not done that since at least 2018, (Breske Dec, ¶23, ECF No. 8-2, PageID.354), and does not do that when counting participants for Title IX purposes. Moreover, a glance at the chart Lopiano puts in her report shows that MSU has not included male practice players on its women's basketball EADA since 2018. (Lopiano Report at 21, ECF No. 2-1, PageID.218). Lopiano nonetheless uses that assumption as a basis to determine that MSU overcounts female participation spots.

**2.  False assumptions regarding MSU's rowing team**

Lopiano claims that because the roster reflected on MSU's website for the women's rowing team reflects fewer athletes than the EADA report, MSU is overcounting participation spots for rowers. First, Lopiano is comparing two sets of data that she concedes do not represent MSU's actual Title IX participation counts, so this analysis has no value in the face of the primary sources that MSU uses to determine its Title IX counts. Second, her own chart again undercuts her

6

conclusion. In two of the three most recent years she includes, the web roster reflected over 80 women rowers, essentially equal to the EADA count. (*Id.* at 23, ECF No. 2-14, PageID.220).

Lopiano claims that MSU is overcounting its female rowers because its roster is bigger than the NCAA Division 1 average. First, MSU's team is one of the smallest in the Big Ten, a better measure of its peer group, so Lopiano's premise is false. (2018-19 EADA Rowing Data, ECF No. 8-4, PageID.400). Second, absent additional information concerning the athletes' actual experiences at MSU, Lopiano's premise, even if it were true, does not support her conclusion. The 1979 Interpretation permits MSU to have as big a roster as it wants so long as the athletes are receiving "institutionally-sponsored support normally provided to athletes," "participating in organized practice sessions and other team meetings and activities on a regular basis," and "listed on the eligibly or squad lists maintained for each sport." As set forth in the Declaration of Kim Chavers, the head coach of the rowing team, that is true of the athletes counted as participants on MSU's rowing team. (Chavers Dec, ¶¶2-21, ECF No. 8-3, PageID.367-372).

Lopiano also claims that "novice" rowers—which she defines as "freshmen who have never participated in rowing before"—should not be counted as participants. (Lopiano Report at 23-25, ECF No. 2-14, PageID.220-222). As an initial matter, her definition of "novice" is wrong. The Big Ten *Game Management Manual, Rowing*, the rules applicable to the athletic conference in which MSU competes, defines a novice rower as "a student-athlete who is participating in her first year of collegiate rowing." (Chavers Dec, ¶4, Exhibit A, ECF No. 8-3, PageID.367-68, 384.) In other words, both experienced and inexperienced first-year rowers are classified as "novice" under Big Ten rules, and MSU recruits both inexperienced and experienced first-year rowers. (*Id.*, ¶4, PageID.367-68). Moreover, novice rowing is an integral part of the sport. (*Id.*, ¶¶3-11, PageID.367-369). Most people do not have the opportunity to row before college, so picking up

7

the sport in college is common. (*Id.*, ¶3, PageID.367). Coach Chavers first rowed in college and went on to career as a rowing coach. (*Id.*) Additionally, MSU alumna Emily Regan started rowing at MSU and went on to win an Olympic gold medal. (https://www.teamusa.org/us-rowing/athletes/Emily-Regan). In Big Ten meets, 18 of the 51 available competition slots are explicitly reserved for novice rowers which earn points for the entire team. (*Id.*, ¶¶8-13, PageID.368-370). At MSU, novice rowers receive the same practice gear and participate in the same training and lifting activities as the rest of the team. (*Id.*, ¶5, PageID.369). Thus, Lopiano's assertion that "novice female rowers are not receiving a genuine Division I varsity sport experience" has no basis in fact.

