UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOPHIA BALOW, et al.,

      Plaintiffs,

v.

      Case No. 1:21-cv-44

MICHIGAN STATE UNIVERSITY, et al.,

      Hon. Hala Y. Jarbou

      Defendants.

_____/

## OPINION

Michigan State University (MSU) announced in October 2020 that, due to budget constraints, it would discontinue its men's and women's varsity swimming and diving programs after the end of the 2020-2021 season. Plaintiffs are current members of MSU's varsity women's swimming and diving team. They claim that MSU discriminates against women, in violation of Title IX, 20 U.S.C. §§ 1681 et seq. Specifically, in Count I of their complaint, Plaintiffs claim that MSU provides "fewer and poorer athletic participation opportunities" for women than it does for men. (*See* Compl., ECF No. 1, PageID.45.)[1] Plaintiffs believe that the elimination of their team would exacerbate this problem; accordingly, they have asked the Court for a preliminary injunction requiring MSU to maintain its varsity women's swimming and diving team for the duration of this lawsuit. The Court heard oral argument on Plaintiffs' motion on February 10, 2021. For the reasons herein, the Court will deny the motion.

---

[1] In Count II, Plaintiffs claim that MSU has not allocated its financial assistance to male and female athletes on an equal basis. In Count III, Plaintiffs claim that MSU has not allocated benefits to male and female athletes on an equal basis. The preliminary injunction motion is concerned only with Count I, i.e., MSU's alleged failure to provide equal athletic participation opportunities. (*See* Pls.' Br. in Supp. of Mot., ECF No. 2-1, PageID.85.)

## I. Preliminary Injunction Standard

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)).  The Court considers four factors when deciding whether to grant a preliminary injunction:

> (1) whether the movant has a "strong" likelihood of success on the merits;
>
> (2) whether the movant would otherwise suffer irreparable injury;
>
> (3) whether issuance of a preliminary injunction would cause substantial harm to others; and
>
> (4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction."  *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).  However, "a finding that there is simply no likelihood of success on the merits is usually fatal."  *Gonzales v. Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000).

## II. Title IX

Title IX prohibits sex discrimination in the provision of college sports programs, providing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity," including intercollegiate athletics. 20 U.S.C. § 1681(a); 34 C.F.R. § 106.41(a).

Title IX's regulations require universities receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).  The following factors are relevant for determining "equal opportunity":

(1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;

(2) The provision of equipment and supplies;

(3) Scheduling of games and practice time;

(4) Travel and per diem allowance;

(5) Opportunity to receive coaching and academic tutoring;

(6) Assignment and compensation of coaches and tutors;

(7) Provision of locker rooms, practice and competitive facilities;

(8) Provision of medical and training facilities and services;

(9) Provision of housing and dining facilities and services;

(10) Publicity.

*Id.*  A school's "failure to provide necessary funds for teams for one sex" also may be indicative of sex discrimination.  *Id.*

The Department of Education's Office for Civil Rights (OCR) clarified the meaning of "equal opportunity" in a 1979 policy interpretation.  *See* Title IX of the Education Amendments of 1972; a Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979).  To comply with the requirement to "effectively accommodat[e] the interests and abilities of male and female athletes," institutions must "provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities."  *Id.* at 71,417.

Compliance is assessed by the following three-part test:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing

3

practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Id.* at 71,418.

In 1996, the OCR clarified that institutions need "comply only with any one part of [this] three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes." OCR, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html.

Plaintiffs have the burden of proving the first part of this test, i.e., that there is a statistically significant disparity between male and female participation opportunities. *See Horner v. Ky. High Sch. Athletic Assoc.*, 43 F.3d 265, 275 (6th Cir. 1994). If Plaintiffs meet their burden, Defendants can escape liability by proving the second part, i.e., a history and continuing practice of program expansion for female athletes. *Id.* If Defendants cannot make this showing, then Plaintiffs must prove the third part, i.e., that the interests and abilities of female students have not been "fully and effectively accommodated." *Id.*

The parties mainly focus their arguments on the first part of the test, substantial proportionality (or lack thereof) in intercollegiate-level participation opportunities at MSU. The parties agree that the number of participation opportunities is determined by counting the number of athletic "participants," which the 1979 Policy Interpretation defines as athletes:

a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, *e.g.*, coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

