UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOPHIA BALOW, et al.,

    Plaintiffs,

v.

MICHIGAN STATE UNIVERSITY, et al.,

    Defendants.

_____/

Case No. 1:21-cv-44

Hon. Hala Y. Jarbou

## **OPINION**

Michigan State University (MSU) decided to end support for its men's and women's varsity swimming and diving programs after the end of the 2020-2021 season. Plaintiffs were members of MSU's varsity women's swimming and diving team[1] when MSU made that decision. They claim that MSU discriminates against women, in violation of Title IX, 20 U.S.C. §§ 1681 et seq. Specifically, in Count I of their complaint, Plaintiffs claim that MSU provides "fewer and poorer athletic participation opportunities" for women than it does for men. (*See* Compl., ECF No. 1, PageID.45.) In Count II, Plaintiffs claim that MSU has not allocated financial assistance to male and female athletes on an equal basis. In Count III, Plaintiffs claim that MSU has not allocated other benefits to male and female athletes on an equal basis. In Count IV, Plaintiffs claim that Defendants discriminated against them in violation of Michigan's Elliott-Larsen Civil Rights Act (ELCRA), Mich. Comp. Laws § 37.2101, et seq.

Plaintiffs believe that the elimination of their team would exacerbate some of these problems. They brought this action against MSU, MSU's Board of Trustees, MSU President

---

[1] The parties dispute whether there was one team comprised of men and women or two separate teams. For purposes of this Opinion, the Court will assume that there were two separate teams.

Samuel L. Stanley, Jr., and MSU's Director of Athletics, Bill Beekman.  Among other forms of relief, Plaintiffs asked the Court for a preliminary injunction requiring MSU to maintain its varsity women's swimming and diving team for the duration of this lawsuit.  The Court denied that request.  (*See* 2/19/2021 Op., ECF No. 16.)

Before the Court are Defendants' motion to dismiss the complaint for failure to state a claim (ECF No. 21) and Plaintiffs' motion for leave to file an amended complaint (ECF No. 30).  The Court will grant the motion to dismiss in part and deny leave to file the amended complaint.

### I. Allegations

According to the complaint, MSU is a member of the NCAA Big Ten Conference, and its sports teams participate in Division I, the highest level of intercollegiate competition.  For the 2020-2021 academic year, MSU sponsored multiple men's and women's sports teams, including:

> baseball, men's and women's basketball, men's and women's cross country, football, men's and women's golf, gymnastics, men's ice hockey, rowing, softball, men's and women's soccer, men's and women's swimming and diving, men's and women's tennis, men's and women's track and field, volleyball, and wrestling.

(Compl. ¶ 124.)  In October 2020, the school announced that it would not sponsor the men's and women's diving teams after the 2020-2021 season.  Plaintiffs do not mention the elimination of the men's team in their complaint, but they acknowledged it in their preliminary injunction briefing.  (*See* Pls.' Reply Br. in Supp. of Mot. for Prelim. Inj. 6, ECF No. 13.)

Plaintiffs allege that there were 38 members of the women's team as of January 2021.  (Compl. ¶ 2.)  Plaintiffs do not allege any details about the men's team, but Defendants' evidence presented in opposition to the preliminary injunction indicated that there were 33 members on the women's team and 29 members on the men's team in the 2019-2020 season (*see* Breske Decl. ¶¶ 19, 21, ECF No. 8-2); thus, if the numbers remained consistent for the 2020-2021 season, eliminating both teams would result in a net loss of approximately four opportunities for women.

2

## II. Dismissal Standard

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* (quoting Fed. R. Civ. P. 8(a)(2)).

Assessment of the complaint under Rule 12(b)(6) must ordinarily be undertaken without resort to matters outside the pleadings; otherwise, the motion must be treated as one for summary judgment under Rule 56. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010). "However, a court may consider exhibits attached to the complaint, public records, items appearing in the record of the case, and exhibits attached to defendant's motion to dismiss, so long as they are referred to in the complaint and are central to the claims contained therein, without converting the motion to one for summary judgment." *Gavitt v. Born*, 835 F.3d 623, 640 (6th Cir. 2016).

