UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SOPHIA BALOW, et al.,

      Plaintiffs,

                                  Case No. 1:21-cv-44

v.

                                  Hon. Hala Y. Jarbou

MICHIGAN STATE UNIVERSITY, et al.,

      Defendants.
_____/

## OPINION

Michigan State University (MSU) announced in October 2020 that, due to budget constraints, it would discontinue its men's and women's varsity swimming and diving programs after the end of the 2020-2021 school year.  When Plaintiffs filed this action, they were members of MSU's varsity women's swimming and diving team.  They claim that MSU discriminates against women, in violation of Title IX, 20 U.S.C. §§ 1681 et seq.  Specifically, in Count I of their complaint, Plaintiffs claim that MSU provides "fewer and poorer athletic participation opportunities" for women than it does for men.  (*See* Compl., ECF No. 1, PageID.45.)  Plaintiffs contended that the elimination of their team would exacerbate this problem; accordingly, they asked the Court for a preliminary injunction requiring MSU to maintain the varsity women's swimming and diving team for the duration of this lawsuit.  The Court initially denied their request.  After an appeal and remand for reconsideration, the Court will grant their motion in part.

## I. Procedural History

When the Court denied Plaintiffs' motion in September 2021, it concluded that Plaintiffs had not shown a substantial likelihood of success and that the balance of factors did not warrant a preliminary injunction.  Plaintiffs appealed that decision.  The Court of Appeals for the Sixth Circuit overturned the Court's decision and remanded the matter to this Court for further

proceedings.  This Court then ordered the parties to provide supplemental briefing on Plaintiffs' request for a preliminary injunction.  After they did so, the Court held oral argument on July 21, 2022.

## II. Preliminary Injunction Standard

"'[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948 (2d ed. 1995)).  The Court considers four factors when deciding whether to grant a preliminary injunction:

(1) whether the movant has a "strong" likelihood of success on the merits;

(2) whether the movant would otherwise suffer irreparable injury;

(3) whether issuance of a preliminary injunction would cause substantial harm to others; and

(4) whether the public interest would be served by issuance of a preliminary injunction.

*McPherson v. Mich. High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc).

"These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction."  *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

## III. Title IX

Title IX prohibits sex discrimination in the provision of college sports programs, providing that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity," including intercollegiate athletics.  20 U.S.C. § 1681(a); 34 C.F.R. § 106.41(a).

Title IX's regulations require universities receiving federal funds to "provide equal athletic opportunity for members of both sexes." 34 C.F.R. § 106.41(c).  The Department of Education's Office for Civil Rights ("OCR") clarified the meaning of "equal opportunity" in a 1979 policy interpretation.  *See Title IX of the Education Amendments of 1972; a Policy Interpretation*, 44 Fed. Reg. 71,413 (Dec. 11, 1979).  To comply with the requirement to "effectively accommodat[e] the interests and abilities of male and female athletes," institutions must "provide both the opportunity for individuals of each sex to participate in intercollegiate competition, and for athletes of each sex to have competitive team schedules which equally reflect their abilities." *Id.* at 71,417.

Compliance is assessed by the following three-part test:

(1) Whether intercollegiate level participation opportunities for male and female students are provided in numbers substantially proportionate to their respective enrollments; or

(2) Where the members of one sex have been and are underrepresented among intercollegiate athletes, whether the institution can show a history and continuing practice of program expansion which is demonstrably responsive to the developing interest and abilities of the members of that sex; or

(3) Where the members of one sex are underrepresented among intercollegiate athletes, and the institution cannot show a continuing practice of program expansion such as that cited above, whether it can be demonstrated that the interests and abilities of the members of that sex have been fully and effectively accommodated by the present program.

*Id.* at 71,418.

In 1996, the OCR issued a letter and clarification stating that institutions need "comply only with any one part of [this] three-part test in order to provide nondiscriminatory participation opportunities for individuals of both sexes."  OCR Letter (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html ("1996 Letter").

Plaintiffs have the burden of proving the first part of this test, i.e., that there is a statistical disparity between male and female participation opportunities.  *See Horner v. Ky. High Sch.*

*Athletic Assoc.*, 43 F.3d 265, 275 (6th Cir. 1994).  If Plaintiffs meet their burden, Defendants can escape liability by proving the second part, i.e., a history and continuing practice of program expansion for female athletes.  *Id.*  If Defendants cannot make this showing, then Plaintiffs must prove the third part, i.e., that the interests and abilities of female students have not been "fully and effectively accommodated."  *Id.*

At issue is the first part of the test, substantial proportionality (or lack thereof) in intercollegiate-level participation opportunities at MSU.  The number of participation opportunities is determined by counting the number of athletic "participants," which the 1979 Policy Interpretation defines as athletes:

> a. Who are receiving the institutionally-sponsored support normally provided to athletes competing at the institution involved, *e.g.*, coaching, equipment, medical and training room services, on a regular basis during a sport's season; and
>
> b. Who are participating in organized practice sessions and other team meetings and activities on a regular basis during a sport's season; and
>
> c. Who are listed on the eligibility or squad lists maintained for each sport, or
>
> d. Who, because of injury, cannot meet a, b, or c above but continue to receive financial aid on the basis of athletic ability.