### 3. False assumptions regarding MSU's women's cross country and track and field teams

Lopiano states that she "suspects" that the women's cross country and women's track and field teams pad their numbers with "ghost participants"—or individuals who are on the roster for the first day of competition but not required to participate—because these teams are larger than average and because, by her estimation, a significant number do not compete. (Lopiano Report at 26-29, ECF No. 2-14, PageID.223-226). She concedes that she cannot make an accurate participation count based on the information she has reviewed and merely "suspects" that these teams are inflated. (*Id.* at 27, PageID. 224). These opinions can be stricken for this reason alone. *Samuels v. Allstate Prop. & Cas. Ins. Co.*, 310 F. Supp. 3d 847, 866 (E.D. Mich. 2018) (citing *Tamaraz v. Lincoln Elec. Co.*, 620 F.3d 665, 671-72 (6th Cir. 2010) ("Absolute certainty is not required of an expert but that sheer speculation, regardless of the qualifications of the speculator, lacks sufficient reliability."). It is unreliable for other reasons too.

As set forth in the affidavit of Walter Drenth, MSU's recently-retired Director of Track & Field/Cross Country, he requested to be able to field large teams (both men's and women's) so

8

that he could improve the teams by developing more athletes. (Drenth Dec, ¶¶4-6, 10, ECF No. 8-5, PageID.402). All members of the team receive the same equipment and gear, have the same access to academic support and sports medicine, participate and train together, and receive the same level of coaching. (*Id.*, ¶¶20-21, PageID.405.) Athletes are expected to come to practice and would be removed from the team if they did not. (*Id.*, ¶19, PageID.405.) It worth noting that, under Coach Drenth, the women's cross country team has been one of the best in the country. It has won six Big Ten Championships since 2010 and an NCAA Division I national championship in 2014. (*Id.*, ¶7, PageID.403.)

Finally, it is immaterial for Title IX participation counts whether athletes compete in competitions or travel with the team. OCR made this clear in its 1996 Clarification which states "participants" include those "[w]ho are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season,"[2] and can be included regardless whether they actually compete. Courts agree. *See Biediger v. Quinnipiac Univ.,* 691 F.3d 85, 93 (2d Cir. 2012) ("[i]t is not necessary for an athlete to meet minimum criteria of playing time or athletic ability to count as a participant."). Were it otherwise, the football team count would be much lower. This season, 49 of the 121 football team members on the team did not play in a game. (Breske Dec, ¶25, ECF No. 8-2, PageID.355). Only 74 are permitted to travel to away games. (Big Ten Travel Squad Limits, ECF No. 8-12, PageID.502). On the cross country and track and field teams, athletes are often recruited based on their potential, and spend their first years training and developing. (Drenth Dec, ¶¶5-6, 17, ECF No. 8-5, PageID.402).

---

[2] Dec. 11, 1979, A Policy Interpretation: Title IX and Intercollegiate Athletics, *available at* https://www2.ed.gov/about/offices/list/ocr/docs/t9interp.html

9

In sum, Lopiano's opinions are based on incomplete and inaccurate information and false assumptions. Her report should be stricken and excluded under Rule 702.

C. **Lopiano's Report Contains Several Contradictions Underscoring the Unreliability of Her Methodology.**

The Lopiano Report also applies inconsistent procedures and methods and should be stricken for that reason as well.

*First*, Lopiano argues that EADA data both is and is not reliable for Title IX purposes. She states that "EADA information can be used to reasonably estimate whether an institution meets the substantial proportionality participation requirement of Prong One" (Lopiano Report at 15, ECF No. 2-14, PageID.212), and that "secondary sources like the institution's EADA report . . . are acceptable alternatives for rendering a reasonable opinion" on substantial proportionality (*id.* at 17, PageID.214). But she also admits that "EADA Report Participant Counts do not follow Title IX counting instructions" and vary in material ways from Title IX based on the definition of who counts as an athletic "participant" under the governing regulations and interpretations. (*Id.* at 18, PageID.215; *see also id.* at 25, PageID.222 (acknowledging that "Title IX requires separate counts for each of these three programs [cross-county, outdoor track, and indoor track] which *cannot be derived* from examining EADA participation data") (emphasis added).)