4

c. Who are listed on the eligibility or squad lists maintained for each sport, or

d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

Exact proportionality would be achieved if the ratio of male to female athletic participants is equal to the ratio of male to female students enrolled at the school.  When the numbers are not exactly proportional, the number of participation opportunities necessary to achieve exact proportionality is known as the "participation gap."  For example, if there are 100 athletic participants in a school where half of the students are men and half are women, then exact proportionality would mean 50 male participants and 50 female participants.  But if there are 55 male participants and only 45 female participants, then the participation gap is 10.[2]

The first part of the three-part test does not require exact proportionality.  It requires "substantial" proportionality.  The OCR's 1996 clarification letter indicated that it would consider opportunities to be "substantially proportionate" when the participation gap

> . . . would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team.  As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.

Clarification of Intercollegiate Athletics Policy Guidance (1996).

### III. Standing

MSU argues that Plaintiffs do not have "standing" to assert their claim for two reasons. First, MSU argues that "[t]here is no private right of action under Title IX to challenge a gender-neutral decision such as eliminating a combined men's and women's team[.]"  (Defs.' Resp. Br.

---

[2] The formula for calculating the participation gap is as follows: (number of male athletes / percentage of males in student body) - total number of athletes = participation gap for women.  Using the numbers above, that calculation would be:  (55 / 0.5) - 100 = 10.

22, ECF No. 8.)  Second, MSU argues that Plaintiffs "have no standing to otherwise challenge a purported gender opportunity imbalance during a period they were swimming and diving for MSU."  (*Id.*)

MSU's first argument is misplaced.  First, there is no question that Title IX creates a private right of action and a remedy for discrimination on the basis of sex.  *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 708 (1979) ("Not only the words and history of Title IX, but also its subject matter and underlying purposes, counsel implication of a cause of action in favor of private victims of discrimination."); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 76 (1992) (finding that a damages remedy is available for an action to enforce Title IX).

MSU relies on *Sandoval v. Alexander*, 532 U.S. 275 (2001), in which the Supreme Court held that there is no private right of action to enforce *disparate impact* regulations under Title VI because the part of Title VI implying a private right of action, 42 U.S.C. § 2000d, prohibited "only intentional discrimination."  *Sandoval*, 532 U.S. at 282.  Title IX was patterned after Title VI, substituting the word "sex" in Title IX to replace the words "race, color, or national origin" in Title VI.  *See Cannon*, 441 U.S. at 695; *cf.* 42 U.S.C. § 2000d (Title VI) *with* 20 U.S.C. § 1681(a) (Title IX).  Accordingly, it follows that the Supreme Court's reasoning regarding Title VI applies to Title IX as well.  *See Doe v. BlueCross BlueShield of Tenn., Inc.*, 926 F.3d 235, 240-41 (6th Cir. 2019) (finding it "unlikely" that Title IX prohibits disparate-impact discrimination) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) ("Title IX implies a private right of action to enforce its prohibition on intentional sex discrimination.")).  In other words, both statutes permit a private right of action for intentional discrimination, but not for disparate impact.

Nevertheless, as other courts have held in similar situations, Plaintiffs assert a claim of disparate treatment, not disparate impact.  Plaintiffs contend that MSU has intentionally treated its

6

female athletes differently than male athletes, and that eliminating the men's and women's swimming and diving team amounts to further discrimination against the female members of that team. This is a disparate treatment claim. *See Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 97-98 (2d Cir. 2012) ("A school's decision to provide students with athletic participation opportunities through separate sports programs for each sex . . . necessarily raises a disparate treatment rather than disparate impact claim in that the school decides which athletic opportunities are available to particular students 'on the basis of sex.'").

In contrast, disparate-impact claims arise when "an entity acts for a nondiscriminatory reason but nevertheless disproportionately harms a protected group." *Foster v. Michigan*, 573 F. App'x 377, 389 (6th Cir. 2014). Plaintiffs do not make such a claim. They do not contend that Defendants acted for nondiscriminatory reasons. Rather, they contend that Defendants specifically chose their team for elimination, and that this choice reflects disparate treatment. Furthermore, the regulations at issue enforce the nondiscrimination requirement of Title IX; they do not purport to regulate facially neutral decisions with disparate impacts. *See Mayerova v. E. Mich. Univ.*, 346 F. Supp. 3d 983, 991 (E.D. Mich. 2018). Thus, *Sandoval* is distinguishable.