## III. Amendment of the Complaint

When considering a motion for leave to amend the complaint, the Court should "freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). However, the Court can deny leave

3

when amendment would be "futile" because the amended complaint would not survive a motion to dismiss. *See Rose v. Hartford Underwriters Ins. Co.*, 203 F.3d 417, 420 (6th Cir. 2000).

## IV. Title IX

Title IX prohibits sex discrimination in the provision of college sports programs, providing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity," including intercollegiate athletics. 20 U.S.C. § 1681(a); 34 C.F.R. § 106.41(a). Under Title IX, schools must "provide 'gender-blind equality of athletic opportunity to . . . students.'" *Clemons ex rel. T.W. v. Shelby Cnty. Bd. of Educ.*, 818 F. App'x 453, 461 (6th Cir. 2020) (quoting *Horner v. Ky. High Sch. Athletic Ass'n*, 43 F.3d 265, 273 (6th Cir. 1994) ("*Horner I*")). "However, [Title IX] does not require 'perfect parity' between sports programs." *Id.* (quoting *Horner v. Ky. High Sch. Athletic Ass'n*, 206 F.3d 685, 697 (6th Cir. 2000) ("*Horner II*")). "Instead, whether a school provides equal athletic opportunities to members of both sexes depends on a consideration of many factors[.]" *Id.* Those factors include the following:

> (1) Whether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes;
>
> (2) The provision of equipment and supplies;
>
> (3) Scheduling of games and practice time;
>
> (4) Travel and per diem allowance;
>
> (5) Opportunity to receive coaching and academic tutoring;
>
> (6) Assignment and compensation of coaches and tutors;
>
> (7) Provision of locker rooms, practice and competitive facilities;
>
> (8) Provision of medical and training facilities and services;
>
> (9) Provision of housing and dining facilities and services;
>
> (10) Publicity.

34 C.F.R. § 106.41(c).  A school's "failure to provide necessary funds for teams for one sex" also may be indicative of sex discrimination.  *Id.*

The Department of Education's Office for Civil Rights (OCR) clarified the meaning of "equal opportunity" in a 1979 policy interpretation.  *See* Title IX of the Education Amendments of 1972; a Policy Interpretation, 44 Fed. Reg. 71,413 (Dec. 11, 1979).  "The policy interpretation is divided into three sections: (1) compliance in financial assistance (scholarships) based on athletic ability; (2) equivalence in other athletic benefits and opportunities (equal treatment claims); and (3) effective accommodation of student interest and abilities (accommodation claims)."  *Parker v. Franklin Cnty. Cmty. Sch. Corp.*, 667 F.3d 910, 918 (7th Cir. 2012).

### 1. Equivalence in Financial Assistance

Title IX's regulations prohibit institutions from doing the following with financial assistance:

> (1) On the basis of sex, provide different amount or types of such assistance, limit eligibility for such assistance which is of any particular type or source, apply different criteria, or otherwise discriminate;
>
> (2) Through solicitation, listing, approval, provision of facilities or other services, assist any foundation, trust, agency, organization, or person which provides assistance to any of such recipient's students in a manner which discriminates on the basis of sex; or
>
> (3) Apply any rule or assist in application of any rule concerning eligibility for such assistance which treats persons of one sex differently from persons of the other sex with regard to marital or parental status.

34 C.F.R. § 106.37(a).

As to athletic scholarships in particular, the regulations require the following of institutions:

> (1) To the extent that a recipient awards athletic scholarships or grants-in-aid, it must provide reasonable opportunities for such awards for members of each sex in proportion to the number of students of each sex participating in interscholastic or intercollegiate athletics.

5

> (2) Separate athletic scholarships or grants-in-aid for members of each sex may be provided as part of separate athletic teams for members of each sex to the extent consistent with this paragraph and § 106.41.