1979 Policy Interpretation, 44 Fed. Reg. at 71,415.

Exact proportionality would be achieved if the ratio of male to female athletic participants is equal to the ratio of male to female students enrolled at the school.  When the numbers are not exactly proportional, the number of participation opportunities necessary to achieve exact proportionality is known as the "participation gap."  For example, if there are 100 athletic participants in a school where half of the students are men and half are women, then exact

proportionality would mean 50 male participants and 50 female participants. But if there are 55 male participants and only 45 female participants, then the participation gap is 10.[1]

The first part of the OCR's three-part test does not require exact proportionality. It requires "substantial" proportionality, which is a "safe harbor for recipients of federal funds." *Horner*, 43 F.3d at 275. In a clarification statement that the OCR attached to its 1996 letter, the OCR indicated that it assesses substantial proportionality on a "case-by-case basis" because its determination "depends on the institution's specific circumstances and the size of its athletic program[.]" Clarification of Intercollegiate Athletics Policy Guidance: The Three-Part Test (Jan. 16, 1996), https://www2.ed.gov/about/offices/list/ocr/docs/clarific.html ("1996 Clarification"). The OCR will consider opportunities to be "substantially proportionate" when the participation gap

> . . . would not be sufficient to sustain a viable team, i.e., a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team. As a frame of reference in assessing this situation, OCR may consider the average size of teams offered for the underrepresented sex, a number which would vary by institution.

1996 Clarification.

## IV. Preliminary Injunction Analysis

### A. Status Quo

As a preliminary matter, MSU asserts that the Court should deny Plaintiffs' request to reinstate the swimming and diving team because doing so would upset the status quo. When Plaintiffs filed this action in 2021, the women's varsity swimming and diving team still existed. But after the Court denied their motion for a preliminary injunction, the 2020-2021 season ended

---

[1] The formula for calculating the participation gap for women is as follows: (number of male athletes / percentage of men in student body) - total number of athletes = participation gap. Using the numbers above, that calculation would be: (55 / 0.5) - 100 = 10.

and MSU continued with its plan to eliminate the team.  Some Plaintiffs continued competing through a club team at MSU, but the varsity team no longer exists.

"It is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo." *Stenberg v. Cheker Oil Co.*, 573 F.2d 921, 925 (6th Cir. 1978).

> [But] [i]f the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury.  The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Id.* (citations omitted).

Here, the last uncontested status between the parties is the existence of a varsity women's swimming and diving team.  Thus, the Court will consider whether it should issue an injunction requiring MSU to restore that team, keeping in mind that the focus is "on prevention of injury by a proper order[.]" *Id.*

**B. Likelihood of Success**

When determining whether Plaintiffs have demonstrated a strong or substantial likelihood of success, the Court's primary focus is on the participation gap.  If the participation gap is large enough to sustain a viable team, then Plaintiffs are likely to succeed.  If not, then the reverse is true.

### 1. Initial Evidence and Analysis of the Participation Gap

Plaintiffs initially relied upon a report by their expert, Dr. Donna Lopiano, who opined that MSU's participation gap was too large for participation opportunities at MSU to be substantially proportionate.  Lopiano used publicly available information to support her calculation of the participation gap, including Equity in Athletics Disclosure Act ("EADA") reports and team rosters that MSU posted on its website ("web rosters").  (*See* 2/19/2021 Op. 10-11, ECF No. 16.)  But she

acknowledged that she could not make an accurate participant count without MSU's squad lists and hourly participation records. (Lopiano Rep. 27, ECF No. 2-14.) She also acknowledged that EADA reports "do not follow Title IX counting instructions." (*Id.* at 16.) She speculated that the web rosters were more accurate. (2/19/2021 Op. 13.) Using the web rosters, she calculated participation gaps of "33, 37, and 35 female athletes in the seasons ending in 2018, 2019, and 2020, respectively." (*Id.* at 11.)

Lopiano argued that actual participation gaps were much larger than what the web rosters indicated because MSU had improperly inflated the sizes of its women's teams. The Court was not persuaded by her reasoning. Ultimately, the Court gave little weight to Lopiano's opinions because they rested upon "imperfect data, flawed assumptions, contradictory reasoning, and a skewed analysis." (*Id.* at 17.)

MSU responded with evidence from its Director of Compliance, Angela Breske, who tracks student athletic participation at MSU. Breske's calculations were, on their face, more accurate and reliable than those of Lopiano because they appeared to follow Title IX's counting instructions. Also, Breske's calculations were grounded in actual student participation rather than inference and speculation. According to those calculations, the gap in athletic opportunities for women was 27 in 2018-2019 and 12 in 2019-2020, the most recent year for which such data was available. (*Id.*) After eliminating the men's and women's swimming and diving teams, if all else remained equal, that gap would increase to 15 for 2020-2021. Using these calculations, the Court concluded that "MSU's participation numbers are substantially proportionate." (*Id.*) Among other things, the Court noted that these numbers are "smaller than the average size of a women's team

at MSU, which is 35 athletes." (*Id.*)  And in percentage terms,[2] those gaps were lower than 2%; no court has held that such a small gap "failed to satisfy the test for substantial proportionality." (*Id.* at 21.)

After Plaintiffs appealed this Court's decision, the Court of Appeals instructed this Court to narrow its focus.  This Court must look at the participation gap solely "in *numerical* terms, not as a percentage." *Balow v. Mich. State Univ.*, 24 F.4th 1051, 1059 (6th Cir. 2022) (emphasis in original).  Also, this Court should not compare the participation gap to the size of an average women's team at MSU.  *Id.* at 1060.  Instead, the Court must determine whether the participation gap is large enough to sustain a viable team, i.e., "'a team for which there is a sufficient number of interested and able students and enough available competition to sustain an intercollegiate team.'"  *Id.* at 1060 (quoting 1996 Clarification).

### 2. Supplemental Evidence

*Participation Gap.*  When the Court denied Plaintiffs' request for a preliminary injunction, Plaintiffs did not possess the data used by Breske to determine the number of athletic participants.  Since that time, Plaintiffs have received some of MSU's data and have had an opportunity to depose MSU's staff, including Breske and MSU's former Athletic Director, Bill Beekman.  Also, some time has passed since the Court's previous decision, so there is more recent data available.