*Second*, Lopiano treats web roster counts inconsistently. When arguing that the rowing EADA count is inflated, Lopiano cites as evidence the roster as reflected on MSU's website arguing "that the Web roster almost always more closely approximates the Title IX participant count." (*Id.* at 23, PageID.220). But in evaluating the women's cross country and track and field count, Lopiano disregards a web roster count that is higher than the EADA count and therefore would, under her theory, indicate that the cross country and track and field teams are undercounting female athletes. (*Id.* at 30, PageID.227).

10

*Third*, while using the average NCAA Division I roster size as a metric for evaluating whether MSU's women's athletic rosters show indicia of "overcounting"—already a tenuous proposition that fails to account for the many legitimate reasons this could be—when the same comparison shows "inflated" men's rosters, Lopiano dismisses these differentials as inconsequential. (*See* Lopiano Report at 33-34, ECF No. 2-14, PageID.230, 231 (conceding that "an inflated team size occurs in men's cross country, indoor track, outdoor track is also present . . ." in the EADA data.)  Lopiano thus treats men's and women's sports differently, without offering any explanation as to why these differentials matter in one context but not the other.  *See* Fed. R. Evid. 702(b).

*Fourth*, Lopiano does not apply other aspects of her analysis to men's teams, rendering her observations about women's teams meaningless. For example, she analyzes whether women rowers, cross country runners, and track and field athletes took part in a competitions and drew conclusions based on her findings. But she conducted no similar analysis to men's teams to determine whether her conclusions would have any effect on their relative participation counts.

In sum, Lopiano's inconsistent application of procedures and methodologies requires that her report be stricken and excluded.

**D.    Lopiano's Report Draws Impermissible Legal Conclusions and Intrudes on the Province of the Court and the Jury.**

The Lopiano Report should also be stricken to the extent it makes legal conclusions.

"Rule 702 prohibits expert witnesses from testifying to legal conclusions." *United States v. Melcher*, 672 F. App'x 547, 552 (6th Cir. 2016) ("An expert offers a legal conclusion when he defines the governing legal standard or applies the standard to the facts of the case.") *see also Goodwin v. Richland Cty., Ohio*, 832 F. App'x 354, 358–59 (6th Cir. 2020) (concluding that expert

11

could not testify whether officer "used appropriate force" since "[t]his part of the report told the jury what law to apply and which witnesses to believe").

Courts have thus regularly excluded proffered expert witness testimony where the witness purports to opine whether a party met or complied with a specified statutory standard, including Title IX. *See, e.g.*, *L.E. v. Lakeland Joint Sch. Dist. #272*, 403 F. Supp. 3d 888, 896 (D. Idaho 2019) (striking declaration of expert who purported to "define[] what he deems the 'applicable legal standards'" and concluded "that the School failed to uphold the regulatory standards of Title IX and was deliberately indifferent to its obligations to comply with Title IX"); *Keyes v. Ocwen Loan Servicing, LLC*, 335 F. Supp. 3d 951, 959 (E.D. Mich. 2018) ("Hansen has not only defined the governing legal standard by providing an extensive history and explanation of what constitutes an ATDS under the TCPA and the Commission's guidance, but he has also impermissibly applied that standard to the facts of this case by concluding that Ocwen's Aspect System is an 'ATDS as contemplated by the TCPA and clarified by the FCC.'"); *Doe v. Wharton Indep. Sch. Dist.*, No. 2:16-CV-48, 2017 WL 932935, at *1 (S.D. Tex. Mar. 9, 2017) (concluding that experts "invade[d] the province of the jury in opining regarding the ultimate fact questions of whether [the district] had actual knowledge of the teacher's alleged violations of Title IX" and "also invade[d] the province of the Court in opining as to the legal requirements of Title IX") (Ex 1).