MSU's second argument is correct, but irrelevant. As far as the preliminary injunction motion is concerned, Plaintiffs are not challenging a gender imbalance in existence during the period in which they have been members of the swimming and diving team. Instead, they seek to prevent the effects of a decision that will subject them to that imbalance. They have standing to assert this claim.

## IV. Preliminary Injunction Analysis

### A. Likelihood of Success

Plaintiffs' request for an injunction falters on the first, and most important, factor. Plaintiffs have not shown a strong or substantial likelihood of success on the merits of their claim.

7

A brief word about the standard for a likelihood of success. Plaintiffs rely heavily on a case with similar facts from the District of Iowa, *Ohlensehlen v. University of Iowa*, No. 3:20-cv-00080-SMR-SBJ, 2020 WL 7651974 (D. Iowa Dec. 24, 2020), in which members of the women's swimming and diving team at the University of Iowa claimed that the university's decision to eliminate their team violated Title IX. *Id.* at *1. The court in that case entered a preliminary injunction to stop the University of Iowa from eliminating the team for the duration of the lawsuit. *Id.* Among other things, the court determined that the plaintiffs had shown a "fair chance" of success on the merits of their Title IX claim. *Id.* at *5. Similarly, Plaintiffs contend that they have demonstrated a "fair chance" of success on the merits of their claim.

Unlike courts in the Eighth Circuit, this Court does not evaluate requests for a preliminary injunction under a "fair chance" standard. The Eighth Circuit has a two-tiered standard for evaluating preliminary injunctions. The first tier, applicable in *Ohlensehlen*, required the plaintiff to show only a "fair chance of prevailing" on the merits, which permits a showing of less than a fifty percent likelihood of success. *See D.M. by Bao Xiong v. Minn. State High Sch. League*, 917 F.3d 994, 999 (8th Cir. 2019). The second tier, a "heightened, likely-to-prevail standard," applies where the plaintiff challenges a "duly enacted state statute." *Id.* at 1000.

This Court is bound by precedent from the Sixth Circuit, not the Eighth. Nevertheless, "[a] fixed legal standard is not the essence of equity jurisprudence"; "'the precise wording of the standard for the likelihood of success on the merits is not as important as a realistic appraisal of all the traditional factors weighed by a court of equity. A balancing is required, and not the mechanical application of a certain form of words.'" *Roth v. Bank of Commonwealth*, 583 F.2d 527, 537-38 (6th Cir. 1978) (quoting *Metro. Detroit Plumbing & Mech. Contractors Assoc. v. HEW*, 418 F. Supp. 585, 586 (E.D. Mich. 1976)). Thus, the Court applies the Sixth Circuit's

8

standard, but recognizes that its duty is to balance the Plaintiffs' likelihood of success against the other factors.

### 1. Plaintiffs' Evidence: Lopiano Report

To support their claim of unequal opportunity, Plaintiffs rely on an analysis conducted by their expert, Donna Lopiano, who uses publicly available data—as well as a series of inferences from that data—to offer her opinion that MSU's participation gap is too large for participation opportunities to be substantially proportionate.

### (a) Admissibility

As an initial matter, MSU contends that the Court should strike Lopiano's report because it is inadmissible.  MSU argues that the report relies upon improper data, makes assumptions from that data that are unwarranted, and offers legal opinions.  MSU also argues that an expert's testimony is unnecessary because the relevant calculations are straightforward and simple.  Alternatively, MSU asks the Court to consider the report of its own expert.

MSU is invoking the Court's "gatekeeping" role.  The Court has a duty to act as a "gatekeeper" for expert testimony by assessing its admissibility.  *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999); *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993); Fed. R. Evid. 104(a).  This inquiry is governed in part by Rule 702, which provides,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Ultimately, an expert's testimony will be admissible if it "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.

The Court will deny MSU's request to strike Lopiano's report and will consider the reports of both experts.  Lopiano's resume indicates that she is qualified to render opinions relating to intercollegiate sports programs.  In addition, her analysis is helpful and relevant.  MSU's objections to her data and her assumptions primarily concern the weight of her conclusions rather than their reliability.  To the extent *Daubert* applies at this stage, the Court can weigh MSU's concerns when assessing Lopiano's report in tandem with the report of MSU's expert.