34 C.F.R. § 106.37(c).

A university complies with these regulations if it provides scholarships "in substantially equal amounts or if a resulting disparity can be explained by adjustments to take into account legitimate, nondiscriminatory factors." 1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

### 2. Equivalence in Other Athletic Benefits and Opportunities

When determining whether a university provides equal athletic opportunities, the OCR assesses compliance by "comparing the availability, quality and kinds of benefits, opportunities, and treatment afforded to members of both sexes." 1979 Policy Interpretation, 44 Fed. Reg. at 71,415. This assessment allows for differences that are "inherent to the basic operation of specific sports." *Id.* For instance, "certain sports—notably football and men's basketball—traditionally draw large crowds. Since the costs of managing an athletic event increase with crowd size, the overall support made available for event management to men's and women's programs may differ in degree and kind." *Id.* at 71,415-16. These differences are acceptable so long as the university "does not limit the potential for women's athletic events to rise in spectator appeal and if the levels of event management support available to both programs are based on sex-neutral criteria (e.g., facilities used, projected attendance, and staffing needs)." *Id.* at 71,416.

When assessing such a claim, the "relevant question . . . is whether the disparate treatment resulted in unequal athletic opportunities for female athletes." *Clemons*, 818 F. App'x at 462.

### 3. Accommodation of Interests (Participation Opportunities)

To comply with the requirement to "effectively accommodat[e] the interests and abilities of male and female athletes," institutions must "provide both the opportunity for individuals of

6

each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities." *Id.* at 71,417.

Compliance with this requirement is assessed by the following three-part test:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Id.* at 71,418.

In 1996, the OCR clarified that institutions need "comply only with any one part of [this] three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes." OCR, Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html.

Plaintiffs have the burden of proving the first part of this test, i.e., that there is a statistically significant disparity between male and female participation opportunities. *See Horner II*, 43 F.3d at 275. If Plaintiffs meet their burden, Defendants can escape liability by proving the second part, i.e., a history and continuing practice of program expansion for female athletes. *Id.* If Defendants cannot make this showing, then Plaintiffs must prove the third part, i.e., that the interests and abilities of female students have not been "fully and effectively accommodated." *Id.*

The parties agree that the number of participation opportunities is determined by counting the number of athletic "participants," which the 1979 Policy Interpretation defines as athletes:

7

    a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, *e.g.*, coaching, equipment, medical and training room services, on a regular basis during a sport's season; and

    b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and

    c. Who are listed on the eligibility or squad lists maintained for each sport, or

    d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

The first part of the three-part test requires "substantial" proportionality. The OCR's 1996 clarification letter indicated that it would consider opportunities to be "substantially proportionate" when the participation gap

> . . . would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team. As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.

Clarification of Intercollegiate Athletics Policy Guidance (1996).

## V. Analysis

### A. Counts I-III (Title IX): Individual Defendants

Defendants argue, and Plaintiffs agree, that "Title IX does not permit claims against individuals." (Pls.' Response to Mot. to Dismiss 7 n.1, ECF No. 24.) *See Campbell v. Dundee Cmty. Schs.*, 661 F. App'x 884, 887 (6th Cir. 2016) (Individuals are not liable because "[o]nly recipients of federal funds may be liable under Title IX."). Accordingly, the Court will dismiss Defendants Beekman and Stanley as defendants to Counts I to III.

### B. Count I (Title IX): Participation Opportunities

As detailed in the Court's opinion on Plaintiffs' motion for a preliminary injunction, and as pled in Plaintiffs' complaint, data released by MSU under the Equity in Athletics Disclosure

8

Act (EADA), 20 U.S.C. § 1092(g), suggest that MSU had a participation gap of 25 opportunities for women in the 2018-2019 year, the most recent year for which EADA data was publicly available when Plaintiffs filed their complaint. According to Plaintiffs' more recent response to the motion to dismiss, the 2019-2020 EADA data now available indicate that eliminating the men's and women's swimming and diving teams will result in a total participation gap of 19 opportunities for women. (Pls.' Resp. to Mot. to Dismiss 14, ECF No. 24.)

EADA data is not a perfectly accurate representation of the participation gap because EADA reports "do not follow Title IX counting instructions." (2/19/2021 Op. 10 (quoting Plaintiffs' expert).) The EADA reports count the number of athletes as of the date of the first scheduled contest for the team, whereas Title IX's regulations count athletes who participate on a regular basis throughout the entire season. (*Id.*) Nevertheless, assuming that the EADA data is somewhat close to Title IX participation numbers, 19 participation opportunities is not a very large gap. Indeed, as the Court discussed in its preliminary injunction opinion, other courts have concluded that a gap of the size alleged by Plaintiffs (when calculated in percentage terms) is substantially proportionate. (*Id.* at 20-21 (citing cases).)