MSU's numbers show the following participation gaps for women athletes:

---

[2] To calculate a participation gap as a percentage, one looks at the difference between the percentage of students enrolled who are women and the percentage of athletic participants who are women.

Table 1: MSU's Data for 2018-19 to 2021-2022

| Year | 2018-2019[3] | 2019-2020[4] | 2020-2021[5] | 2021-2022[6] |
|---|---|---|---|---|
| Students | 35,744 | 35,722 | 34,588 | 35,062 |
| Men / Women | 17,431 / 18,313 | 17,530 / 18,192 | 16,639 / 17,949 | 16,763 / 18,299 |
| Men / Women (%) | 48.8% / 51.2% | 49.1% / 50.9% | 48.1% / 51.9% | 47.8% / 52.2% |
| Student Athletes | 908 | 895 | 891 | 807 |
| Men / Women | 456 / 452 | 445 / 450 | 448 / 443 | 403 / 404 |
| Men / Women (%) | 50.2% / 49.8% | 49.7% / 50.3% | 50.3% / 49.7% | 49.9% / 50.1% |
| Participation Gap | 27 | 12 | 40 | 36 |

The Court finds that the numbers in Table 1 are the participation gaps for the academic years starting in 2018, 2019, 2020, and 2021.[7]  A few points stand out from the data in Table 1. One is that the enrollment and participation numbers were relatively stable from the academic year ending in 2019 to the year ending in 2020, and then enrollment dropped the next year.  There were over a thousand fewer students in 2020-2021 compared to the previous year, likely due to the onset of the COVID-19 pandemic.  That drop in enrollment only partially recovered in 2021-2022.

Also worth noting is that the enrollment of men in 2020-2021 dropped more than the enrollment of women.  Indeed, almost eighty percent of the overall drop in enrollment for that year is attributable to the drop in enrollment of men.[8]  And while the enrollment of women returned to its pre-pandemic level this past year, the enrollment of men did not.  A decrease in the enrollment of men contributes to a larger participation gap for women.

---

[3] (Ex. A to Breske Decl., ECF No. 8-2, PageID.357.)

[4] (Suppl. O'Brien Rep. 2, ECF No. 93-2.)

[5] (Pls.' Ex. 15, ECF No. 89-14.)

[6] (Pls.' Ex. 22, ECF No. 100.)

[7]  Plaintiffs argue that the participation gap in 2020-2021 should be 45 because that is what the gap would have been without the men's and women's swimming and diving teams.  But the parties know what the gap was without these teams.  It was 36, as shown in the last column of Table 1.

[8] It is not clear why the pandemic would have impacted the enrollment of men more than women, but some evidence suggests that this was part of a larger trend.  *See* National Student Clearinghouse Research Center, *Term Enrollment Estimates Fall 2020*, at 12, available at https://nscresearchcenter.org/wp-content/uploads/ CTEE_Report_Fall_2020.pdf (reporting a 1.6% drop in the enrollment of men at public, 4-year institutions in the fall of 2020, compared to a 1.6% increase in the enrollment of women).

*Improper Counting*. Plaintiffs contend that the actual participation gaps are even higher because MSU systematically overcounts female participation opportunities and undercounts male participation opportunities.  For instance, Plaintiffs assert that, in 2019-2020, MSU counted members of the women's crew team who quit or were cut "before the season beg[an]," but did not count men who quit the men's track and field teams before the start of their seasons.  (Pls.' Suppl. Br. 8-9, ECF No. 89.)  Plaintiffs assert that MSU's crew team "lost seven women before the first unofficial scrimmage and a total of eighteen women before the team's season began [in 2019]." (*Id.*)  Plaintiffs submit a chart purporting to summarize data showing that 18 women on the crew team who "quit or were cut . . . before the start of the team's conference season" were improperly counted as participants by MSU.  (*Id.* at 10.)  At oral argument, Plaintiffs revised their estimate to "at least seven" women who were improperly counted, instead of 18.

Plaintiffs rely on a squad list for the women's crew team in 2019-2020.  That list contains the names of 90 women and the dates when some of them quit in the fall of 2019 or the spring of 2020.  (*See* 2019-2020 Squad List: Women's Crew, ECF No. 90, PageID.1754.)  According to this list, five women "Quit" or "Quit w/ aid" before September 21, 2019.  (*Id.*, PageID.1754-1755.) Another two women "Quit" or "Quit w/ aid" between September 21, 2019, and October 5, 2019, the date that Plaintiffs claim is the start of the season.[9]  (*Id.*)  Kimberly Chavers, the coach of the women's crew team, testified in her deposition that September 21, 2019, was the "first scrimmage" for the team, when it competed against Notre Dame.  (*See* Chavers Dep. 131, ECF No. 98-4.) "[O]nly experienced athletes" competed in that competition, not novices.  (*Id.*)  The novice rowers apparently did not compete until an event on October 5, 2019.  Also, the scrimmage on September 21 did not involve "regulation distances."  (*See* Pls.' Suppl. Reply Br. 9, ECF No. 98; *see* Chavers

---

[9] The list does not identify any rowers who were cut from the team.

Dep. 31.) Thus, according to Plaintiffs, MSU should not have counted any rowers as participants under Title IX unless they were part of the team on or after October 5, 2019; the seven rowers who quit before that date should not be counted.