The Lopiano Report makes numerous legal conclusions. For example, Lopiano opines that MSU "did not provide male and female athletes with athletics participation opportunities proportional to the percent of males and female in its undergraduate student population" under Prong One of the Three-Part Test and therefore "has not met" its Title IX requirements. (*See* Lopiano Report at 10, 34, ECF No. 2-14, PageID.207, 231; *see also id.* at 37, 40, PageID.234, 237; *see also generally id.* at 36-54, PageID.233–251.) Lopiano's report is also replete with legal

conclusions as to MSU's compliance with the Three-Part Test—for example, that "MSU was not in compliance with Prongs One, Two or Three" (*id.* at 38, PageID.235); that "MSU could not use the Prong Two option because it did not demonstrate a history and continuing practice of program expansion for the underrepresented sex" (*id.* at 11, PageID.208); and that "MSU female participation counts have not met the Title IX proportionality standards" (*id.* at 34, PageID.231.) Lopiano also opines on whether Plaintiffs have established the legal requirement that they demonstrate irreparable harm before the issuance of a preliminary injunction. (*Id.* at 55-60, PageID.252-257). All of these conclusions rest on Lopiano's view of the meaning of Title IX, its implementing regulations, and OCR guidance. (*See generally id.* at 6-19, PageID.203–216.)

Lopiano's legal opinions have been rejected by other courts. In *Portz v. St. Cloud State University*, 297 F. Supp. 3d 929 (D. Minn. 2018), Lopiano offered proposed testimony "concern[ing] the statutory and regulatory requirements of Title IX" and "conclusions about whether [the university] has complied with Title IX." *Id.* at 953. The district court correctly held that Lopiano inappropriately attempted to provide testimony about "'whether federal law was contravened'" and, therefore, excluded Lopiano's testimony "about the legal requirements of Title IX or about her conclusions as to whether [the university] complies with Title IX." *Id.*; *see also id.* (noting that one portion of Lopiano's report was "just a summary of the requirements of 34 C.F.R. § 106.3" and concluding that "Lopiano may not testify regarding the requirements of law . . . .").

And in *Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 68, 101-02 (D. Conn. 2010), the judge declined to adopt Lopiano's belief, advanced again here, athletes who participate in multiple sports are not properly counted as a participant in each sport under Title IX.

13

## V. CONCLUSION

For all of these reasons, Defendants request that this Court strike Donna Lopiano's report and exclude her testimony from any hearing on Plaintiffs' Motion for Preliminary Injunction and any subsequent proceedings.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/ *Scott R. Eldridge*
    Scott R. Eldridge (P66452)
    Brian M. Schwartz (P69018)
    Ashley N. Higginson (P83992)
    Erika L. Giroux (P81998)
    One Michigan Ave. Suite 900
    Lansing, MI 48933
    eldridge@millercanfield.com
    schwartzb@millercanfield.com
    higginson@millercanfield.com
    giroux@millercanfield.com
    *Attorneys for Defendants*

Dated: February 3, 2021

**CERTIFICATION PURSUANT TO LCivR 7.3(b)(ii)**

The undersigned hereby certifies that, to the best of his knowledge, this Brief, in its entirety (exclusive of the cover page, table of contents, index of authorities, signature block, exhibits, affidavits, certificate of service, and this certification), contains 4,248 words (as checked with Microsoft Word 2010's word counting function).

                        Respectfully submitted,

                        /s/ *Scott R. Eldridge*
                        Scott R. Eldridge (P66452)
                        Miller, Canfield, Paddock and Stone P.L.C.
                        One Michigan Avenue, Suite 900
                        Lansing, MI  48933
                        (517) 483-4918
Dated:  February 3, 2021         eldridge@millercanfield.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 3, 2021, I electronically filed the foregoing document with the Clerk of the Court using the ECF system that will send notification of such filing upon all ECF filing participants.

                        MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

                         */s/ Scott R. Eldridge*

                        Scott R. Eldridge (P66452)
                        Attorneys for Defendants
                        One Michigan Avenue, Suite 900
                        Lansing, MI 48933
                        (517) 483-4918
                        eldridge@millercanfield.com