**(b) EADA Reports**

Lopiano begins her analysis by examining reports filed by MSU under the Equity in Athletics Disclosure Act (EADA), 20 U.S.C. § 1092(g).  (*See* Lopiano Rep., ECF No. 2-14, PageID.212.)  For the most recent year in which MSU's EADA data is publicly available, the 2018-2019 academic year, the EADA reports show a participation gap of 25 female participation opportunities.  (*Id.*, PageID.216.)

As Lopiano acknowledges, however, the participant counts in EADA reports are not equivalent to participation opportunities under Title IX because the EADA reports "do not follow Title IX counting instructions."  (*Id.*, PageID.215.)  The EADA reports "were designed to make prospective students aware of an institution of higher education's commitment to providing equitable athletic opportunities."  (*Id.*, PageID.213.)  They were not designed to report official tallies of participation opportunities for purposes of Title IX.

For instance, the EADA requires universities to report the number of their undergraduate athletes, by team, "as of the day of the first scheduled contest for the team."  20 U.S.C. § 1092(g)(1)(B)(i).  However, the number of athletes as of the date of the first scheduled contest may not be the same number of athletes who participate "in organized practice sessions and other

team meetings and activities on a regular basis during a sport's season."  *See* Policy Interpretation, 44 Fed. Reg. at 71,415.  Some athletes who participate in the first competition might leave the team after that event, making the EADA statistics overinclusive.

Lopiano surmises that MSU's participation counts for women are systematically overinflated in the EADA reports because the 2019 instruction manual for EADA reports advises schools to count "male practice players" as participants on women's teams, even though those players would not count as female participants under Title IX.  (Lopiano Rep., PageID.216.)  However, there is no evidence in the EADA online database that MSU counted male practice players as female participants in its most recent public data.  According to Lopiano, the number of male practice players would be displayed in a "caveat" field in the database.  (*Id.*, PageID.218.)  MSU's EADA data for 2018-2019 contains nothing in that field.  Lopiano apparently believes that MSU simply left that field blank, but MSU provides a more straightforward reason: it stopped counting male practice players as female participants in 2019.  (*See* Breske Decl. ¶ 23, ECF No. 8-2.)

### (c) Web rosters

Next, Lopiano analyzes the player rosters available on MSU's website, which Lopiano believes more closely reflect the number of participants in MSU's athletic programs for purposes of Title IX.  She notes that these "web rosters" show participation numbers that are lower than those in the EADA reports.  Lopiano implies that this as a sign that MSU is inflating its EADA data, but the difference is also attributable Lopiano's earlier point that EADA reports tend to overcount participants.

By Lopiano's count, the web rosters show participation gaps of 33, 37, and 35 female athletes in the seasons ending in 2018, 2019, and 2020, respectively.  (*Id.*, PageID.232.)  In percentage terms, these gaps are 1.8%, 2.0%, and 2.0%.  (*Id.*)

#### (d) Inflation

Lopiano believes that the actual participation gaps are much larger than the numbers in the web rosters due to artificial inflation of the player rosters on several of MSU's women's teams, particularly the women's rowing, cross country, and track and field teams.

#### (i) Women's rowing

Lopiano contends that MSU has inflated its numbers for women's rowing by including 20 to 30 "novices" on its team.  (*Id.*, PageID.220.)  According to Lopiano, novice rowers are freshmen who have never participated in rowing before college.  Lopiano believes that novice female rowers should not be counted as participants because they do not receive "a genuine Division I varsity experience"; in contrast to other rowers, they "participate in fewer regular season events," "do not receive athletic scholarships, and do not have national championships."  (*Id.*, PageID.222, 238.) However, she acknowledges that "participation in a competition is not required in order to count as a participant [under Title IX]" (*id.*, PageID.224 n.6), undermining her point that the ability to participate in season events and national championships has relevance to determining whether an athlete is a participant.

#### (ii) Women's cross country and track and field teams

Lopiano counts between 35 and 44 members of MSU's women's cross country team during the years 2012 to 2019.  (*Id.*, PageID.223.)  She believes those numbers are suspicious because the average size of a NCAA Division I women's cross country team is 17 runners.  (*Id.*, PageID.224.) At the same time, however, she notes that the men's team is also larger than average, albeit to a lesser extent.  And she acknowledges that "she cannot make an accurate participant count."  (*Id.*)

Lopiano believes that MSU has improperly inflated the number of participants on its women's cross country and track and field teams because a substantial number of them do not

participate in any events.  Again, however, Title IX's regulations make clear that participation in an event is not required for an athlete to count as a participant.