However, Plaintiffs also allege that MSU has improperly "padded" the rosters of its women's teams. For instance, its complaint alleges that the rosters of many of those teams are significantly larger than the average sizes of such teams at other Division I schools, which arguably suggests that some members of those women's teams might not be true participants countable under Title IX. If that is true, then the actual participation gap could be somewhat larger than 19 and could be too large for participation opportunities to be substantially proportionate.

Defendants responded to Plaintiffs' motion for a preliminary injunction with affidavits undermining Plaintiffs' assertions of roster padding. And after considering all the evidence

available to the Court at that stage, the Court was not persuaded that Plaintiffs had demonstrated a sufficient likelihood of success to warrant an injunction. Defendants now ask the Court to apply that analysis to the complaint and find that Plaintiffs do not state a viable claim in Count I.

The problem with Defendants' request is that the analysis is different when asking to dismiss a claim. Although the Court found that Plaintiffs were not likely to succeed based on the available evidence, that does not mean Plaintiffs do not state a viable claim. Alleging a plausible claim is not as difficult as demonstrating the need for a preliminary injunction. Although it is a close call, Plaintiffs' contention that there will be a participation gap of 19 after eliminating the men's and women's swimming and diving programs, together with allegations tending to suggest that MSU padded the rosters of other women's teams, are adequate to state a claim that participation opportunities have not been substantially proportionate and will not be substantially proportionate without the men's and women's swimming and diving teams.

Defendants would like the Court to consider their affidavits and other evidence addressing the issue of roster padding because they contend that this evidence is now part of the "record of the case," but it would be premature for the Court to do so because Plaintiffs have not had an opportunity to test that evidence through discovery. For instance, according to Plaintiffs, Defendants have not provided the data underlying their calculation of participation numbers. Thus, Defendants' evidence from the preliminary injunction proceedings does not establish that Plaintiffs fail to state a claim in Count I. Reliance on affidavits is more appropriate for a summary judgment motion than for a motion to dismiss the complaint. The Court declines to convert Defendants' motion to dismiss into one for summary judgment.

### C. Count II (Title IX): Financial Assistance

In Count II of the complaint, Plaintiffs allege that Defendants "fail to provide female student athletes with an equal allocation of athletic financial assistance." (Compl. ¶ 175.)

Specifically, Plaintiffs allege that, "[a]ccording to the 2018-2019 EADA data, MSU is depriving female student athletes in scholarships by $467,047.00." (*Id.* ¶ 148.) In their proposed amended complaint, Plaintiffs allege that EADA data shows that "MSU is depriving female student athletes in scholarships by $1,194,798.00." (Proposed Am. Compl. ¶ 148, ECF No. 30-3.) This number apparently represents the total difference between the "financial aid" actually awarded to "female athletes" and the "financial aid" to which they were "entitled" from the 2003-2004 season to the 2019-2020 season. (*Id.*) Plaintiffs apparently define the amount to which they are "entitled" as the percentage of total financial aid that equates to the percentage of athletes who are women. For instance, in 2019-2020, 50% of MSU's athletes were women, but these women allegedly received only 43.2% of the financial aid awarded to all athletes. (*Id.*)

### 1. Standing

Defendants argue that Plaintiffs lack standing under Article III of the Constitution to assert a claim for unequal financial assistance. The following elements are necessary to establish standing under Article III:

> First, Plaintiff must have suffered an injury in fact—an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations and quotations omitted). "Where, as here, a case is at the pleading stage, the plaintiff must 'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth v. Seldin*, 422 U.S. 490, 518 (1975)).

Defendants argue that Plaintiffs do not allege that they suffered a personal injury with regard to unequal allocation of financial assistance. "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S. at 560 n.1). Plaintiffs simply allege that the total financial assistance awarded to all male athletes is larger than the total awarded to all female athletes. And from that disparity, Plaintiffs conclude that they

> are harmed by Defendants' failure to provide its female students with an equal allocation of athletic financial assistance. Such harm includes lost educational opportunities, financial assistance, and lost quality in participation opportunities.