There are three problems with Plaintiffs' argument. First, Plaintiffs do not identify which women on the squad list MSU counted as participants under Title IX. MSU clearly did not count all 90 women on that list; according to Plaintiffs, MSU counted only 87 participants on the women's crew team for 2019-2020, not 90. (*See* Pls.' Suppl. Br. 12; O'Brien Rep. 16, ECF No. 8-8.)

Second, Plaintiffs' argument regarding novice rowers and an October start date conflicts with the OCR's guidance.

> OCR considers a sport's season to commence on the date of a team's *first intercollegiate competitive event* and to conclude on the date of the team's final intercollegiate competitive event. As a general rule, all athletes who are listed on a team's squad or eligibility list and are on the team as of the team's first competitive event are counted as participants by OCR.

1996 Clarification (emphasis added). In this case, the first intercollegiate competitive event for the women's crew team occurred on September 21, 2019. (Breske Suppl. Decl. ¶ 7, ECF No. 93-3.) Thus, women who were part of the team on that date are, "as a general rule," properly counted as participants.

Plaintiffs apparently contend that the start of the season is when all the team members are skilled enough to participate in a competition, and when that competition allows team members to row "regulation distances." But the OCR's guidance provides no support for that position. To the contrary, the 1996 Clarification states that "athletes who practice but may not compete" are properly counted as participants because there are "numerous benefits and services, such as training and practice time, . . . as well as non-tangible benefits derived from being a member of an intercollegiate athletic team." 1996 Clarification. Thus, novice rowers who practiced with the

11

team and received the benefits of being a team member are properly counted whether or not they possessed the skills or ability to compete at the first intercollegiate event.  In addition, as indicated above, the OCR considers a season to begin on the date of the "first intercollegiate competitive event."  *Id.*  It does not exclude events with shorter distances or different rules than other events.

Third, the Court is not persuaded that MSU improperly counted rowers who quit between September 21 and October 5, 2019.  Although the 1979 Policy Interpretation defines participants as athletes who participate "*on a regular basis* during a sport's season," it does not explain what that means.  It does not specify a minimum amount of participation time that would suffice.  In contrast, the 1996 Clarification states that the OCR generally considers athletes who are on the team on the date of the first competition to be participants.  The latter is supposed to clarify the 1979 Policy Interpretation; accordingly, the Court defers to the 1996 Clarification where there appears to be friction between the two.[10]

Another court has held that an athlete who quits their team less than halfway through the season, without competing in any events, should not be counted as a participant.  *Biedeger v. Quinnipiac Univ.*, 928 F. Supp. 2d 414, 465-66 (D. Conn. 2013).  That decision is not persuasive. There, the court cited *Cohen v. Brown*, 879 F. Supp. 185 (D.R.I. 1995) to support its decision.  But the *Cohen* opinion issued before the 1996 Clarification, so reliance on that opinion is questionable. Also, the court in *Biedeger* noted that the institution in that case failed to provide evidence that the athletes who quit midseason had practiced with the team before they quit.  *Biedeger*, 928 F. Supp.

---

[10] When might the OCR's "general rule" not apply?  A school that *cuts* a student from a team shortly after the start of the season arguably has not provided a genuine participation opportunity.  But when a player *quits* the team, the school has provided an opportunity that the student elected not to use.  The difference lies in what the school can control versus what it cannot.  (*See* Breske Dep. 48-49 (explaining that students who quit "made the conscious choice to remove themsel[ves] from the roster.  We are not the ones removing them from the roster.").)  Similarly, the OCR has explained that it counts "actual athletes" rather than "unfilled slots, i.e., those positions on a team that an institution claims the team can support but which are not filled by actual athletes."  1996 Letter.  Students who are part of the team at the start of the season are actual athletes that the team supports and intends to continue supporting; they are not merely unfilled slots.

2d at 466.  Here, Plaintiffs do not contend that the members of the crew team who quit after the start of the season did not practice with the team.  Thus, *Biedeger* is distinguishable.

At any rate, even if MSU improperly counted rowers who quit shortly after the start of the season, its counting method would be more troubling if it counted male athletes in any sport differently from female athletes in this respect.  Plaintiffs have not shown that to be the case.

On the other hand, Plaintiffs are right to question whether the five women who quit *before* September 21, 2019, could be counted as participants.  They would not fall under any definition of participant in the 1979 Policy Interpretation or the 1996 Clarification.  Without these five athletes, there are 85 women on the squad list.  Accordingly, MSU potentially counted two female athletes who would not qualify as participants under Title IX. [11]  But that number is small enough that it would not meaningfully impact the Court's assessment of the participation gap.

Next, Plaintiffs contend that MSU overcounts women by adding to its participant count students who join the women's soccer and volleyball teams after their seasons end, while not doing the same for students who join the football team after the end of its season.  MSU responds that, unlike football, soccer and volleyball have countable intercollegiate events in the spring.  (Breske Suppl. Decl. ¶¶ 9-10.)  And MSU counts students who join the men's soccer team in the spring in the same manner that it counts students who join the women's team.  (*Id.*)  Plaintiffs offer no evidence to suggest otherwise.

Plaintiffs assert, without support, that there are no "official spring competitions for the women's volleyball and soccer teams"; instead, those teams have "informal scrimmages with other teams."  (Pls.' Suppl. Reply Br. 10.)  Here, Plaintiffs appear to be making a distinction between

---

[11] Perhaps by mistake, Plaintiffs' counsel asserted at oral argument that only *three* women quit the crew team before September 21, 2019.  Subtracting that number from the total in the squad list leads to MSU's participant count.

"official" and "informal" events, but the Court cannot discern what that distinction is or why it is relevant for counting participation opportunities under Title IX.  The OCR's guidance does not use those terms.