### (e) Summary

In short, Lopiano believes that MSU's actual participation gap is much larger than approximately 35 female participants due to her belief that MSU has improperly inflated the sizes of several of its women's teams.

Lopiano's analysis contains several shortcomings and flaws that taint her conclusions. First, as she acknowledges, she does not possess the data necessary to accurately count participant numbers.  She is forced to guess the number of participants based on EADA reports that are inconsistent with the definition of participant under Title IX, and web rosters that she speculates are more in line with that definition.

Second, to reach a participation gap higher than approximately 35 female athletes, Lopiano makes inferences that are tenuous, at best.  For instance, she compares the sizes of MSU's teams to the average size of teams at similar schools.  It is difficult to discern the relevance of this comparison.  Nothing in Title IX compels a school to make the size of its teams comparable to that of other schools.  And in any event, an average necessarily implies that other Division I schools also have teams that are larger than the average, some of which may be comparable to the size of MSU's teams.

Third, Lopiano contends that some of the female athletes on MSU's teams should not count as participants because they do not participate in competitions, but that assertion conflicts with her acknowledgement that such participation is not necessary for an athlete to count as a participant for purposes of Title IX.  As summarized by the Second Circuit:

> It is not necessary for an athlete to meet minimum criteria of playing time or athletic ability to count as a participant.  As OCR explained, "athletes who practice but may not compete" nevertheless "receive numerous benefits and services, such as

13

training and practice time, coaching, tutoring services, locker room facilities, and equipment, as well as important non-tangible benefits derived from being a member of an intercollegiate athletic team." Thus, "it is necessary to count all athletes who receive such benefits when determining the number of athletic opportunities provided to men and women." . . . for an athlete to be counted, he or she must be afforded a participation opportunity that is "real, not illusory," in that it offers the same benefits as would be provided to other *bona fide* athletes. . . . .

*Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 93 (2d Cir. 2012) (citations omitted).

Fourth, Lopiano's logic is skewed in favor of a larger participation gap for female athletes. She does not apply her analysis to men's sports at MSU, such as football.[3] She does not count how many members of the men's teams never or rarely participate in a competition, and then subtract those numbers from the male side of the ledger.

### 2. MSU's Evidence: O'Brien Report

MSU responds with a report prepared by its own expert, Timothy O'Brien, who provides details that fill in gaps in Lopiano's report. His report suggests that there is no significant participation gap at MSU.

### (a) Counting participants

O'Brien reviewed data maintained by MSU's Director of Compliance and compared it to MSU's squad lists. (O'Brien Rep., ECF No. 8-8, PageID.429.) Because the NCAA regulates the number of hours that a student athlete can participate in athletics on a weekly basis, MSU maintains a system to track student athletic activity. (*Id.*, PageID.432.) This data includes "practices, team meetings, strength and conditioning, travel, and competition[.]" (*Id.*) O'Brien also spoke with the coaches of the women's rowing, cross country, and track and field teams to determine whether the spots on their teams represented "legitimate participation opportunities." (*Id.*, PageID.434.)

---

[3] MSU's Director of Compliance, Alexandra Breske, avers that 29 out of 121 members of the football team did not participate in a competition in 2019. (Breske Decl. ¶ 25, ECF No. 8-2.) In 2018, 40 out of 120 members did not participate in a competition. (*Id.*)

MSU's data for the 2019-2020 academic year shows a total of 895 athletic participants, 445 of which are male and 450 of which are female.  (*Id.*, PageID.431.)  The enrollment for that year was 17,530 male students (49.07%) and 18,192 female students (50.93%).  These numbers result in a participation gap of 12 female participation opportunities.[4]  (*Id.*, PageID.443.)  After eliminating the men's and women's swimming and diving teams, if all else remained equal, that gap would increase to 15.[5]  (*Id.*, PageID.444.)

### (b) Women's rowing

To verify that the novice rowers on MSU's women's rowing team receive legitimate participation opportunities, O'Brien interviewed the coach of that team, Kimberly Chavers. Among other things, Chavers told O'Brien that "women's rowing is not a prominent or highly populated sport at the high school level in the Midwest"; consequently, there is a need for a collegiate program that recruits, trains, and develops skilled multi-sport female athletes to compete in rowing.  (O'Brien Rep., PageID.435.)