(Compl. ¶ 177.) However, the complaint contains no allegations regarding Plaintiffs' individual circumstances, other than that one plaintiff received a "10%" scholarship and another received a "90%" scholarship. (*Id.* ¶¶ 30, 51.) Plaintiffs do not contend, for instance, that they were denied scholarships given to men or that they received smaller scholarships or less financial assistance than their male counterparts. Their assertion of personal injury is conclusory.

Although Plaintiffs purport to bring their claim on behalf of what appears to be a fail-safe class[2] of "all present, prospective, and future female students at MSU who are harmed by and want to end MSU's sex discrimination" (*id.* ¶ 84), Plaintiffs "are not absolved of their individual obligation to satisfy the injury element of Article III just because they allege class claims." *Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582 (6th Cir. 2016). "[P]otential class representatives must demonstrate 'individual standing vis-a-vis the defendant; [they] cannot

---

[2] A fail-safe class is one that "cannot be defined until the case is resolved on its merits." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012). "Such a class is prohibited because it would allow putative class members to seek a remedy but not be bound by an adverse judgment—either those 'class members win or, by virtue of losing, they are not in the class' and are not bound." *Id.* (quoting *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011)). Plaintiffs rely on "harm" and "discrimination" for their class definition, but those issues cannot be decided until the case is resolved on the merits.

acquire such standing merely by virtue of bringing a class action.'" *Id.* (quoting *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998)).

Plaintiffs' allegations fail to satisfy the injury requirement; thus, they lack standing to assert the claim in Count II. *See Anders v. Calif. State Univ., Fresno*, No. 1:21-cv-179, 2021 WL 3115687, at *18 (E.D. Cal. July 22, 2021) (concluding that the plaintiffs lacked standing to sue for a gender imbalance in scholarship funds because "the Court could not infer from the[] allegations which Plaintiffs, if any, were deprived of a scholarship—or which Plaintiffs, if any, received a diminished scholarship—as a result of such a Title IX violation").

### 2. Failure to State a Claim

Even if Plaintiffs' allegations are adequate to satisfy the low threshold for standing, they are not adequate to state a claim of discrimination. Plaintiffs have not alleged facts from which to plausibly infer that they personally suffered discrimination with respect to scholarships and other forms of financial assistance. Without more detailed allegations, the Court cannot infer more than the "mere possibility" of discrimination against them individually or as representatives of a larger class. *See Iqbal*, 556 U.S. at 679. Thus, Count II fails to state a claim in both the complaint and the proposed amended complaint.

### D. Count III (Title IX): Allocation of Athletic Benefits

In Count III, Plaintiffs assert that MSU "fails to provide equal athletic benefits in some or all of the categories set forth in the Regulations and the Policy Interpretation, including but not limited to"

1. The provision of equipment, uniforms, and supplies;
2. Scheduling of games and practice time;
3. Travel, transportation, and per diem allowance;
4. Opportunity to receive coaching and academic tutoring;
5. Assignment and compensation of coaches and tutors;
6. Provision of locker rooms, practice and competitive facilities;
7. Provision of medical and training services;

13

      8. Provision of housing and dining facilities and services;
      9. Publicity & sports information services;
      10. Administrative support;
      11. Recruiting resources and support; and
      12. Resources necessary to provide any of the foregoing benefits or to provide the female athletes with a genuine Division I athletic experience.

(Compl. ¶ 185.)

Plaintiffs' initial complaint contains no facts to support these allegations.[3] Their proposed amended complaint provides some details. Plaintiffs allege that members of certain "priority athletic teams," including the football team, the men's and women's basketball teams, and the men's ice hockey team, have their own locker rooms and their own facilities for weight training, practice, and competition. (Proposed Am. Compl. ¶ 154-55.) Also, these teams were the only ones "provided free Covid tests 6 times per week," and unlike other teams, they each receive a "staff member dedicated solely to the team's social media presence[.]" (*Id.*) In addition, the football and basketball teams "are permitted to fly to nearly every away competition" while other "women's teams must take buses for the vast majority of away games[.]" (*Id.* ¶ 155.) And members of the men's hockey team each receive an iPad. Finally, members of the men's football team are the only athletes who receive housing in the dining hall for student athletes, as well as their own exit in the dining hall, their own line in the dining hall, an on-site "nutritionist" who makes smoothies, and an on-site barber. (*Id.* ¶ 159.)