Plaintiffs also contend that the football team is large enough to scrimmage with itself in the spring, so MSU should have counted any men who joined the team before that scrimmage.  But such an event is clearly not an "intercollegiate" one, so including those men in the participant count would not be consistent with the 1996 Clarification, which defines a season according to intercollegiate events.

Finally, Plaintiffs allude to "discretion" that Breske exercises when deciding whether an athlete who has been *cut* from a team after the start of a season has received a genuine participation opportunity.  (*See* Pls.' Suppl. Reply Br. 7.)  Plaintiffs imply that she counted male and female athletes differently in this regard, but they offer no evidence to support that assertion.

In summary, the Court is not persuaded that MSU overcounts participation opportunities for women and undercounts opportunities for men.  With a possible exception for a couple of women on the crew team in the 2019-2020 season, MSU's numbers appear to be accurate.

*Natural Fluctuations*.  MSU urges the Court not to rely on the last two years of data showing participation gaps of 40 and 36 because those gaps resulted from "natural fluctuations" in its enrollment.  The OCR recognizes that "in some circumstances it may be unreasonable to expect an institution to achieve exact proportionality—for instance, because of natural fluctuations in enrollment and participation rates[.]"  1996 Clarification.  It provides the following example:

> If an institution's enrollment is 52 percent male and 48 percent female and 52 percent of the participants in the athletic program are male and 48 percent female, then the institution would clearly satisfy part one.  However, OCR recognizes that natural fluctuations in an institution's enrollment and/or participation rates may affect the percentages in a subsequent year.  For instance, if the institution's admissions the following year resulted in an enrollment rate of 51 percent males

and 49 percent females, while the participation rates of males and females in the athletic program remained constant, the institution *would continue to satisfy part one because it would be unreasonable to expect the institution to fine tune its program in response to this change in enrollment*.

*Id.* (emphasis added).

The numbers in Table 1 indicate that the higher participation gaps in the 2020-2021 academic year, as well as the following year, are somewhat attributable to "natural fluctuations" in enrollment. After the year in which MSU had a participation gap of 12, the participation rate for women dropped by about half a percent while their enrollment rate increased by 1 percent. *See* Table 1. In numerical terms, the number of male and female athletes from one year to the next changed very little. But together, the changes in the enrollment and participation rates resulted in a significant increase in the participation gap. Accordingly, MSU argues that its numbers were substantially proportionate until it experienced unexpected changes due to the pandemic. It argues that the Court should not require it to "fine tune" its programs to account for these changes.

A look further back in time provides context that undermines MSU's argument. According to MSU's EADA data, the participation gaps from earlier years look like the following:

Table 2: EADA Data for 2014-2015 to 2017-2018[12]

| Year | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 |
|---|---|---|---|---|
| **Total Students** | 35,038 | 35,425 | 35,280 | 35,249 |
| Men / Women | 17,257 / 17,781 | 17,376 / 18,049 | 17,245 / 18,035 | 17,314 / 17,935 |
| **Total Student Athletes** | 939 | 961 | 921 | 940 |
| Men / Women | 470 / 469 | 479 / 482 | 465 / 456 | 459 / 481 |
| **Participation Gap** | **15** | **16** | **30** | **- 6** |

---

[12] Lopiano provided this data in her report. (*See* Lopiano Rep. 20, ECF No. 2-14.) MSU has not offered its own data from these years. The Court uses the EADA data instead of Lopiano's web roster data because the EADA data is less speculative and appears to be closer to MSU's actual participation data. For instance, the EADA report for 2018-2019 shows 451 male athletes and 449 female athletes. (*See id.* at 22.) Those numbers are close to those in Table 1 (456 and 452, respectively). In contrast, when using web rosters, Lopiano counted 453 male athletes and only 439 female athletes for that year. (*Id.* at 35.)

These numbers do not tell the whole story because MSU has acknowledged that, before 2018-2019, it counted male practice players as female participants in its EADA reports.  (*See* Breske Decl. ¶ 23, ECF No. 8-2 ("Since 2018-19, men participating on women's teams as practice players have not been included as part of women's participation on any [EADA] reports as they are no longer required to be listed on an institution's squad list  and/or roster.").)  Adjusting the numbers in Table 2 to account for male practice players[13] results in the following participation gaps:

Table 3: Adjusted EADA Data for 2014-2015 to 2017-2018[14]

| Year | 2014-2015 | 2015-2016 | 2016-2017 | 2017-2018 |
|---|---|---|---|---|
| **Total Students** | 35,038 | 35,425 | 35,280 | 35,249 |
| Men / Women | 17,257 / 17,781 | 17,376 / 18,049 | 17,245 / 18,035 | 17,314 / 17,935 |
| **Student Athletes** | 939 | 961 | 921 | 940 |
| Men / Women | 470 / 469 | 479 / 482 | 465 / 456 | 459 / 481 |
| *Male Practice Players* | *17* | *21* | *20* | *23* |
| **Student Athletes (Adj.)** | 922 | 940 | 901 | 917 |
| Men / Women (Adj.) | 470 / 452 | 479 / 461 | 465 / 436 | 459 / 458 |
| **Participation Gap** | **32** | **37** | **50** | **17** |

The Court finds that Table 3 shows the likely participation gaps in the academic years beginning in 2014, 2015, 2016, and 2017.  Putting all the data together, the participation gaps for the last eight years are the following:

---

[13] In her report, Lopiano *estimated* the number of male practice *basketball* players using web rosters (Lopiano Rep. 21), but the *actual* numbers of *all* male practice players are in MSU's publicly available EADA reports.  *See* https://opb.msu.edu/functions/institution/equity-athletics.html.  The Court can take judicial notice of these reports and will use their numbers.  *See Anders v. Calif. State Univ., Fresno*, No. 121CV00179AWIBAM, 2021 WL 5040405, at *5 (E.D. Cal. Oct. 29, 2021).  And in any case, Lopiano's estimates are close to those in the EADA reports.