In addition, the Big Ten Conference requires a minimum team size of 51 student-athletes in order to participate.  (*Id.*, PageID.436.)  Rowing is a sport with "natural attrition," so to meet the minimum, a larger squad is necessary to offset departures from the program.  (*Id.*, PageID.437.)

Most importantly, Chavers confirmed that novice rowers are treated the same as other members of the team.  In other words, all the women on the rowing team–novice and otherwise–receive the same "gear, attire, uniforms, iPads, and . . . access to the athletic trainers, academic support, strength and conditioning, nutrition and coaching, among other things."  (*Id.*,

---

[4] Using the formula in footnote 2, the calculation is:  (445 / 0.4907) - 895 = 12.

[5] The women's swimming and diving team has four more members than the men's team.

PageID.437.)   And contrary to Lopiano's assertion, some novice rowers receive athletic scholarships.  (Chavers Decl. ¶ 21, ECF No. 8-3.)

Furthermore, in the Big Ten Conference, novice rowers can receive points for their team at conference events because some races are reserved for novice rowers.  Consequently, novice rowers are necessary for the success of the team.  (O'Brien Rep., PageID.436; Chavers Decl. ¶ 10.) And as they develop, novice rowers can compete in the varsity events if their skills allow them to do so.  (Chavers Decl. ¶ 9.)  Indeed, one novice rower at MSU went on to compete in the Olympics. (*Id.* ¶ 3.)

### (c) Women's cross country and track and field

The head coach of the men's and women's cross country and track and field teams, Walter Drenth, told O'Brien that he committed to larger squads in order to be competitive in the Big Ten Conference.  (*Id.*, PageID.438-439.)  A larger team allows him to recruit quality athletes and focus on their development over the course of four or five years.  (*Id.*, PageID.439.)  Part of that development involves running athletes as "unattached" at some events, which means that they are not running on behalf of MSU and do not use up a year of their eligibility.  (*Id.*, PageID.440.) Drenth also confirmed that all members of the teams are "treated in the same manner and get[] the same level of attention and support."  (*Id.*, PageID.441.)

Drenth explained that the women's teams are larger than the men's teams because the NCAA permits MSU to award more scholarships to members of the women's teams than those of the men's teams.  The size of the men's teams is approximately 70% of the size of the women's teams, which roughly matches the ratio of scholarship funds available for men versus women (12.6 versus 18).  (*Id.*, PageID.442; *accord* Drenth Decl. ¶ 11, ECF No. 8-5.)

### 3. Assessing Substantial Proportionality

Based on MSU's numbers, there is a gap of 12 participation opportunities for women in the most recent academic year for which the parties can calculate such a gap, the 2019-2020 academic year.[6]  In the year before that, the gap was 27.  (Breske Decl. ¶ 17.)  These numbers are smaller than the average size of a women's team at MSU, which is 35 athletes.  (*Id.*)  Accordingly, using one of the OCR's stated criteria for proportionality, MSU's evidence indicates its participation numbers are substantially proportionate.

Plaintiffs offer a much higher calculation of the participation gap, but as discussed above, their calculation depends upon imperfect data, flawed assumptions, contradictory reasoning, and a skewed analysis.  Thus, Plaintiffs have provided a shaky foundation on which to argue that MSU's participation gap is statistically significant.  The cracks in that foundation become even more apparent after considering the evidence offered by MSU.

O'Brien's report, which is supported by affidavits from the coaches for the women's rowing, cross country, and track and field teams, provides facially valid reasons to justify the sizes of those teams and to explain why all the members of those teams are countable as participants under Title IX's criteria.  Importantly, the evidence indicates that all members of the foregoing teams are treated equally with respect to the benefits of participation.  Although it is true that novice rowers on the women's rowing team generally have less experience and compete in different events than other members of the team, the Court finds no legal support for Lopiano's or Plaintiffs' contention that the spots for these women are not genuine participation opportunities.

---

[6] The parties agree that the Court cannot calculate a participation gap until after a season has ended.  Consequently, the Court cannot calculate a gap for the 2020-2021 academic year.

Plaintiffs analogize novice rowers to female athletes at a university that downgraded several women's teams from varsity status to club status, aggravating an existing imbalance between athletic opportunities for men and women.  *See Cohen v. Brown Univ.*, 991 F.2d 888, 892 (1st Cir. 1993) (*Cohen II*).  That comparison is inapt.