Plaintiffs' additional allegations do not suffice to state a discrimination claim. Notably, one of the teams mentioned that receives the bulk of these additional benefits is a women's team. And presumably other men's teams (like the men's swimming and diving team) are in the same

---

[3] When responding to the motion to dismiss, Plaintiffs refer the Court to affidavits filed in support of their motion for a preliminary injunction, but the Court declines to consider these affidavits for the same reason that the Court will not consider similar evidence from Defendants.

boat as Plaintiffs' team, which indicates that sex is not the basis for any disparity in benefits provided to Plaintiffs compared to athletes in other sports.

Title IX does not require institutions to allocate benefits equally to all of its teams. Accepting Plaintiffs' argument that the foregoing differences violate Title IX would effectively require schools to provide the same benefits (e.g., iPads) to members of all teams. But "neither the statute nor the regulations call for identical programs for male and female athletes." 1979 Policy Interpretation, 44 Fed. Reg. at 71,422. Indeed, "the Policy Interpretation contemplates that a disparity disadvantaging one sex in one part of a school's athletics program can be offset by a comparable advantage to that sex in another area." *McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 293 (2d Cir. 2004). *See* Policy Interpretation, 44 Fed. Reg. at 71,415 ("Institutions will be in compliance if the compared program components are equivalent, that is, equal or equal in effect. Under this standard, identical benefits, opportunities, or treatment are not required, provided the overall effect of any differences is negligible."). "Compliance should not be measured by a 'sport-specific comparison' but rather by examining 'program-wide benefits and opportunities.'" *McCormick*, 370 F.3d at 293 (quoting Policy Interpretation, 44 Fed. Reg. at 71,422).

Plaintiffs focus on a few differences between a handful of "priority" teams at MSU and other teams. As with Count II, Plaintiffs' allegations do not permit the Court to infer more than the mere possibility of sex discrimination. Moreover, Plaintiffs do not allege facts indicating that the disparate treatment harmed them personally, by denying them "equal athletic opportunity." *See Clemons*, 818 F. App'x at 462. Accordingly, the Court will deny Plaintiffs' motion for leave to amend because their proposed amendments would not survive a motion to dismiss.

15

### E. Count IV (ELCRA)

The ELCRA prohibits discrimination by "educational institutions" because of sex. Mich. Comp. Laws § 37.2402(b).

#### 1. Immunity

Plaintiffs cannot bring such a claim against MSU and its Board of Trustees because those entities are entitled to sovereign immunity. Regardless of the form of relief requested, the states and their departments are immune under the Eleventh Amendment from suit in the federal courts, unless the state has waived immunity or Congress has expressly abrogated Eleventh Amendment immunity by statute. *See Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98-101 (1984); *Alabama v. Pugh*, 438 U.S. 781, 782 (1978); *O'Hara v. Wigginton*, 24 F.3d 823, 826 (6th Cir. 1994). Congress has not abrogated sovereign immunity for claims under the ELCRA and the State of Michigan has not consented to civil rights suits in federal court. *See Abick v. Michigan*, 803 F.2d 874, 877 (6th Cir. 1986).

As an arm of the state of Michigan, MSU is entitled to invoke sovereign immunity. *See Estate of Ritter by Ritter v. Univ. of Mich.*, 851 F.2d 846, 848-50 (6th Cir. 1988) (recognizing that Michigan state universities are immune from suit in federal court); *Vargo v. Sauer*, 576 N.W.2d 656, 664 (Mich. 1998) ("It is undisputed that MSU, as an extension of the state, generally is entitled to invoke sovereign immunity.").

The same conclusion applies to MSU's Board of Trustees because it is also an arm of the state and any judgment against it would come out of state funds. *See Hutchins v. Bd. of Trs. of Mich. State Univ.*, 595 F. Supp. 862, 866-68 (W.D. Mich. 1984); *Uraz v. Mich. State Univ. Bd. of Trs.*, No. 1:19-CV-223, 2019 WL 2442314, at *3 (W.D. Mich. June 12, 2019). Thus, the Court will dismiss MSU and its Board of Trustees as defendants to Count IV.