[14] The Court adjusted the EADA data by subtracting the number of male practice players from the number of female athletes and from the total number of all athletes.

<u>Table 4: Participation Gaps for 2014-2015 to 2021-2022</u>

| Year | Total Students | Male Students | Female Students | Total Athletes | Male Athletes | Female Athletes | Gap |
|---|---|---|---|---|---|---|---|
| 2014-2015 | 35,038 | 17,257 | 17,781 | 922 | 470 | 452 | **32** |
| 2015-2016 | 35,425 | 17,376 | 18,049 | 940 | 479 | 461 | **37** |
| 2016-2017 | 35,280 | 17,245 | 18,035 | 901 | 465 | 436 | **50** |
| 2017-2018 | 35,249 | 17,314 | 17,935 | 917 | 459 | 458 | **17** |
| 2018-2019 | 35,744 | 17,431 | 18,313 | 908 | 456 | 452 | **27** |
| 2019-2020 | 35,722 | 17,530 | 18,192 | 895 | 445 | 450 | **12** |
| 2020-2021 | 34,588 | 16,639 | 17,949 | 891 | 448 | 443 | **40** |
| 2021-2022 | 35,062 | 16,763 | 18,299 | 807 | 403 | 404 | **36** |

The numbers in Table 4 indicate that, over the last eight years, the participation gap has ranged from 12 to approximately 50, with an average of 31. In all these years, the gap disfavored women. Intuitively, one would expect natural fluctuations at a school complying with Title IX to result in some years where the gap disfavors men. That is not the case here, which suggests that MSU's recent participation gaps are only partially the result of natural fluctuations. *See Lazor v. Univ. of Conn.*, 560 F. Supp. 3d 674, 683 (D. Conn. 2021) ("UConn experienced participation gaps disfavoring females every year for the past 13 years. That trend indicates that natural fluctuations in the student body are not to blame for the participation gap."); *Robb v. Lock Haven Univ. of Pa.*, No. 4:17-CV-00964, 2019 WL 2005636, at *8 (M.D. Pa. May 7, 2019) ("While this could be termed a 'borderline case' in terms of raw statistics, a glance at Lock Haven's long history of Prong One nonsatisfaction reveals that gap cannot be attributed to natural fluctuations in the student body.").

MSU also contends that the Court should look only at the participation gap of 12 for the 2019-2020 academic year because that was the most recent year before MSU made its October 2020 decision to cancel the women's team. But because enrollment and participation numbers fluctuate every year, the Court must look at data from multiple years to determine whether MSU is complying with Title IX. Just as it might be unfair to use the unfavorable gap in 2020-2021 to assess MSU's compliance, it would be illogical to use a more favorable gap from any other single

year to do the same.  A long-term trend is a more reliable indicator of the true extent of the participation gap than a single year of data.

Furthermore, the salient issue in this case is not whether MSU's October 2020 decision to eliminate the men's and women's varsity swimming and diving teams amounts to discrimination on its own.  Instead, the issue is whether the elimination of that team subjected Plaintiffs to—and/or contributed to—an imbalance in athletic participation opportunities that already existed at MSU.  (*See* 2/19/2020 Op. 7 ("Plaintiffs are not challenging a gender imbalance in existence during the period in which they have been members of the swimming and diving team.  Instead, they seek to prevent the effects of a decision that will subject them to that imbalance.").)  A participation gap is not necessarily the result of any one decision.  It may be the result of many decisions over the course of several years.  Thus, the Court does not look solely at the data for 2019-2020.

On the present record, the Court finds that MSU's participation gap after accounting for natural fluctuation is around 31 opportunities for women, which is the average participation gap over the past eight years.

*Size of a Viable Team*.  The parties conceded at oral argument that the only viable team at issue is the varsity women's swimming and diving team.  Plaintiffs have not presented evidence of interest, ability, or available competition for any other women's team.  To determine whether the participation gap is larger than a viable varsity women's swimming and diving team, the Court must determine the size of such a team.  Plaintiffs' team had 34 members in 2018-2019 (ECF No. 8-2, PageID.357) and 37 members in 2020-2021 (ECF No. 89-14, PageID.1726).  MSU represents that the smallest swimming and diving team in the Big Ten Conference has 21 members.

(*See* Ex. 4 to Defs.' Suppl. Resp., ECF No. 93-5.)  The Court will use the latter as the size of a

viable swimming and diving team at MSU.

MSU contends that such a team is no longer viable because some of the former members

of the women's swimming and diving team have left the school or graduated.  MSU faults

Plaintiffs for providing affidavits from only 12 former team members who were still enrolled this

past year and who remained interested in competing.  However, the existence of that team in the

recent past provides strong evidence of interest, ability, and available competition at MSU:

> If an institution has recently eliminated a viable team from the intercollegiate
> program, OCR will find that there is sufficient interest, ability, and available
> competition to sustain an intercollegiate team in that sport unless an institution can
> provide strong evidence that interest, ability, or available competition no longer
> exists.

1996 Clarification.  Add to that evidence the existence of a club team at MSU that won the national

championship last year.  Based on the foregoing, Plaintiffs have shown there is sufficient interest,

ability, and available competition at MSU to sustain a viable women's swimming and diving team

of at least 21 members.

*Comparing the Size of a Viable Team to the Participation Gap.*  As indicated above, the

most recent participation gap is 36 athletes.  Over the long term, the average gap is around 31.