In *Cohen*, the downgrade to club status meant that these teams lost "financial subsidies and support services routinely available to varsity teams (*e.g.*, salaried coaches, access to prime facilities, preferred practice time, medical trainers, clerical assistance, office support, admission preferences, and the like)."  *Id.*  Unlike the club team members in that case, there is no evidence that novice rowers do not receive the same type of subsidies and support as other rowers on the team.

The district court in *Cohen* issued a preliminary injunction requiring the university to reinstate the women's club teams to their former status as varsity teams.  *Cohen v. Brown Univ.*, 809 F. Supp. 978, 1001 (D.R.I. 1992) (*Cohen I*).  In response to the injunction, the school submitted a plan to add "junior varsity positions" to women's varsity teams.  *See Cohen v. Brown Univ.*, 101 F.3d 155, 186 (1st Cir. 1996) (*Cohen IV*).  The district court, noting that "junior varsity squads" do not qualify as "intercollegiate competition" under Title IX, concluded that the university's plan to put junior varsity positions on the varsity teams was not a "good faith" effort to comply with the injunction.  *Id.*

Plaintiffs argue that a novice rower is like a junior varsity position on a varsity team. Unlike the district court in *Cohen*, however, this Court does not possess the relevant information to determine what facts distinguished a "junior varsity" position from a varsity one on the same team under the school's plan in that case.  If that court was concerned that the junior varsity positions could never participate in intercollegiate competition, it would make sense for the court

to conclude that those positions were not countable as genuine participation opportunities under Title IX.  However, novice rowers are different.  They participate in intercollegiate events specifically designated for them and earn points at those events for the benefit of the team.  They can also participate in varsity races as their skills allow.  In that respect, they are little different from members of any other varsity team who practice with the team regularly and receive the same institutional support as other teammates but are not yet skilled enough to compete on behalf of the school at intercollegiate events.

In short, on the present record, the Court is not persuaded that MSU has improperly inflated its participation opportunities for women, or that Plaintiffs have shown a likelihood of success on their claim to the extent it requires them to demonstrate such inflation.

Furthermore, the Court is not persuaded that a participation gap of 25 (according to Lopiano's initial estimate based on EADA data), 35 (according to Lopiano's estimate based on the web rosters), or 12 (according to MSU's most recent records) is likely to be too large for a school of MSU's size to satisfy the test for substantial proportionality.  Most of these estimates are less than the average size of a women's team at MSU.

The Court rejects Plaintiffs' contention that a participation gap as small as eight athletes would place MSU outside the OCR's proportionality "safe harbor" for demonstrating "nondiscriminatory participation opportunities."  *See* Clarification of Intercollegiate Athletics Policy Guidance (1996).  Although it is theoretically possible that a school like MSU could field a viable team of eight female tennis players, the OCR has made clear that it considers substantial proportionality in the context of each institution, including that institution's "specific circumstances and the *size of its athletic program*."  *See id.* (emphasis added).  Plaintiffs' argument does not account for the size of MSU's athletic program.

If the size of an athletic program is relevant, then the size of the participation gap in relation to the size of the athletic program should also be relevant.  Indeed, the substantial proportionality test stems from the OCR's recognition that, because "natural fluctuations in an institution's enrollment and/or participation rates may affect the percentages in a particular year," "it would be unreasonable to expect an institution to achieve exact proportionality[.]"  *Id.*  Schools with larger athletic programs are likely to see larger fluctuations in participation numbers from year to year.  Ignoring the size of the participation gap in relation to the size of the athletics program would significantly hinder the ability of schools with larger programs to maintain compliance.  They would be more likely to fall outside the safe harbor due to "natural fluctuations in enrollment and participation rates" that may be somewhat large in absolute numbers but are relatively small in relation to the size of their programs.

Courts seem to recognize this point.  They generally examine participation gaps *as a percentage* of the size of the athletic program at the school in question.  A case cited by Plaintiffs suggests that a gap lower than 2% typically satisfies the substantial proportionality requirement:

> OCR has not established a threshold statistical figure for determining whether a school offers participation opportunities substantially proportional to its enrollment, but instead examines each school on a case-by-case basis. 1996 Clarification at 4.  Courts, however, have held that a disparity within two percentage points is proof that an educational institution falls within the substantial proportionality safe harbor.  *See Equity in Athletics, Inc. v. Dep't of Educ.*, 675 F. Supp. 2d 660, 682-83 (W.D. Va. 2009) (finding no case in which a disparity of two percentage points was held to constitute a lack of substantial proportionality).