### 2. Individual Liability

That leaves Defendants Stanley and Beekman as the remaining defendants to Count IV. Defendants contend that the ELCRA does not permit individual liability because it applies to "educational institutions." It does not expressly apply to individuals.

Plaintiffs respond that the definition of "educational institution" includes "an agent of an educational institution," Mich. Comp. Laws § 37.2401, which could include an individual. However, Defendants note that, unlike Article 2 of the ELCRA, which prohibits a "person" from discriminating against individuals with respect to employment,[4] the prohibition in Article 4 includes only educational institutions and their agents. It does not refer to "persons" or individuals.

Neither party cites a case directly supportive of their respective positions, and the Court cannot find one. As another court recently concluded, the answer to this question is unclear. *Doe v. Univ. of Mich.*, 448 F. Supp. 3d 715, 731 (E.D. Mich. 2020), *vacated on other grounds*, 2021 WL 3482950 (E.D. Mich. Mar. 22, 2021).

The Court will not resolve the issue of individual liability because the Court declines to exercise supplemental jurisdiction over the ELCRA claim going forward. The Court can decline to exercise supplemental jurisdiction over a state law claim where it "raises a novel or complex issue of State law," where it "substantially predominates" over the federal claims, or if, "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(1), (c)(2), (c)(4). "[A] federal court should consider . . . the values of judicial economy, convenience, fairness, and comity" when deciding whether to exercise supplemental jurisdiction. *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).

---

[4] Article 2 of ELCRA expressly prohibits "employers" from discriminating, Mich. Comp. Laws § 37.2202, but "employer" is defined as a "person who has one or more employees," Mich. Comp. Laws § 37.2201. The term "person" includes individuals. Mich. Comp. Laws § 37.2103(g).

A state law claim can substantially predominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought[.]" *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The Court can consider "the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial[.]" *Id.*

Here, Plaintiffs assert their ELCRA claim against individuals, which raises a novel issue of state law. The state court should decide that issue in the first instance. *See Doe*, 448 F. Supp. 3d at 731 (declining to exercise supplemental jurisdiction over an ELCRA claim for the same reason).

In addition, Plaintiffs' claims apply different statutes with different standards to the same set of facts. The Title IX claims rely on regulations that prescribe specific types of equivalence in athletic opportunities whereas the ELCRA is focused more generally on instances of discrimination "against an individual" and does not share the same regulatory framework as Title IX. Indeed, the Court is not aware of a case applying the ELCRA to the type of discrimination in athletic opportunities and benefits alleged here.

Also, the two types of claims now have different defendants. The institutional defendants are the only remaining defendants to the Title IX claims and the individual defendants are the only remaining defendants to the ELCRA claim. Different theories of liability against different, but closely related, defendants based on the same set of facts poses a significant risk of jury confusion if the case were to proceed to trial. As another court observed:

> The attempt to reconcile these two distinct bodies of [state and federal] law often dominates and prolongs pre-trial practice, complicates the trial, lengthens the jury instructions, confuses the jury, results in inconsistent verdicts, and causes post-trial problems with respect to judgment interest and attorney fees. Consequently, in many cases the apparent judicial economy and convenience of the parties' interest

in the entertainment of supplemental state claims may be offset by the problems they create.

*Frankel v. Detroit Med. Ctr.*, 409 F. Supp. 2d 833, 835 (E.D. Mich. 2005). For all these reasons, the Court declines to exercise supplemental jurisdiction over the ELCRA claim in Count IV.

## VI. Conclusion

For the reasons stated herein, the Court will grant Defendants' motion to dismiss in part. The Court will dismiss Defendants Stanley and Beekman as defendants to Counts I, II and III. The Court will dismiss Counts II and III of the complaint for failure to state a claim. The Court will dismiss Defendants MSU and its Board of Trustees as defendants to Count IV because they are immune from suit for that claim. Also, the Court will decline to exercise supplemental jurisdiction over Count IV going forward. In addition, the Court will deny Plaintiffs' motion for leave to amend their complaint.

Count I will proceed against Defendants MSU and its Board of Trustees.

An order will enter consistent with this Opinion.

Dated: September 22, 2021 /s/ Hala Y. Jarbou
HALA Y. JARBOU
UNITED STATES DISTRICT JUDGE