Both numbers are higher than 21.  By this measure, Plaintiffs have shown a substantial likelihood

of success.  In other words, they have shown a substantial likelihood that the participation gap at

MSU is higher than a viable varsity women's swimming and diving team.

### C. Irreparable Injury

Next, the Court considers whether Plaintiffs have shown the possibility of irreparable

injury in the absence of an injunction.  Although MSU has maintained Plaintiffs' athletic

scholarships, the discontinuation of their team has had significant impacts on Plaintiffs' collegiate

athletic experience.  Those Plaintiffs who still remain at MSU now lack an opportunity to compete

on a varsity team at a time when their school appears to offer proportionally more intercollegiate athletic opportunities for men than for women.  They have met their burden of showing irreparable harm.

### D. Substantial Harm to Others

The next factor is the harm to others from the injunction.  The parties apparently contend that continuing the women's swimming and diving team would cost approximately $1 million per year (around half the $2.07 million cost of maintaining both the men's and women's teams), not including unquantified "capital outlays" that would be necessary to upgrade and repair the swimming and diving facilities at some point in the future.  (*See* Beekman Decl. ¶ 5, ECF No. 8-6; *see also* Pls.' Reply Br. 18, ECF No. 13 (arguing that the annual cost of maintaining the women's swimming and diving team is "only $1,143,000").)  Reinstating the team would not necessarily cost the full $1.1 million per year because a portion of that amount includes scholarships to team members that MSU has already promised it would provide even after the team disbanded.[15]  If those team members with scholarships compete for the reinstated team, then some of the team's expenses are already included in MSU's current budget.[16]  Nevertheless, reinstating the team would be costly.

Plaintiffs argue that MSU will suffer little or no financial harm because it received large financial donations for other sports programs, which would be more than enough to cover the cost of maintaining Plaintiffs' team.  However, there is no evidence that those donations are available to MSU's general athletic budget and would be available to fund Plaintiffs' team.  According to Beekman, "recent and upcoming upgrades to MSU's football facilities" were "underwritten by

---

[15] Plaintiffs do not know the scholarship amounts.

[16] It is not clear whether MSU would need to offer new scholarships to new members of a reinstated team.

restricted donor gifts" and "are not being paid for from the athletic department's general funds." (*See id.* ¶ 7.)  In contrast, MSU's expenses for the swimming and diving teams were paid out of its general athletic budget.  (*Id.* ¶ 6.)

Plaintiffs assert that money is fungible and that a donation to any sports team at MSU would allow the school to shift funds to other teams.  That is not necessarily the case, however. Donations specifically allocated to new programs or improvements would not necessarily reduce the burden of ongoing operating expenses.  Although Plaintiffs have had the opportunity to obtain more information about these donations, Plaintiffs have not shown that they will offset the cost of an injunction.

Plaintiffs argue that financial hardship is not a defense to a Title IX violation, so the Court should conclude that any financial harm to MSU would be insubstantial.  This argument puts the cart before the horse.  The Court is not making a final determination on the merits of Plaintiffs' claims.  Instead, the Court is considering whether preliminary relief is warranted before a full trial. Financial harm to MSU is a relevant consideration at this stage because Plaintiffs might not succeed at trial.  Consequently, the Court must consider what impact a preliminary injunction will have on MSU and weigh that against other factors.  The record indicates that the financial impact of reinstating the team would be close to $1 million per year.

### E. Public Interest

The public interest would be served by reducing discrimination in the provision of athletic opportunities for women.

### F. Relief

On balance, the factors weigh in favor of a preliminary injunction, though not in the form requested by Plaintiffs.  Plaintiffs ask the Court to reinstate their team immediately.  MSU, on the

other hand, asks the Court to have it prepare a compliance plan within 90 days, should the Court find that preliminary relief is warranted.

The Court of Appeals indicated that "[a]t the preliminary injunction stage, the appropriate remedy when a school seeks to eliminate a women's team in violation of Title IX is typically an injunction that prevents them from doing so.  This is true even though, as a more permanent matter, a school may be entitled to determine its own method for achieving statutory compliance." *Balow*, 24 F.4th at 1061 (quotation marks and citations omitted).  The Court of Appeals also recognized that the appropriate remedy is a "'choice within the court's discretion'" and that this Court must decide that issue "in the first instance." *Id.* at 1062 (quoting *Cohen v. Brown Univ.*, 991 F.2d 888, 906 (1st Cir. 1993)).

As a general matter, the Court's relief "'should be no broader than necessary to remedy the harm at issue.'"  *United States v. Miami Univ.*, 294 F.3d 797, 816 (6th Cir. 2002) (quoted in *Mayerova v. E. Mich. Univ.*, No. 19-1177 (6th Cir. Mar. 28, 2019) (unpublished order)).  Here, Plaintiffs suffered harm by losing the ability to compete on their team.  But the specific harm that Title IX intended to prevent, and that Plaintiffs' injunction seeks to alleviate, is the harm caused by a disproportionate allocation of athletic opportunities to men.   If Plaintiffs ultimately demonstrate at trial that MSU has not complied with Title IX, that statute would not require MSU to maintain a varsity women's swimming and diving team, or any other sports team.  Title IX "provides institutions with flexibility and choice regarding how they will provide nondiscriminatory participation opportunities." 1996 Letter.  MSU could, for instance, "choose to eliminate or cap [men's] teams as a way of complying with part one of the three-part test." *Id.*; *see Horner*, 43 F.3d at 275 ("An institution need not pour ever-increasing sums into its athletic programs in order to bring itself into compliance, but has the option of reducing opportunities for

the overrepresented gender while keeping opportunities for the underrepresented gender stable."). Thus, if the Court were to find that Plaintiffs are entitled to relief at the conclusion of this case, then the Court would likely require MSU to create a plan to reach compliance.  The Court would hesitate to dictate where and how MSU should allocate its resources to provide equal athletic opportunities for women.  MSU is better positioned to manage its resources for the benefit of all its student athletes while complying with its legal obligations.  That is especially true here, where there is almost no evidence that MSU has intentionally evaded compliance with Title IX by artificially inflating the sizes of its women's teams, manipulating its rosters, or improperly counting athletes to present the appearance of compliance.