*Biediger v. Quinnipiac Univ.*, 728 F. Supp. 2d 62, 110 (D. Conn. 2010); *see also Portz v. St. Cloud State Univ.*, 196 F. Supp. 3d 963, 975 (D. Minn. 2016) (discussing cases and noting that a deviation of "10 or more percentage points . . . [is] very rarely substantially proportionate," whereas "a deviation of less than 3.5 percentage points typically keeps the ratios substantially proportionate").

MSU's participation gap appears to be lower than 2%.  Plaintiffs have not cited, and the Court is not aware, of any case where a gap lower than 2% failed to satisfy the test for substantial proportionality.  *Cf. Ohlensehlen v. Univ. of Iowa*, No. 3:20-cv-00080-SMR-SBJ, 2020 WL 7651974, at *5 (N.D. Iowa, Dec. 24, 2020) (granting preliminary injunction where participation gap was at least 2.8%); *Portz*, 196 F. Supp. 3d at 976 (granting preliminary injunction where gap was 3.5%); *Ollier v. Sweetwater Union High Sch. Dist.*, 768 F.3d 843, 856 (9th Cir. 2014) (gap of 6.7% was not substantially proportionate); *Biediger*, 728 F. Supp. 2d at 111 (gap of 3.62% was a "borderline case of disproportionate athletic opportunities for women").

Accordingly, for all the foregoing reasons, the Court finds that Plaintiffs have not shown a substantial likelihood of success.

### B. Irreparable Injury

Next, the Court considers whether Plaintiffs have shown the possibility of irreparable injury in the absence of an injunction.  Plaintiffs have met their burden.  Although MSU has promised to maintain Plaintiffs' athletic scholarships throughout their enrollment, the Court recognizes that the discontinuation of their team will likely have significant impacts on Plaintiffs' athletic experience and their ability to compete at an elite level in the future.  Transferring to a comparable program at another school could be difficult and costly.  And it might require surrendering academic credits that Plaintiffs have earned at MSU.

On the other hand, some of the damage has already been done.  MSU made the difficult decision to eliminate Plaintiffs' team and is willing to defend that decision.  Plaintiffs now ask the Court to keep their team on temporary life support until the outcome of the case, which is uncertain in both timing and result.  MSU will likely have difficulty retaining and recruiting staff and team members in these circumstances, to the detriment of the remaining team members and their ability to compete.

In any event, Plaintiffs have demonstrated a likelihood of irreparable injury in the absence of an injunction.

### C. Substantial Harm to Others

MSU apparently contends that maintaining its women's swimming and diving team would cost approximately $1 million per year (around half the $2.07 million cost of maintaining both the men's and women's teams), not including unspecified "capital outlays" that would be necessary to upgrade and repair the swimming and diving facilities.  (*See* Defs.' Resp. Br. 8.)

Plaintiffs argue that MSU will suffer no harm because it recently received very large donations for its sports programs, which would be more than enough to cover the cost of maintaining Plaintiffs' team.  However, it is not clear how much of those donations would be available to fund Plaintiffs' team.  Moreover, those donations do not necessarily mitigate the impact of the Court's injunction.  With or without the donations, an injunction would require MSU to allocate significant resources to the women's swimming and diving team that MSU could use elsewhere.

### D. Public Interest

The public interest would be served by preventing discrimination in the provision athletic opportunities for women; however, Plaintiffs have not shown that they are likely to succeed on that claim.  Absent such a showing, an injunction would not serve the public's interests.  MSU is best positioned to steward its financial resources for the benefit of the institution and its students.

On balance, the factors weigh against the grant of a preliminary injunction.  Accordingly, the Court will deny Plaintiffs' motion.

## V. Conclusion

For the reasons stated herein, the Court will deny Defendants' motion to strike Plaintiffs' expert report.  The Court will also deny Plaintiffs' motion for a preliminary injunction.

An order will enter consistent with this Opinion.


Dated:   February 19, 2021            /s/ Hala Y. Jarbou
                                      HALA Y. JARBOU
                                      UNITED STATES DISTRICT JUDGE