In *Cohen*, the court noted that "specific relief" (i.e., requiring a school to maintain or eliminate a particular sports team) is "most useful in situations where the institution, after a judicial determination of noncompliance, demonstrates an unwillingness or inability to exercise its discretion in a way that brings it into compliance with Title IX."  *See Cohen*, 991 F.2d at 907. MSU's actions do not suggest such an unwillingness or inability.  Instead, they suggest that it may have relied on certain metrics to determine compliance (e.g., the average size of a women's team) that some courts have used and that the Court of Appeals has only recently rejected.  Thus, an injunction requiring reinstatement of a particular team is less "useful" here.[17]

Also, in addition to the financial burden of reinstating the women's team, MSU would face several logistical hurdles if the Court required it to assemble a team to compete this coming season,

---

[17] Although *Cohen* was referring to a demonstrated unwillingness or inability to comply *after* a judicial determination of noncompliance, its logic about when specific relief is "most useful" readily extends to the preliminary injunction stage as well.  At any rate, this factor is one additional consideration that supports a compliance plan; in light of other factors, its absence would not change the outcome.

including recruiting team members, potentially hiring coaching staff,[18] and scheduling practices and competitions with other schools before the start of the season.  Some of those hurdles may prove to be difficult or impossible to overcome in so short a time period, adding to MSU's expense. The parties disagree on whether a speedy reinstatement is even possible, but the record is too thin for the Court to adequately assess that issue.[19]

Furthermore, for reasons indicated above, MSU's effort and expense could be wasted even if the Court ultimately finds in Plaintiffs' favor after a full trial.  That trial is currently scheduled for January 2023.  The Court expects to issue a decision on the merits of Plaintiffs' Title IX claims shortly thereafter.  If the Court were to conclude that MSU has not complied with Title IX due to a significant participation gap for women, then the Court would likely give MSU the freedom to decide whether to reinstate the women's swimming and diving team or to eliminate the gap in some other manner.  It makes little sense to require MSU to use its finite resources to temporarily reinstate the women's swimming and diving team where, even if Plaintiffs *succeed* on their claims, MSU could chart a different course in a few months' time.  Those resources are better spent on what is more likely to be a sustainable course of compliance over the long term.

Accordingly, the Court finds that the appropriate relief is to require MSU to submit a compliance plan to reduce or eliminate the existing participation gap for women.

---

[18] Plaintiffs indicate that two former swimming and diving coaches are still employed by MSU in other capacities (*see* Beekman Dep. 129, ECF No. 89-16), though MSU asserts that one of those coaches is set to retire at the end of the month.

[19] For instance, Plaintiffs did not indicate in their briefing when the season starts, and the parties made conflicting statements about that issue at oral argument.  Similarly, Plaintiffs have not indicated when teams generally finalize their schedules.  After oral argument, Plaintiffs submitted a letter and sworn declaration from the Executive Director of the College of Swimming & Diving Coaches Association of America, Samantha Barany.  (*See* Barany Decl, ECF No. 108-1.)  Barany avers that she contacted coaches of other teams in the Big Ten Conference, and those coaches "expressed a willingness to schedule the MSU Swim and Dive team during the 2022-23 season." (*Id.*, PageID.2028.) Only "one Big Ten program has published its schedule for the 2022-2023 season." (*Id.*) This declaration is hearsay, so its reliability is suspect.  And it suggests that one team has already scheduled its events.  It does not indicate when the others plan to do so.

### G. Bond

A court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  "While this language appears to be mandatory, 'the rule in our circuit has long been that the district court possesses discretion over whether to require the posting of security.'"  *Appalachian Reg'l Healthcare, Inc. v. Coventry Health & Life Ins. Co.*, 714 F.3d 424, 431 (6th Cir. 2013) (quoting *Moltan Co. v. Eagle-Picher Indus., Inc.*, 55 F.3d 1171, 1176 (6th Cir. 1995)).  *But see Ohlensehlen v. Univ. of Iowa*, 509 F. Supp. 3d 1085, 1105 (S.D. Iowa 2020) (requiring a bond in a similar Title IX case because courts in the Eighth Circuit "'almost always require[] a bond before issuing a preliminary injunction'" (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1043 (8th Cir. 2016))).

The Court declines to require security here.  Plaintiffs in this case are college students seeking to enforce their civil rights.  As students, they are unlikely to possess the means to pay security.  Moreover, by requiring MSU to submit a compliance plan, the Court gives MSU the flexibility to minimize the costs it will sustain from the preliminary injunction.

### H. Stay

Defendants also ask the Court to stay these proceedings while they appeal the Court of Appeals' decision to the United States Supreme Court.  The Court declines to do so because that would amount to a denial of all relief.  This case can proceed while Defendants pursue their appeal.

### V. Conclusion

For the reasons stated herein, the Court will grant Plaintiffs' motion for a preliminary injunction in part and require MSU to propose a Title IX compliance plan.

The Court will enter an order consistent with this Opinion.


Dated: August 8, 2022                              /s/ Hala Y. Jarbou
                                                   HALA Y. JARBOU
                                                   CHIEF UNITED STATES DISTRICT JUDGE